**In re RESORTS INTERNATIONAL, INC.,**
 **Resorts International Financing, Inc.**
 **Griffin Resorts Holding, Inc., Griffin**
 **Resorts, Inc., Debtors.**

Bankruptcy Nos. 89–10119, 89–10120,
89–10461 and 89–10462.

United States Bankruptcy Court,
D. New Jersey.

Aug. 16, 1990.

Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime by Robert A. Baime, Sharon L. Levine, Roseland, N.J., Gibson, Dunn & Crutcher by Stephen A. Kaplan, Bennett Silverman, Peter C. Rockwell, New York City, for debtors.

Shanley & Fisher by A. Dennis Terrell, Robert K. Malone, Morristown, N.J., Jones, Day, Reavis & Pogue by Marc S. Kirschner, Craig S. Gatarz, Peter Leib, New York City, for Combined Official Bondholder Committee of Resorts Intern., Inc. and Resorts Intern. Financing, Inc.

Wolff & Samson by Robert E. Nies, Roseland, N.J., Stutman, Treister & Glatt, P.C. by Kenneth N. Klee, Susan R. Purcell, Los Angeles, Cal., for Griffin Resorts, Inc., Noteholders Committee.

Gendel, Raskoff, Shapiro & Quittner by Bernard Shapiro, Sheri A. Bluebond, Los Angeles, Cal., for Merv Griffin.

Miller, Marvin, Dunham, Doering & Schreiber by Valerie J. Munson, Philadelphia, Pa., for Merv Griffin and Griffco Resorts Holding.

Willkie, Farr & Gallagher by Richard L. Posen, Myron Trepper, Sharon Schneier, New York City, for Trump Litigation defendants.

Wolf, Block, Schorr & Solis–Cohen by Marc L. Alderman, Philadelphia, Pa., for Trump defendants.

Schnader, Harrison, Segal & Lewis by Christine S. Levin, Philadelphia, Pa., for Bariscillo, Druz and Sviridoff.

Wilentz, Goldman & Spitzer by Anne S. Babineau, Francis X. Chiaffiotte, Woodbridge, N.J., for Housing Authority and Urban Redevelopment Agency of Atlantic City.

Leonard J. DiGiacomo, Asst. Counsel, State of N.J., Casino Control Com'n.

Mary Jo Flaherty, Deputy Atty. Gen., State of N.J., Div. of Gaming Enforcement.

Rosenman & Colin by Carl Diehl, New York City, for Drexel Burnham Lambert.

Greenfield & Chimicles by James R. Malone, Jr., Haverford, Pa., for Objectors to the Plan.

Fred Lowenschuss Associates by Fred Lowenschuss, Philadelphia, Pa., for Certain Resort Debentureholders including Fred Lowenschuss Associates Pension Plan, Fred Lowenschuss, trustee for Lawrence Lowenschuss, Edward Lowenschuss and Alan Lowenschuss and custodian for David Lowenschuss.

Mordecai Rosenfeld, P.C. by Mordecai Rosenfeld, New York City, for Kenwood Dual Fund, Ltd.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

Before the Court is the Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the United States Bank-

ruptcy Code ("the Plan") dated May 31, 1990 submitted by Resorts International, Inc., ("Resorts"), Resorts International Financing, Inc., ("RIFI"), Griffin Resorts, Inc., ("GRI") and Griffin Resorts Holding, Inc., ("GRH"), all debtors herein collectively referred to as "Debtors", together with Resorts International Hotel, Inc. ("RIH"), Griffco Resorts Holding, Inc., (formerly known as The Griffin Company) ("TGC"), and Merv Griffin ("Griffin"), collectively referred to as the "Proponents."

Objections to confirmation of the Plan have been filed by Mr. Arthur M. Friedman, C.P.A., ("Friedman"), Mr. Ernest L. Rahm, ("Rahm"), Greenfield and Chimicles, ("Greenfield"), June Linabury and Howard A. Linabury, ("Linabury"), Fred Lowenschuss Associates, ("Lowenschuss"), the Kenwood Dual Fund, Ltd., ("Kenwood"), the Housing Authority and Urban Redevelopment Agency of the City of Atlantic City ("the Authority"), The New Jersey Casino Control Commission, ("the Commission" or "CCC"), The State of New Jersey, Department of Law and Public Safety, Division of Gaming Enforcement ("the Division of Gaming"), and The Trump Litigation Group, ("Trump"). Hearings on Confirmation of the Plan were conducted on July 24, 25, 26 and 27, 1990. The following constitutes this Court's findings of fact and conclusions of law.

On November 12, 1989, involuntary petitions under Chapter 11 of the United States Bankruptcy Code ("Code") were filed against Resorts and RIFI.

On December 22, 1990, Resorts and RIFI consented to the entry of an order for relief pursuant to Chapter 11 of the Code. On that same date, GRI and GRH filed separate voluntary petitions under Chapter 11 of the Bankruptcy Code. Upon application of the Debtors, on December 22, 1989, this Court entered an order directing the joint administration and consolidation for administrative purposes only of the Resorts, RIFI, GRH and GRI Chapter 11 cases.

Resorts' Disclosure Statement dated May 31, 1990 ("Disclosure Statement") describes the Debtors and their operations as follows:

Resorts is a holding company which, through its subsidiaries, is principally engaged in the ownership and operation of the Resorts Casino Hotel in Atlantic City, New Jersey, and the Paradise Island Resort & Casino, the Ocean Club and the Paradise Beach Resort, all located on Paradise Island, The Bahamas.

RIFI is a wholly owned subsidiary of Resorts which was formed for the purpose of issuing the RIFI Debentures, payment of principal of and interest on which was guaranteed by Resorts. The proceeds from the sale of the RIFI Debentures were primarily used to fund the construction of the Taj Mahal casino and hotel project. Except for various intercompany loan transactions related to the funding of the Taj Mahal and the acquisition of Resorts by The Griffin Company ("TGC"), now renamed Griffco Resorts Holding, Inc., in November 1988 (the "Acquisition"), RIFI has not engaged in any business or incurred any indebtedness other than the issuance of the RIFI Debentures.

GRH is a wholly owned subsidiary of Resorts which was formed in connection with the Acquisition. Except for participating in certain intercompany loan transactions in connection with the Acquisition and owning all of the stock of GRI, GRH has not engaged in any business or incurred any indebtedness since its organization.

GRI was formed in connection with the Acquisition for the purpose of issuing the GRI Notes. The GRI Notes are secured by certain collateral, including a first mortgage on the Resorts Casino Hotel in Atlantic city and (in the case of the Reset Notes) a $50,000,000 first mortgage on certain of Resorts' Bahamian operating properties and a pledge of 66% of the capital stock of Resorts International (Bahamas) 1984 Limited ("RIB") which, through its subsidiaries, owns all of the Debtors' consolidated assets in The Bahamas. RIB is a wholly owned subsidiary of GRI.

Resorts' Disclosure Statement Dated as of May 31, 1990 Pursuant to Section 1125 of the Bankruptcy Code, III General Information, A. Corporate Structure, page 7 (D–9).

Prior to the entry of an order for relief in these Chapter 11 cases, Resorts had issued three series of subordinated debentures in the aggregate original principal amount of approximately $380 million (the "RII Debentures"). RIFI, a wholly-owned subsidiary of Resorts, issued one series of subordinated debentures in an original principal amount of approximately $200 million, which Resorts guaranteed as to principal and interest (the RIFI debentures). In addition, GRI, a second tier wholly-owned subsidiary of Resorts issued in 1988 two series of senior secured notes in the aggregate original principal amount of $325 million ("GRI Notes") which were secured by *inter alia,* liens on and security interests in assets of Resorts' subsidiaries, which own and operate the Atlantic City and Paradise Island casino and hotel properties. Because of shortfalls between their debt service requirements and income from operations, the Debtors on August 28, 1989 announced a proposed reorganization and a moratorium on the payment of interest on the RII/RIFI Debentures and GRI Notes. In the fall of 1989 two unofficial committees were formed to represent the interests of the RII/RIFI Debentures and the GRI Noteholders. After the institution of involuntary bankruptcy proceedings against Resorts and RIFI on November 12, 1989 and the consents by Resorts and RIFI to the entry of orders for relief under Chapter 11 and the filing of voluntary Chapter 11 petitions by GRI and GRH on December 22, 1989, official committees were formed. In January of 1990, the United States Trustee formed two separate official committees to represent the RII/RIFI Bondholders and the GRI Noteholders respectively.

On December 22, 1989 the Debtors filed a Joint Plan of Reorganization. On April 16, 1990 the Debtors filed an Amended Plan of Reorganization together with a Disclosure Statement. Thereafter, the Debtors filed a Second Amended Joint Plan of Reorganization dated as of May 31, 1990 and Disclosure Statement. The Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code to Accompany Debtors' Second Amended Joint Plan of Reorganization Dated as of May 31, 1990 was approved by this Court by Order dated June 14, 1990. That joint plan is presently before the Court for approval.

A basic overview of the Plan which represents a complete reorganization of the Debtors' capital structure and a substantial restructuring of claims of the Debtors' secured and unsecured creditors and the extinguishment of existing equity interests is necessary. As set forth at length in the Debtors' Memorandum of Law in Support of Confirmation, the Plan's basic concepts are as follows:

A. Existing RII/RIFI Debentures and GRI Notes representing an aggregate face amount of approximately $931 million will be cancelled.

B. Existing equity interests in Resorts will be cancelled.

C. RII/RIFI Debentureholders and GRI Noteholders will be issued a combination of the following:

1. Series A Notes (to GRI Noteholders) and Series B Notes (to RII/RIFI Debentureholders) in an aggregate principal amount of approximately $329 million. Terms of the Series Notes which differ significantly from those of the RII/RIFI Debentures and GRI Notes include:

 a. The Series Notes will mature on April 15, 1994. Currently, the RII Debentures mature in 1998, 1999, and 2013; the RIFI Debentures mature in 2004; and the GRI Notes mature in 1995 and 1998.

 b. The Series A Notes will bear interest at 6% per year from April 11, 1990 until April 15, 1991, increasing to 9% in the second year, 12% in the third year, and 15% in the fourth year. The Series B Notes will bear interest at 11% per year from May 8, 1990 until April 15, 1991 and thereafter at 15% per year until maturity. Currently the RII Debentures bear interest at 10%, 10%, and 11-3/8% per year; the RIFI

Debentures bear interest at 16-5/8% per year; and the GRI Notes bear interest at 13-1/2% and 13-7/8%.

c. New Resorts may pay some or all interest due on the Series Notes by issuing additional Series Notes and is not generally required to make any cash payment on the Series Notes until April 15, 1994.

d. The Series Notes will be secured by substantially all the assets of New Resorts, excluding the Showboat Collateral. Previously the RII/RIFI Debentures were unsecured and the GRI Notes were secured by fewer assets.

2. Showboat Notes will be issued by New Resorts to GRI Noteholders in an aggregate principal amount of approximately $105 million and secured by the Showboat Collateral. The Showboat Notes will mature on June 30, 2000 and will pay interest by pass-through of lease payments received by New Resorts under the Showboat Lease. The Showboat Notes will be issued without recourse against New Resorts.

3. Shares of New Resorts representing approximately 76% of the equity in the reorganized corporation will be tendered to electing RII/RIFI Debentureholders. Shares representing 2.5% of New Resorts' equity will be issued to GRI Noteholders.

D. Global settlement of all potential litigation, including fraudulent conveyance, preference, substantive consolidation, and equitable subordination causes of action arising out of the 1988 acquisition of Resorts by Griffco Resorts Holding Inc. (formerly The Griffin Company ("TGC")) (the "Acquisition Claims") in the following manner:

1. The Debtors will release Griffin, TGC, and their affiliates from all Acquisition Claims.

2. Resorts, RIFI, GRI, and GRH will release all Acquisition Claims each Debtor entity may have against another.

3. The RIFI Debentureholders and GRI Noteholders will have the option to provide voluntary releases of all Acquisition Claims against Griffin, TGC, and their affiliates in exchange for:

(i) 500,000 shares of New Resorts shares to be distributed to those GRI Noteholders giving voluntary releases to Griffin. The shares are to be issued by Resorts in exchange for $2,654,000 in cash to be paid by Griffin to Resorts;

(ii) up to $2,500,000 to be distributed on a pro-rata basis to RIFI Debentureholders giving voluntary releases to Griffin.

E. Payments by Griffin for shares of New Resorts and voluntary releases from the RIFI Debentureholders and GRI Noteholders as follows:

1. Griffin will provide $26 million of cash and notes backed by letters of credit to be paid to and for the use by New Resorts.

2. Griffin will perform services for New Resorts and grant license to use his name and likeness to promote New Resorts operations, all without charge.

3. Griffin will serve as chairman of the Board of Directors of New Resorts, without charge.

4. Griffin will be issued shares representing 21.5% of New Resorts' Equity.

F. Transfer of the claims of the Debtors' estates to a trustee to prosecute any claims i.e. the estates may have against Donald Trump and his affiliates arising out of the Acquisition as follows:

1. A Litigation Trust will be created to prosecute such claims for the benefit of RII/RIFI Debentureholders.

2. Litigation expenses will be funded by an initial $5 million payment by New Resorts.

3. Any recoveries on such claims will be distributed to holders of class 3B and 3C claims including RII/RIFI Debentureholders.

As noted above, the Plan embodies a complete reorganization of the Debtors' capital structure, substantially restructuring the claims of the Debtors' secured and unsecured creditors, and extinguishing the existing equity interests. The Plan provides for (1) a comprehensive capital re-

structuring that will leave the Reorganized Debtors with less than one-half of their existing level of debt, in conjunction with (2) a global settlement of all potential litigation, including fraudulent conveyance, preference, substantive consolidation, and equitable subordination causes of action arising from or related to the acquisition of control of the Debtors in late 1988 (the "Acquisition") by Griffco Resorts Holding Inc. (formerly The Griffin Company ("TGC")), as against (i) Merv Griffin, TGC, and certain of their affiliates, (ii) GRI Noteholders, and (iii) the Debtors, (3) the issuance of shares of common stock of New Resorts to Bondholders, and (4) payment by Griffin in consideration for receiving a sizeable quantity of New Resorts' common stock.

As a part of the transactions contemplated by the Plan, Griffin will, among other things, (1) enter into the License and Services Agreement, requiring Griffin to serve as Chairman of New Resorts' Board of Directors and granting New Resorts a license to use Griffin's name and likeness, (2) waive his $10 million claim for subrogation with respect to a letter of credit drawn to pay interest on the Mortgage Notes, (3) contribute all of the stock of TGC to New Resorts by means of a merger of TGC into a newly created subsidiary, and (4) concurrently contribute approximately $23.3 million in cash and a note in exchange for approximately 21.5% of the capital stock of New Resorts.

Griffin will also (1) create a $2.5 million fund in which RIFI Debentureholders can share by volunteering to exchange releases with Griffin and others, and (2) pay approximately $2.6 million to create a fund of approximately 2.4% of the capital stock of New Resorts in which GRI Noteholders can share by volunteering to exchange releases with Griffin and others.

In consideration for the release of all of the Debtors' direct and derivative claims against them, the GRI Noteholders (Classes 2A and 2B) will receive new secured debt with a present value that is less than the aggregate amount of their existing claims, and the collateral for the bulk of which will be shared on a *pari passu* basis with the new secured debt to be issued to the RII and RIFI Debentureholders under the Plan.

The RIFI Debentureholders (Class 3B) and the RII Debentureholders and general unsecured creditors (Class 3C) will receive new secured debt with an aggregate face amount of approximately one-fourth of the aggregate amount of their existing unsecured claims, approximately 76% of the capital stock of New Resorts, and beneficial rights to the proceeds of the Litigation Trust established to pursue claims that the Debtors may have against the Trump Litigation Defendants.

The Plan's treatment of the remaining claims and interests follows: all claims against the Debtors arising out of or related to the Acquisition (whether in connection with pending securities fraud litigation (Classes 4A and 4B), requests for appraisal of shares (Class 6), or otherwise) and all other subordinated claims (Class 4C) will be extinguished; all Intercompany Claims (Class 5) will be extinguished; all existing equity interests in RII (Class 7) will be extinguished; RIFI and GRH will be merged into New Resorts, leaving the equity interests in RIFI and GRH (Classes 8 and 10) unimpaired; GRI will become a wholly owned subsidiary of New Resorts, leaving the equity interests in GRI (Class 9) unimpaired; all secured claims other than those based on the GRI Notes (Classes 2C, 2D, 2E, 2F, and 2G) will be left unimpaired; and all small (Class 3A), priority (Class 1), administrative, and tax claims will be paid in cash and in full in compliance with the requirements of the Bankruptcy Code.

The Housing Authority and Urban ReDevelopment Agency of the City of Atlantic City filed an objection to Debtors' Plan on July 18, 1990. A summary of the Authority's objection as originally filed is as follows:

1. Debtors seek to defer the assumption or rejection of its Agreement with the Authority until sometime after Debtor's confirmation in violation of § 365(d)(2) of the Code.

2. The Plan is not feasible in violation of § 1129(a)(11) and is likely to be followed by liquidation or the need for further financial reorganization.

To the extent that Resorts' Plan proposes to reserve a right to assume or reject the Agreement, the Plan is deficient as it fails to provide a means for that aspect of plan implementation pursuant to 11 U.S.C. § 1123(a)(5) and fails to provide adequate assurance of future performance as is required by 11 U.S.C. § 365(b)(1)(C) in the case of assumed executory contracts.

To the extent the Resorts' Plan proposes to reserve a right to reject the Agreement, the Plan is deficient because it fails to provide a means to pay the Authority's damages for rejection of the Agreement.

3. The Plan violates § 1123(a)(4) as it discriminates against the Authority, and does not provide the same treatment for each claim or interest of a particular class.

On July 24, 1990, the first day of the confirmation hearings, the Debtors and the Authority submitted to the Court a proposed Stipulation resolving all issues including the litigation pending in this Court between the parties [1] and the objections of the Authority to Debtors' Plan of Reorganization. That litigation involved a Contract for the Sale of Land for Private Redevelopment, subsequently amended, ("Agreement" or "Contract") which Resorts on October 22, 1976 entered into with the Housing Authority. Pursuant to the terms of the Agreement, Resorts had a series of options to purchase parcels of the Uptown Urban Renewal Tract ("UURT") in Atlantic City, New Jersey and develop these parcels in accordance with the Agreement. At the time of the inception of these proceedings, the Debtors utilized a portion of the subject property for parking. (Transcript of Confirmation Hearing, July 24, 1990 at pp. 9–20) (hereinafter "TR1 at ——"). In summary the Stipulation provides that: the parties agreed to extinguish the injunction previously entered by this Court which enjoined the Authority from interfering with Resorts' use and occupancy of the property; the Debtor has rejected the contract (the subject of the litigation); except as provided in the Stipulation, the Authority will not assert any claim in these proceedings against the Debtors; [2] general releases as between the parties will be exchanged inclusive of all claims arising out of the Agreement; the debtor will pay the real estate taxes for the property through December 31, 1990; to the extent that the Debtor occupies the property between this time and December 31, 1990, the Debtor will pay a pro rata share of the administrative fee for the property which has an annual cost of $210,000 per year; the Debtor will have the opportunity to quit the premises on 30 days written notice; Resorts agrees to pay the Authority the sum of $200,000.00 on or before January 1, 1991, which is anticipated to be used by the Authority and/or Atlantic City in connection with the redevelopment and remarketing of the Tract; the Authority is holding $100,000.00 as a deposit on account of the Agreement and this amount will be credited as against the aforesaid $200,000.00 payable by Resorts at the end of 1990. (TR1 at 10–12). Upon review and approval of the Stipulation of Settlement and the proposed form of order by counsel for the GRI Noteholders Committee and counsel for the combined official Bondholders' Committee, this Court entered an order approving the Stipulation of Settlement. (TR1 at 20).

On July 18, 1990, separate objections to the Debtors' Plan of Reorganization were filed by The New Jersey Casino Control Commission ("CCC") and the Division of Gaming Enforcement. The Division of Gaming concurred in the objection submitted by the Commission.

A summary of the Commission's objections are as follows:

---

1. That adversary proceeding is entitled, *Resorts International, Inc. v. Housing Authority and Urban Redevelopment Agency of the City of Atlantic City,* Adversary No. 90–1054.

2. The Housing Authority had filed a proof of claim in the amount of $34,365.68 plus an unliquidated damage claim. The Housing Authority in its ballot purported to vote a $56 million claim.

1. The Plan purports to confer jurisdiction on this court that is beyond the Congressional limits of the Bankruptcy Court's jurisdiction. Specifically, the Commission objects to the following provisions of the Plan:

(a) Section 11.1(1) which provides that "Following the Effective Date, the Bankruptcy Court will retain jurisdiction of the Reorganization Cases ... to hear and determine all issues relating to, and issue any necessary orders with respect to, the CCC, the Bahamas Gaming Board, and any other governmental or regulatory agencies or instrumentalities."

(b) The Plan also provides that the Commission's approval of the Plan is a waivable condition precedent to the effective date of the Plan. [Plan § 12.2(iii)].

(c) The Commission objects to certain language contained in the Plan and proposed confirmation order. The Plan provides that following the Effective Date, the Bankruptcy Court will retain jurisdiction of the Reorganization Cases:

" ... to hear and determine applications for orders sought pursuant to Section 7.23 hereof. Plan, § 11.1(m). Section 7.23 of the Plan provides as follows:

From and after the Effective Date, any of the Proponents may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by this Plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of this Plan, pursuant to Bankruptcy Code § 1142(b)."

The form of proposed confirmation order provides that:

The Court shall retain jurisdiction over the Debtors' Chapter 11 cases and any subsequent bankruptcy filing by any of the Reorganized Debtors in accordance with the provisions of Article XII [sic; should be 'XI'] of the Plan and Section 1142 of the Bankruptcy Code.

The proposed confirmation order also provides:

Pursuant to 28 U.S.C. § 157(b)(3), the Confirmation Hearing and all matters adjudged and decreed in this Order shall be deemed to be core proceedings under 28 U.S.C. § 157(b)(2).

Also, on the first day of the hearing on confirmation, the Debtors, the Commission and the Division of Gaming agreed to the settlement of the Commission's and Division of Gaming's objections to the Plan. (TR1 at 23–28). (D–1). The parties agreed that there would be no amendment to Article 11 of the Plan dealing with the jurisdiction of this court over matters concerning the New Jersey Casino Control Commission, but rather certain language would be inserted into the confirmation order. (TR1 at 25–28). That language preserves the objections of the CCC and the Division of Gaming to this Court's exercise of jurisdiction and allows such objections to be raised at such time, if any, in an adversary proceeding or other proceeding that may involve the CCC or Division of Gaming. (D–1).

The remaining objections filed in response to the Plan are as follows.

*ARTHUR M. FRIEDMAN, C.P.A.,*—Objection filed on July 6, 1990.

Arthur M. Friedman by his objection states that he is the holder of Resorts' 11–⅜% subordinated debentures due in the year 2013.

A summary of Mr. Friedman's objection to confirmation of the Plan is as follows:

1. Friedman objects to the provision of the plan which provides for a release of Merv Griffin from lawsuits by the debtor company and by the bondholders. Friedman objects to the plan on grounds that (a) Griffin is exchanging inadequate consideration for the releases; and (b) Griffin was the principal cause of the deterioration of Resorts' operations to the point where the original Resorts' debt could no longer be serviced.

2. Under the Plan, Griffin is being offered 21.5% of the common stock of "The New Resorts" for a payment of $23,000,-

000.00; which amount "is well below the true value of such an interest."

3. The employment agreement with David P. Hanlon, President of Resorts is a form of "unjust enrichment" in his favor and is detrimental to all classes of bondholders.

4. The Plan fails to assign a market value to the combination of bonds and the stock package being offered to the Resorts bondholders. Friedman claims that bondholders have no way of evaluating the package without an estimated market value of the exchange package being offered on a per $1,000.00 bond par value basis of the old bonds.

5. Friedman asserts that the section of the Plan dealing with alternative plans and liquidation under Chapter 7 is a "deliberate attempt to frighten bondholders into not pursuing these alternative or approaches." Friedman cites as an example Exhibit "D" to the Disclosure Statement which places a gross liquidation value of $15 million on the Atlantic City undeveloped real estate. Friedman claims that in October 1988, at a hearing before the CCC, Griffin and his appraisal experts valued this same property at $140–160 million.

6. Friedman objects to the section of the Plan which calls for the appointment and compensation of a member of the bondholders committee to serve as an Advisory Director to New Resorts on the basis that this action constitutes a waste of corporate funds.

*Ernest L. Rahm*—Objection filed on July 10, 1990.

Mr. Rahm, identified in the objection as a former shareholder of Resorts, asserts that the Plan unfairly discriminates against the rights of "the small investor."

*Greenfield and Chimicles*—Amended Objection filed on July 17, 1990; Objection filed on July 10, 1990.

Greenfield and Chimicles objects to Confirmation of Resorts' Plan based on the following:

1. The Plan provides for the abandonment of property of the estate (various claims against Merv Griffin) without any showing that the claims against Griffin are burdensome or of inconsequential value to the estate as required under § 554.

2. The Plan violates 11 U.S.C. § 1122(a) by classifying claims which are not "substantially similar." The Objector's claims arise out of a signed Amended Stipulation and Agreement of Compromise and Settlement entered into by certain shareholder litigation in the Chancery Court for the State of Delaware and the United States District Court for the District of New Jersey, pursuant to which Objectors provided Donald Trump with a "broad" release from any future claims arising out of his ownership of Resorts or its acquisition by Griffin. The Objectors object to the classification of their claims with the claims of creditors who have not granted a release to Trump since that class of claimants are to receive an interest in a litigation trust established under the Plan to prosecute claims against Trump which arose out of his ownership of Resorts and its acquisition by Griffin.

3. The Plan violates § 1123(a)(4) as it fails to treat claims of a particular class equally. In view of the release given to Trump by the objectors, objectors' claims will not be treated the same as other class 3C creditors since in view of the release, Objectors may be estopped to participate in the Litigation Trust or to receive any proceeds from the Litigation Trust while the other class 3C members who have not given Trump a release will be given an interest in the trust under the Plan to prosecute claims against Trump.

4. Resorts has failed to comply with the applicable duties of a trustee under 11 U.S.C. § 1107. Specifically, Resorts is required to manage its property in accordance with the requirements of applicable state law pursuant to 28 U.S.C. § 959(b). The Objectors assert that Resorts has elected to release claims against an officer, director, and principal shareholder without review by independent, disinterested directors or a shareholder vote in violation of applicable law.

5. The Plan was not proposed in good faith in violation of 11 U.S.C. § 1129[a](3).

a. The Plan provides for a release of Griffin which was approved by the GRI Noteholders Committee because the GRI Noteholders were to receive a release from claims under §§ 544, 547, and 548 of the Bankruptcy Code.

b. The Combined Official Bondholder Committee of Resorts International Inc. and Resorts International Financing Inc. (RIFI) approved releases of Griffin and GRI Noteholders as the release of the GRI Noteholders avoided the possibility that the subordination provisions of the Resorts and RIFI Bond Indentures would be triggered.

c. The Plan is a product of self dealing by Merv Griffin.

6. The Plan has been proposed by means forbidden by law in violation of § 1129(a)(3) as the Disclosure Statement fails to provide adequate information with respect to the Plan, more particularly the conflicts of interest of the GRI Noteholders and the Combined Bondholders Committees.

7. Griffin's continuation in office is not consistent with the interest of creditors and equity shareholders as he lacks "experience and business accumen to manage Resorts' affairs and has previously managed Resorts in a self interested manner."

The objectors claim that Griffin may not qualify for and maintain a casino license under the Casino Control Act based on provisions of N.J.S.A. § 5:12–84 dealing with "character, reputation ... business, professional and personal associates."

8. Under the Plan, holders of claims will not receive property of a value, as of the Effective Date of the Plan, that is not less than the amount such holders would receive upon liquidation under Chapter 7.

9. Confirmation of the Plan is likely to be followed by the need for further financial reorganizations by the debtors.

10. Under the Plan, Griffin will receive and retain an interest in the debtors even though unsecured creditors will not be paid in full.

*June and Howard Linabury* —Objections filed on July 11, 1990 and July 16, 1990, respectively.

Objectors by their objection state that they own $25,000.00 of the RIFI Notes bearing interest at 16–5/8% due 2004.

The objections to the Plan are as follows:

1. Objectors' investment will be "almost worthless" if the Plan is approved.

2. "The timing of the presentation of the Plan and time allowed the creditor to contact advisors or absorb it themselves is too short and only favors the debtors." In fairness to creditors, the hearing should be postponed for a month.

3. Objection is made to the fact that the record dates of purchases will not be considered under the Plan, and that holders will be reimbursed equally without regard to the record date of purchases.

4. The Objectors assert that fraudulent conveyances were involved in the purchase by Griffin.

5. Objectors disagree with the appointment of Griffin as Chairman of the Board of Directors of New Resorts.

6. The Objectors object to the treatment of all bondholders equally. The Objectors propose that the bondholders should be classified as
 A. Pre–Griffin
 B. Post–Griffin
 C. Post–Bankruptcy

7. Objectors suggest the following alternatives to the Plan:
 "The amount of stock that is issued and the units of the litigation trust should be divided on a pro rata basis, considering the Class of their holdings. What has been offered is grossly unfair since the GRI bonds should not have been issued in the first place considering the collateral involved."

*Fred Lowenschuss et al.* —Objection filed on July 11, 1990.

This objection was filed on behalf of holders of Resorts' debentures that objector represents individually as trustee and/or in any other capacity, including Fred Lowenschuss Associates Pension

Plan, Fred Lowenschuss, Trustee for Lawrence Lowenschuss, Fred Lowenschuss, Trustee for Edward Lowenschuss, Fred Lowenschuss, Trustee for Alan Lowenschuss, and Fred Lowenschuss, Custodian for David Lowenschuss, and/or in his custodian capacity for others. Lowenschuss incorporated the objections of all other parties to confirmation not inconsistent with these additional objections.

1. The Plan is unfair to the holders of RIFI 16–5/8% debentures due 2004.

2. The Plan is unfair to the other Resorts debenture holders including 10% debentures due 1998, 10% debentures due 1988 and 11–3/8% subordinated debentures due 2013.

3. The Plan is improperly preferential to holders of Griffin Resorts, Inc. 13–7/8% mortgage notes due May 1, 1998 and holders of Griffin Resorts Inc. 13–1/2% Senior Secured Reset Notes due November 1, 1995.

4. The disclosure was inadequate here, incorporating previously filed objections to the Second Amended Disclosure Statement.[3]

**3.** Lowenschuss in his objection to confirmation reiterates these objections as follows:

"... Lowenschuss claims that the Disclosure Statement is slanted towards an acceptance of an inadequate offer to bondholders, and fails to outline all the options available to Resorts and Resorts' bondholders, specifically claiming that the Disclosure Statement fails to outline all the options to bondholders, fails to indicate that the five million dollar litigation trust set aside under the plan by Resorts for the benefit of RII and RIFI debenture holders for all claims of debtors and their affiliates against Trump Taj Mahal Associates Limited Partnership, Donald Trump, Harvey Freedman, Robert Trump and Trump Hotel Corp. could be used to establish claims against GRI to vacate the preference position as secured creditors which would result in the Resorts bonds being paid prior to any payments being made to GRI bonds, and against Merv Griffin and the Griffin Companies for certain funds identified as the 50 million dollars borrowed according to the objection from Resorts which contributed to insolvency and bankruptcy; and against the law firm of Gibson, Dunn & Crutcher for what the objection states is aiding and abetting and structuring the leveraged buy out in such a fashion as to act as fraud upon Resorts bondholders by rendering Resorts insolvent and with insufficient capital to make interest and principal payments.

"Lowenschuss also asserts that the Disclosure Statement fails to set forth that there is an equal if not better likelihood of success against GRI in subordinating its bonds to Resorts bondholders than there is for a success in litigation against the Trump entities.

"Further, that the Disclosure Statement fails to disclose that there is a similar likelihood of success against Griffin and Griffin Companies; a similar likelihood of success against Griffin and the Trump entities; and that the Disclosure Statement fails to disclose Donald J. Trump and his entities' financial condition; fails to set forth the lack of the Board of Directors and efficient management; fails to address the propriety, impropriety and legality of the Debtors' release of Griffin without adequate consideration; fails to outline a conflict of interest of the law firm of Gibson, Dunn and Crutcher and monies paid to it from the Debtors or Griffin Companies. Fails to set forth the effect of the absolute priority rule on Griffin's new capital contribution; and is improper and unfair, if not false in implying that litigation against the Trump interest would not be disruptful to the Debtors but litigation against Griffin would be.

"Lowenschuss also objects to the Disclosure Statement insofar as it seeks quick approval and is slanted and prepared to benefit Griffin and its entities. Lowenschuss also asserts that the Disclosure Statement fails to acknowledge that the Debtor can be sold as a going concern and maximum profits obtained. That the Disclosure Statement falsely states or creates or implies that in the event quick acceptance of a 'cramdown' is not made, the casino license will be lost. That the statement fails to set forth the arrangement and agreement between Griffin and Trump, including failing to disclose that Mr. Griffin was the master of ceremonies at the opening of the Taj Mahal. That the Disclosure Statement further fails to set forth that the Lowenschuss motion pertaining to a conflict of interest by Gibson, Dunn and Crutcher is on appeal to the United States District Court. That the Disclosure Statement also fails to set forth that William Jacobs, identified as vice-member of the ad hoc creditors' committee in September of 1989, influenced and controlled the action of the committee and employment of counsel while evidently representing and owning no bonds.

"Lowenschuss also states that or objects to statements made that certain major bondholders of Resorts reached basic understanding in November of 1989 in regard to the major economic terms for restructuring; and that the Disclosure Statement fails to explain how Mr. Marc Kirschner of the firm of Jones, Day, Reavis and Pogue orchestrated and formed the ad hoc committee of Resorts bondholders, or that the committee is not interested in protecting long-term bondholders' interests.

5. The litigation trust should be utilized to pursue claims against Merv Griffin, the officers and directors, including the independent directors George Barascillo, Jr. William Druz and Mitchell Svirdorff as well as other non-bankrupt entities and persons including lawyers, accountants, appraisers and the advisors.

6. The court should refuse to release all non-debtor entities in accordance with this Court's opinion in *Elsinore Shore Associates,* 91 B.R. 238 (Bankr.D.N.J.1988).

7. Voting on the Plan was not fair and even-handed and should not be considered by the court for the following reasons:

a. The public security holders were not given the benefit of the objections to the Disclosure Statement and/or the objections to the Confirmation of the Plan as filed in this Court.

b. Any person who fails to submit a vote and/or who submits a vote which is not completely in accordance with the instructions is deemed to have accepted the Plan.

c. There were mailings and contacts made to Resorts bondholders besides those authorized by this court.

d. During the past year Resorts bonds have been purchased at distress prices by various parties who are attempting to obtain approval of the Plan for a quick profit on their investment.

e. The court should require the debtor to disclose the votes received from the long term Resorts bondholders who accepted the Plan by fully and properly completing the ballot for acceptance.

8. The Court should not approve control of the debtor to be placed with Griffin and/or the law firm of Gibson, Dunn & Crutcher, co-counsel for the debtors, because they have mismanaged the debtors to date and caused the bankruptcy.

9. The court should permit open bids from investors and/or the general public to compete with Griffin's offer for shares of New Resorts.

10. Griffin is being permitted to retain control and a major share of the common stock of the New Resorts in violation of 11 U.S.C. § 1129(b).

11. The creation of an advisory board member to the New Resorts Board of Directors serves no useful purpose and wastes $75,000.00 or more annually.

12. The employment and compensation agreements as outlined in the disclosure statement are excessive as well as the commission to be paid on sale of properties including the Paradise Island properties.

*Kenwood Dual Fund, Ltd., et al.*[4]—Objection filed July 18, 1990.

The Objectors, in the aggregate, are holders of (a) debtor Resorts International, Inc.'s 10% Subordinated Debentures due 1998, 10% Subordinated Debentures due 1998, 10% Subordinated Debentures due 1999, and 11-3/8% Subordinated Debentures due 2013, and (b) debtor Resorts International Financing, Inc.'s 16.625% Subordinated Debentures due 2004, which were generated by Resorts.

Movants had commenced four separate actions[5] in the Supreme Court, New York County, individually and in the aggregate on behalf of all subordinated bondholders of Resorts International, Inc. and Resorts International Financing, Inc. (both herein-

---

"Lowenschuss also asserts that the statement fails to fully and adequately set forth the rights and the position of the RIFI bondholders and fails to set forth a scenario where the assets and business of the Debtors could be marketed as a going concern." (Pages 28–32 of the Transcript of the Opinion of the Court, June 4, 1990, Approving Disclosure Statement).

**4.** The objectors are Kenwood Dual Fund, Ltd., The George S. Kolbe Target Benefit Pension Plan, George S. Kolbe, trustee, Paul D. Fisher, Jack Shulman, Leonard J. Hanlein, and D. Campbell, G. Frank, R. Frank, and D. Frank,

trustees f/b/o Shirley Frank dated 6/9/78 ("Kenwood").

**5.** The four suits are:

(a) Kenwood Dual Fund, Ltd. v. Resorts International, Inc., Index No. 88/17769;

(b) The George S. Kolbe Target Benefit Pension Plan, et al. v. Resorts International, Inc., et al., Index No. 88/22270;

(c) D. Campbell, et al. v. Resorts International Inc., et al., Index No. 89/20394;

(d) Jack Shulman, et al. v. The Griffin Company, et al., Index No. 89/20648.

after referred to as "Resorts" or "debtors"), against Griffin, Donald Trump ("Trump") and other related entities, asserting the fraudulent conveyance claims. These actions were stayed by the bankruptcy pursuant to 11 U.S.C. § 362(a).

A summary of Kenwood's grounds for objections are as follows:

1. Griffin and other non-debtors are being released from substantial liabilities for grossly inadequate consideration.

2. The Creditors Committees and the Debtors have agreed to a release by the Debtors and certain classes of note and debenture holders of Griffin and the non-debtor Griffin-related entities of all claims that have been or may be asserted against them, citing Plan § 7.10(h). Griffin and the Debtors, as the proponents of the compromise, have not met their burden of demonstrating that the proposed settlement is reasonable and in the best interests of the estate.

The Joint Plan of Reorganization is too risky and does not meet the "feasibility" test or "best interest" test under § 1129(a)(7)(A)(ii) and (a)(11).

3. There are substantial reasons to believe that the proposed compromise was not negotiated between the parties at arm's length. The Objectors state in their objection that Gibson, Dunn & Crutcher, co-counsel for the debtors, has served as counsel for Griffin personally and for RII. The Plan calls for Griffin to be the head of New Resorts and counsel is interested in continuing its representation of RII. In view of the fact that the Plan calls for a "giveaway" of RII's fraudulent conveyance claims, and other claims, as against Griffin for virtually no consideration, there is a strong likelihood that the Joint Plan has been materially tainted by this conflict of interest. Further, it appears that the RII Debentureholders Committee consists disproportionately of entities that acquired

their debentures *after* the alleged fraudulent conveyances who may not have fraudulent conveyance claims, *citing Kupetz v. Wolf,* 845 F.2d 842, 849–50 n. 16 (9th Cir. 1988).

4. Since the Plan seeks to release litigation claims of RIFI Debentureholders (*citing* Exhibit 1.72 to Plan), and does not differentiate between holders who purchased their interests prior to the leveraged buy-out from those who purchased their interests after the leveraged buy-out, the Plan raises disparate treatment issues under the case of *In re AOV Industries, Inc.,* 792 F.2d 1140, 1152 (D.C.Cir.1986).

*The Trump Litigation Defendants —* Objection filed on July 19, 1990.

The Trump Litigation Defendants include Donald Trump, Harvey Freeman, Robert Trump, Trump Taj Mahal Associates Limited Partnership, the Trump Hotel Corporation and their respective affiliates ("Trump Defendants").

A summary of the Trump Litigation Defendants' objections to the Plan is as follows:

(1) The Plan improperly attempts to secure the release of non-debtor third parties by the Debtors' bondholders without demonstrating as required that those releases are being given voluntarily and are supported by independent and sufficient consideration. (i.e. the Plan provides for the general release of Griffin, Griffin Acquisition Corp., Drexel Burnham Lambert, Inc. and their respective present and former officers, directors, agents, attorneys, representatives, trustees, affiliates, parents, subsidiaries, general and limited partners, heirs, executors, administrators, successors and assigns. (Plan §§ 1.38, 1.72 and 7.16)).

(2) The Plan provides for the settlement and release of all claims of the Debtors against Griffin, the Morgan Bank, the Released Defendants [6], or their respective affiliates, agents, accountants, attorneys, ad-

---

6. Section 1.62 of the Amended Plan defines "Released Defendants" to include "Resorts RIH, RIFI, GRI, GRH, TGC, Griffin Acquisition Corp., Griffin, and each of their officers, directors, employees, agents, attorneys, representatives, trustees, financial advisors, investment bankers,

affiliates, associates, parents, subsidiaries, general and limited partners, heirs, executors, and administrators on the Confirmation Date, but in any event including William Druz, George A. Bariscillo, Jr. and Michael Sviridoff, and their successors and assigns."

visors, employees, representatives, officers and directors, and all the claims of the Debtors against GRI Noteholders, to the extent such claims and causes of action arise out of or relate to the acquisition. (Plan § 7.11(h) and 7.16(a)). The Plan proposes to release non-debtor third parties from potentially valuable claims of the estate with little, if any analysis of the value of those claims and no showing that these releases are "fair and equitable".

(3) The Plan evidences bad faith by its disparate treatment of the claims against Trump and the claims against Griffin and all other potential defendants.

(4) The Plan is not feasible because it severely impairs Resorts' continuing viability by establishing a $5 million "war chest" to litigate claims against Resorts' neighboring hotel and casino, the Taj Mahal Hotel and Casino, on whose continued success Resorts concededly depends, and by placing the future of Resorts in the hands of Griffin and others who brought it to bankruptcy.

(a) The Plan is not feasible because the litigation trust would damage the casino market upon which Resorts depends.

(b) The Plan is not feasible because its success depends on management with a demonstrated inability to manage.

(c) The Plan fails to disclose the identity and affiliation of the litigation trustee in violation of 1129(a)(5)(A)(i) which provides that the proponent of a plan must disclose the identity and affiliation of any individual proposed to serve as a trustee of the debtor or any successor to the debtor.

As part of the hearing on confirmation, several other matters were disposed of by the parties and the Court.

Also returnable on the date of the confirmation hearing was a previously filed notice of motion by William J. Crosby, Robert Peloquin and Steven H. Norton, as retired employees of Resorts International, Inc. seeking the appointment of a retired employees committee pursuant to Section 1114(d) of the Bankruptcy Code. On the record, counsel for the Debtor informed the Court that the parties had settled the matter. (TR1 at 28). According to Debtors' counsel, Resorts has agreed that all medical benefits will continue under the Plan.[7] A stipulation and proposed order is to be submitted with regard to the settlement of this matter. (TR1 at 28–29).

Debtors' counsel also informed the Court that in regard to the "Litigation Trust" established under the proposed Plan, the parties submitted into evidence Exhibit "A" to Litigation Trust Agreement which details the terms of compensation and reimbursement of the "Litigation Trustee", and proposes to name Kenneth R. Feinberg, Esquire as trustee; also included was Mr. Feinberg's resume. (TR1 at 29). (D–2).

In addition, Debtors' counsel indicated to the Court that the Debtors have consented to a request for the change of one of the definitions under the litigation trust agreement. (Tr1 at 30). The request was made by the Debenture Bondholders Committee. The original Litigation Trust Agreement provided that a decision by the holders would be made by a majority of all holders of certificates under the trust. *See* Exhibit 1.46 to Plan, Article II. Under the Litigation Trust Agreement "Majority Holders" was defined as "the Holders from time to time of at least a majority of the outstanding units." The requested change in language provides that a decision can be made by a majority of those voting as opposed to those holding certificates. (TR1 at 30–31). The proposed change in language provides:

"Majority Holders" means the Holders from time to time of at least a majority of the outstanding Units, except that in the event any vote of Holders is taken in accordance with Section 4.6 hereof and in

---

7. Section 1114 of the Code provides in relevant part:

(d) The Court, upon a motion by any party in interest, and after notice and a hearing, shall appoint a committee of retired employees if the debtor seeks to modify or not pay

the retiree benefits or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.

connection with such vote no persons or entities or groups of persons and/or entities who are defendants with respect to any Litigation Claim and no Affiliates of such defendants hold collectively more than five percent in the aggregate of the outstanding Units, "Majority Holders" means the Holders of at least a majority of the outstanding units responding to the solicitation of consents by the Trustee as the Trustee may determine. (D–4).

In regard to paragraph 7.21(c) of the Plan, which provides in part that no entity shall be approved as Disbursing Agent or registrar until it executes and files a statement with the Bankruptcy Court agreeing to perform all duties of Disbursing Agent or registrar and consents to the jurisdiction of the Bankruptcy Court in respect of all matters relating to the performance of those duties,[8] counsel for Debtors offered into evidence a letter dated July 20, 1990 to the Clerk of the United States Bankruptcy Court for the District of New Jersey from Mark B. Zimkind, Assistant Vice President of Manufacturers Hanover Trust Company, the proposed Disbursing Agent and registrar which provided in part:

We have been retained by the Reorganizing Entities to serve as the Disbursing Agent and Registrar pursuant to the Plan. We hereby agree to perform all duties of Disbursing Agent and Registrar under the Plan, and consent to the jurisdiction of the United States District Court for the District of New Jersey with jurisdiction over the Reorganization Cases and the United States Bankruptcy Court for the District of New Jersey in respect of all matters relating to the performance of our duties as Disbursing Agent or Registrar under the Plan. (Trl at 30). (D–3).

In connection with the hearing on the Plan, Debtors' counsel also offered into evidence a number of certifications in support of the confirmation proceeding. They are as follows: (1) a certification of Peter C. Rockwell of publication notice of the order fixing date, time and place for hearing on confirmation of Debtors' Plan (Trl at 31–32) (D–5); (2) a declaration of John C. Stevenson regarding the distribution of certain solicitation material to the Beneficial Holders of Resorts Debt for acceptance or rejection of the Plan (Trl at 33) (D–6). A copy of a Declaration of Christopher D. Whitney, Executive Vice President of Resorts International dealing with requirement of § 1129 was offered into evidence subject to the availability of Mr. Whitney for cross-examination. (Trl at 33–37). (D–7).

The final declaration offered into evidence by Debtors' counsel was that of

---

8. Section 7.21 of the Plan provides:

(a) **Disbursing Agent.** The Disbursing Agent shall be designated by the Reorganizing Entities prior to the conclusion of the hearing on the confirmation of the Plan and shall serve without bond, unless the Bankruptcy Court requires a bond. New Resorts shall be responsible for all fees of the Disbursing Agent. All property held by the Disbursing Agent shall be held by it in trust for the Holders of Allowed Claims, shall not be commingled with the general assets of the Disbursing Agent, and shall not be subject to any claim by any Person except as provided under this Plan. The Disbursing Agent shall invest the cash deposited with it in investments with maturities appropriate in light of anticipated payment dates, until such cash is distributed pursuant to the Plan.

(b) **Registrar.** The Reorganizing Entities shall also designate, in the same manner, a third party, independent registrar, approved by the Bankruptcy Court, which may be the same entity as the Disbursing Agent. Prior to the Initial Distribution Date the registrar shall countersign all certificates of New Common Stock. Thereafter, the registrar shall maintain appropriate records of the names and addresses of all shareholders and will act as transfer agent of the New Common Stock and dividend paying agent for the New Common Stock. New Resorts shall bear all expenses of the registrar and may change registrars at any time or from time to time; *provided, however,* that prior to the Initial Distribution Date any change in registrar shall require approval of the Bankruptcy Court.

(c) **Qualification.** No entity shall be approved as Disbursing Agent or registrar until it executes and files a statement with the Bankruptcy Court (i) agreeing to perform all of the duties of Disbursing Agent or registrar, as the case may be, under the Plan, and (ii) consenting to the jurisdiction of the Bankruptcy Court in respect of all matters relating to the performance of its duties as Disbursing Agent or registrar under the Plan.

Claudia King certifying the distribution of the solicitation material and tabulation of ballots accepting and rejecting the Plan. (Trl at 38). (D–8).

The Plan before the Court contains ten classes of claims and interests, with varying distribution provisions as follows:

*Class 1—Priority Claims.* Class 1 Claims are any Claims against the Debtors entitled to priority in accordance with Section 507(a) of the Bankruptcy Code.

The Plan provides that such claims will be paid in cash and in full on the Initial Distribution Date or as soon as practicable after such claims are allowed if the date of allowance is later than the Initial Distribution Date. This class is treated as unimpaired under Section 1124 of the Bankruptcy Code.[9]

*Secured Claims.*

(a) *Classes 2A and 2B—GRI Noteholder Claims.* The Class 2A and 2B Claims consist of the Claims of holders of the GRI Notes, of which $200,000,000 in aggregate face amount of Mortgage Notes and $125,000,000 in aggregate face amount of Reset Notes are outstanding as of the date hereof.

The Plan provides that the existing GRI Notes, representing aggregate outstanding obligations in excess of $345 million, secured by first priority liens on the Debtors' Atlantic City and Bahamas operating properties will be cancelled.

In exchange each GRI Noteholder will receive its pro rata share of (a) Series A Notes in an aggregate principal amount of $18.75 million, and (b) Showboat Notes in an aggregate principal amount of approximately $105.3 million. The Series A Notes will be secured by liens on the collateral currently securing the GRI Notes. The liens securing the Series A notes will be of an equal priority to the liens on the same collateral that will secure New Resorts' obligations under the Series B Notes to be issued to holders of Class 3B and 3C claims, as discussed below. The Showboat Notes will be secured by liens on New Resorts' interest in the Showboat Property and Showboat Lease. The collateral for the Showboat Notes will not serve as collateral for the Series A or Series B Notes and will be non-recourse as to Resorts. Classes 2A and 2B are treated as impaired within the meaning of Section 1124.

(b) *Class 2C—Miami Mortgage Claims.* The Class 2C Claim consists of the Secured Claim of Evangeline Percha, Phil Chase and Elinor Chase as holders of a first mortgage on Resorts' property at 915 N.E. 125th Street, North Miami, Florida.

(c) *Class 2D—Aircraft Lease Letter of Credit Claim.* The Class 2D Claim consists of the contingent Claim of Morgan

---

9. 11 U.S.C. § 1124 provides:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim; or

(B) with respect to an interest, if applicable, the greater of—

(i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; or

(ii) any fixed price at which the debtor, under the terms of such security, may redeem such security from such holder.

Guaranty Trust Company (the "Morgan Bank") as issuer of a letter of credit in the amount of approximately $1,200,000, which was issued for the benefit of the lessor of an aircraft leased by a subsidiary of Resorts, Chalk's International Airline, Inc.

(d) *Class 2E—Insurance Liability Letters of Credit Claim.* The Class 2E Claim consists of the contingent Claim of City National Bank as issuer of letters of credit aggregating approximately $77,-140, which were issued for the benefit of certain insurance companies from whom Resorts purchased liability insurance.

(e) *Class 2F—Atlantic City Property Tax Claim.* The Class 2F Claim consists of the Claim of Atlantic City for real property taxes in the amount of $285,-754, secured by a lien on certain of Resorts' unimproved real property in Atlantic City.

(f) *Class 2G—Miscellaneous Secured Claims.* The Class 2G Claims consist of all Secured Claims other than those included in Classes 2A, 2B, 2C, 2D, 2E and 2F.

The Plan provides that with regard to Classes 2C, 2D, 2E and 2G claims, all secured claims other than those held by the GRI Noteholders, any defaults will be cured, the maturity of such claims will be reinstated and the holders will be compensated for any reasonable reliance damages, and the legal, equitable, or contractual rights to which such claims entitle their holders will not be otherwise altered. These classes of claims are treated as unimpaired within the meaning of Section 1124.

*Unsecured Claims.*

(a) *Class 3A—Small Claims.* The Class 3A Claims consist of all Unsecured Claims existing as of the Petition Date (other than Claims in respect of RII and RIFI Debentures and Claims by former shareholders of Resorts in respect of the payment of the Merger price for their shares) that on or before the Effective Date either are for an amount of $1,000 or less or are reduced to $1,000 by the election of the Holder as provided in such Holder's ballot.

The Plan provides that Class 3A claims will be paid in cash and in full on the Initial Distribution Date. This claim is treated as unimpaired within the meaning of Section 1124.

(b) *Classes 3B and 3C—RIFI Debenture Claims and General Unsecured Claims (including RII Debenture Claims).* The Class 3B Claims consist of the Claims of holders of RIFI Debentures, while the Class 3C claims consist of the Claims of holders of RII Debentures and Holders of all other Unsecured Claims that are not in Classes 3A, 3B or 4.

The Plan provides that the RIFI Debentures (representing outstanding obligations aggregating $219.5 million) and the RII Debentures (representing outstanding obligations aggregating approximately $366.2 million) and all other obligations giving rise to Unsecured Claims (which the Debtors estimate will not exceed $20 million, and which cannot exceed $46.6 million, for the Plan to be effective) will be cancelled. In exchange each holder of a Class 3B or 3C claim will receive a percentage share (determined by the amount and classification of its claim) of: (a) Series B Notes in an aggregate principal amount of approximately $141.8 million; (b) approximately 76% of the capital stock of New Resorts; and (c) the proceeds of the Litigation Trust established to pursue the debtors' claims against the Trump Litigation Defendants. The Series B Notes will be secured by a lien on the collateral securing the former GRI Notes which liens are of equal priority with the liens that will secure the Series A Notes. These claims are treated as impaired within the meaning of Section 1124.

*Litigation Claims.*

Class 4 Claims consist of various Claims asserted against the Debtors in or arising in connection with the Debentureholders' Litigation and other subordinated claims.

(a) *Class 4A—GRI Litigation Claims.* The Class 4A Claims consist of Claims against the Reorganizing Entities that have arisen or that could arise in connection with the GRI Litigation known as *Peter Stuyvesant Ltd. v. William Druz, et al.,* a putative class action pending in the United States District Court for the Southern District of New York, Civil Action No. 89 Civ. 3611 (MGC); *Executive Life Ins. Co. v. Druz,* presently pending in the United States District Court for the Central District of California, Case No. 89–3611, and *Kemper Investors Life Ins. Co. v. American Appraisal Assoc., Inc.,* presently pending in the United States District Court for the Northern District of Illinois, Case No. 90–C–2055.

The Plan provides that the holders of Class 4A claims will not receive or retain any property pursuant to the Plan on account of such claims, and that such claims shall be discharged pursuant to Section 13.2 of the Plan. This class is treated as impaired within the meaning of Section 1124.

(b) *Class 4B—RIFI/RII Litigation Claims.* The Class 4B Claims consist of all Claims that have arisen or that could arise in connection with litigation known as *Kenwood Dual Fund v. Resorts International, Inc. and Donald J. Trump,* pending in the Superior Court of New York, New York County, as Index No. 88/22270; *Shulman et al. v. The Griffin Company, et al.,* pending in the Superior Court of New York, New York County, as Index No. 89/20648; *The George S. Kolbe Target Benefit Pension Plan, et al. v. Resorts International, Inc., et al.,* pending in the Superior Court of New York, New York County, as Index No. 19882/89; *Campbell et al. v. Resorts International Inc., et al.,* pending in the Superior Court of New York, New York County, as Index No. 20394/89; and the following putative class action pending in the United States District Court for the Southern District of New York: *William*

*Hulkower v. Resorts International, Inc., et al.,* Civil Action No. 89 Vic. 6494 (MGC); *Benjamin Fishbein and Sylvia K. Weber v. Resorts International Inc., et al.,* Civil Action No. 89 Vic. 6443 (MGC); and *Shirley and David Marcus v. Resorts International, Inc., et al.,* Civil Action No. 89 Vic 6495 (MGC) ("RIFI/FII Litigation").

The Plan provides that the holders of Class 4B claims will not receive or retain any property pursuant to the Plan on account of such claims, and that such claims shall be discharged pursuant to Section 13.2 of the Plan. This class is treated as impaired within the meaning of Section 1124.

(c) *Class 4C—Other Subordinated Claims.* The Class 4C claims consist of all claims that are subordinated pursuant to Bankruptcy Code § 510 and are not included in Class 4A or Class 4B. The Plan provided that the holders of Class 4C claims will not receive or retain any property pursuant to the Plan on account of such claims and such claims shall be discharged pursuant to Section 13.2 of the Plan. This class is treated as impaired within the meaning of Section 1124.

*Class 5—Intercompany Claims.*

Class 5 Claims consist of all Claims asserted by the Debtors or any of their wholly owned subsidiaries or Affiliates against any other Debtor or its wholly owned subsidiary or Affiliate, and includes the Claims of Resorts and RIH against TGC with respect to the TGC Loans.

The Plan provides that the holders of Class 5 claims will not receive or retain any property under the Plan on account of such claims and that such claims shall be discharged pursuant to Section 13.2 of the Plan. Where appropriate, extinguished Intercompany claims shall be treated as contributions to capital at the election of New Resorts.

This class is treated as impaired within the meaning of Section 1124.

*Class 6—Shareholders' Merger Claims.*

This class consists of all claims of former shareholders of Resorts that have arisen or that could arise in connection with the merger of Griffco Acquisition Corp. with and into Resorts pursuant to the Agreement and Plan of Merger dated as of November 15, 1988.

The Plan provides that the holders of Class 6 claims will not receive or retain any property under the Plan on account of such claims, and that such claims shall be discharged pursuant to Section 13.2 of the Plan. This class is treated as impaired within the meaning of Section 1124 of the Plan.

*Class 7—Equity Interests in Resorts.*

This class consists of all equity interests in Resorts. The holders of Class 7 interests will not receive or retain any property under the Plan on account of such claims, and such claims shall be discharged pursuant to Section 13.2 of the Plan. All existing stock of Resorts will be cancelled and its current holders will not receive or retain any property on account of equity interest. This class is treated as impaired within the meaning of Section 1124.

At the date hereof, all of the outstanding shares of capital stock of Resorts are held by TGC. Pursuant to the Plan, TGC will be merged into a newly formed subsidiary of Resorts and all existing common stock of Resorts will be cancelled.

*Class 8—Equity Interests in RIFI.*

This class consists of all of Resorts' equity interests in RIFI.

The Plan provides that RIFI will be merged into New Resorts pursuant to the Plan, as a result of which New Resorts will be vested with the value of the equity, if any, in RIFI. Under the Plan, the legal, equitable and contractual rights to which such interests will entitle New Resorts will remain unaltered.

This class is treated as unimpaired within the meaning of Section 1124(1).

*Class 9—Equity Interests in GRI.*

This class consists of all of GRH's equity interests in GRI.

The Plan provides that the holders of Class 9 Interests shall retain such Interests after the Effective Date of the Plan and shall retain unaltered the legal, equitable and contractual rights to which such interests entitle such holder. The Plan provides for the retention of such interests by GRH, which will be merged into New Resorts, and leave unaltered the legal, equitable and contractual right to which such interests will entitle New Resorts.

This class is treated as unimpaired within the meaning of Section 1124(1).

*Class 10—Equity Interests in GRH.*

This class consists of all of Resorts' equity interest in GRH.

The Plan provides that GRH will be merged into New Resorts pursuant to the Plan, as a result of which New Resorts will be vested with the value of the equity, if any, in GRH. Under the Plan the legal, equitable and contractual rights to which such interests will entitle New Resorts will remain unaltered.

This class is treated as unimpaired within the meaning of Section 1124(1).

The Debtors submitted the Plan for vote to the Classes of GRI Noteholders (Classes 2A and 2B); RIFI Debentureholders (Class 3B) and RII Debentureholders and general unsecured creditors (Class 3C). The Debtors did not solicit the votes of members of impaired classes of litigation and other subordinated claims (Classes 4A, 4B, and 4C), intercompany claims (Class 5), shareholder merger claims (Class 6), and RII equity interests (Class 7). These classes are deemed under the Plan to have rejected the Plan under § 1126(g) as the Plan provides that the holders of claims or interests in such classes are not entitled to receive or retain any property on account of such classes or interests.

The Declaration of Claudia King (D–8) sets forth the following results of voting:

Class 2A—Mortgage Noteholders

| | Voters Accepting | | Voters Rejecting | |
|---|---|---|---|---|
| | Number | Amount | Number | Amount |
| Totals | 185 | $181,651,000 | 3 | $ 80,000 |
| Percentage | 98.4% | 99.9% | 1.6% | .1% |

Class 2B—Reset Noteholders

| | Voters Accepting | | Voters Rejecting | |
|---|---|---|---|---|
| | Number | Amount | Number | Amount |
| Totals | 85 | $111,018,000 | 10 | $ 245,000 |
| Percentage | 89.4% | 99.8% | 10.6% | .2% |

Class 3B—RIFI Debentureholders

| | Voters Accepting | | Voters Rejecting | |
|---|---|---|---|---|
| | Number | Amount | Number | Amount |
| Totals | 537 | $140,930,000 | 61 | $ 2,084,000 |
| Percentage | 90.1% | 98.5% | 9.9% | 1.5% |

Class 3C—RII Debentureholders and
General Unsecured Claims

| | Voters Accepting | | Voters Rejecting | |
|---|---|---|---|---|
| | Number | Amount | Number | Amount |
| Totals | 1,821 | $239,162,641.32 | 211 | $16,352,690 |
| Percentage | 89.6% | 93.6% | 10.4% | 6.4% |

Class 3C—General Unsecured Claims Electing
Class 3A Status

| | Number | Amount |
|---|---|---|
| Totals | 5 | $ 51,944.52 |

On the instructions of the Debtors, the tabulation results set forth in paragraph 21 do not reflect any vote based on a proof of claim to which the Debtors have filed an objection and for which there has been no order estimating the amount of each claim.

Holders of Mortgage Notes, Reset Notes, and RIFI Debentures tendering their respective RIFI and GRI Plaintiff's Releases did so as follows:

a. Mortgage Notes

| | Number | Amount |
|---|---|---|
| Totals | 185 | $168,571,000 |
| Percentage | | 84.3% |

b. Reset Notes

| | Number | Amount |
|---|---|---|
| Totals | 81 | $110,854,000 |
| Percentage | | 88.7% |

c. RIFI Debentures

| | Number | Amount |
|---|---|---|
| Totals | 512 | $146,578,000 |
| Percentage | | 73.3% |

Christopher D. Whitney, executive vice president and chief of staff of Resorts International, Inc. testified before this Court. Mr. Whitney testified that he began employment with the debtor companies (hereinafter "Company") in December 1988 and that by the spring of 1989 several persons felt that the Company's capital structure should be reviewed by experts at which time Salomon Brothers was retained in May 1989. (TR1 at 46). Mr. Whitney explained that on the recommendation of Salomon Brothers, the firm of Alvarez and Marsal was retained in August 1989, for the purpose of ascertaining the company's liquidity.

Mr. Whitney testified that in August 1989, Alvarez and Marsal informed the Debtors that "as a function of its liquidity, it would not be in a position to continue debt service payment and also be able to make the capital expenditures and otherwise spend operating money necessary for the company to proceed on a healthy basis.

(TR1 at 47). Mr. Whitney also testified that Resorts was not going to make its ensuing debt service payments and scheduled a meeting with its bondholders for September 1989 in Atlantic City, New Jersey (TR1 at 47). The meeting with bondholders was conducted on September 19, 1989 at which representatives of senior management, Alvarez and Marsal and Salomon Brothers conducted a presentation for bondholders. (TR1 at 48). Mr. Whitney testified that a proposed form of exchange offer was preliminarily advanced. (TR1 at 49). According to Mr. Whitney, the bondholders organized into two large groups of bondholders: the GRI secured bondholders, which were created as part of Merv Griffin's leveraged buyout of Resorts, the face amount of such bonds being approximately $325 million; and the RII and RIFI unsecured bondholders with an approximate face amount of $600 million. (TR1 at 49–50). Mr. Whitney stated that the GRI bondholders retained Duncan Darrow, Esquire of the firm Anderson Kill as its legal advisor (who was later replaced by Kenneth N. Klee of Stutman, Triester and Glatt) and Rothchild, Inc. as its financial advisor. (TR1 at 50–51). The RII and RIFI bondholders retained Marc Kirschner of Jones, Day, Reavis & Pogue as their legal advisor and Arthur Newman of Chemical Bank as their financial advisor. (TR1 at 50–51). Mr. Whitney testified that the committees were compensated by Resorts at the demand of the committees. (TR1 at 51).

In regard to the plan of reorganization, Mr. Whitney testified that the company's business plan of reorganization included a "Global Restructuring" which included RII, GRI, RIFI, and GRH. (TR1 at 53). Whitney also testified that the regulatory authorities in New Jersey and the Bahamas were concerned about the financial stability and responsibility of the company and that the recapitalization plan had to proceed as quickly as possible. (TR1 at 56). Whitney also testified that in his opinion resolution of potential disputes needed to take place before a global plan could be arrived at. (TR1 at 58).

Mr. Whitney testified that to his knowledge and understanding, Mr. Merv Griffin would not participate in the plan of reorganization without obtaining the releases which are now embodied in the Plan. (TR1 at 60–61). According to Mr. Whitney, there were negotiations as to the settlement of the fraudulent transfer dispute set forth in the Plan. (TR1 at 61). Whitney also testified that he made no independent examination of the validity of fraudulent conveyance claims as they pertain to the security interest of the GRI Noteholders nor was he aware that David Hanlon, President of Resorts made such an analysis, instead retaining professional advisors for that purpose.

Mr. Whitney testified that in addition to the components of the releases and the settlement of fraudulent transfer claims, the plan of reorganization included several other essential components including revenue projections and certain market strategies all of which would be implemented to stabilize the company. (TR1 at 69–71).

Mr. Whitney testified that Resorts' projections as to market share and marketing strategies were to be implemented under a five year business plan which took into consideration certain assumptions including the projected growth of the Atlantic City casino industry in 1990 and the growth of Resorts' Atlantic City market share in that growth. (TR1 at 69, 71, 79). According to Mr. Whitney, the first year of the Plan, 1990, was to be the stabilizing year. (TR1 at 69). Stabilization included a marketing strategy, cost control, the positioning of the property in a manner which would make it able to compete with the Taj Mahal Hotel and Casino as well as attract some of the Taj Mahal's customer activity, and trying to minimize the damage associated with the negative publicity arising from the bankruptcy proceedings. (TR1 at 70).

Mr. Whitney also testified that as part of the marketing strategy, Resorts would make a "better and more prominent use of Mr. Merv Griffin's name and persona upon the property to distinguish the property in that manner." (TR1 at 71). According to Mr. Whitney's testimony, under the Plan

Mr. Merv Griffin is to contribute $26 million dollars of new funds for the company, and as part of this infusion of capital, Mr. Griffin's original equity position in Resorts would be extinguished and his new equity position would be approximately 21–1/2 percent of the New Resorts International common stock. (TR1 at 72, 233).

Mr. Whitney stated that it was his understanding that under the proposed Plan, Mr. Griffin would waive a $10 million subrogation claim against the company which arose from a letter of credit transaction. (TR1 at 72).

In further regard to Mr. Griffin's contribution to the marketing strategy of Resorts, Mr. Whitney stated, that Mr. Griffin is an integral part of the Resorts marketing strategy and that the utilization of Mr. Griffin's name and persona would serve to distinguish Resorts in the difficult Atlantic City casino market. (TR1 at 73–74). Whitney also testified that Griffin's visibility was important for the public and Resorts' employees. (TR1 at 127). In this regard, Whitney testified that Griffin spent approximately one week a month in Atlantic City, during which time he participates in events, entertains or spends time with employees. (TR1 at 184). Mr. Whitney also testified that as part of the marketing strategy which is reflected in a license agreement with Mr. Griffin, Mr. Griffin would serve as chairman of Resorts. (TR1 at 73). Whitney also testified that under the Plan Merv Griffin would be contributing to the New Resorts shares of the Griffin Company which will preserve a NOL (net operating loss) going forward.[10] (TR1 at 74).

Mr. Whitney also testified as to the treatment of the unsecured creditors in Class 3C which include the RII bondholders. Mr. Whitney testified that he had undertaken steps to determine that the other 3C creditors (non-RII bondholders) will not exceed 20 million dollars. (TR1 at 75–76). Mr. Whitney testified that he examined the

filed claims with legal and financial advisors and with other senior financial officers of the company. (TR1 at 76). Specifically, Mr. Whitney testified that he conducted a review of these other unsecured claims with Matthew B. Kearney, Resorts' vice president and chief financial officer. Mr. Whitney testified that they reviewed the listing of the claims as filed and some individual claims, including the individual pleadings and the claims in the case of litigation. (TR1 at 76).

Mr. Whitney also testified that as part of the confirmation process, he had examined Resort's executory contracts and leases including those executory contracts which are set forth in the Disclosure Statement. (TR1 at 77). Mr. Whitney also testified that he examined the executory contracts which are to be rejected and was satisfied that it was in the best business judgment of the Company to reject those contracts. Whitney also testified that he examined the executory contracts which are not listed on the list of rejected executory contracts in the Disclosure Statement and in this regard, Mr. Whitney stated that the decision to assume these contracts has been made after an analysis as to the economic viability and benefit to the company. (TR1 at 78).

Mr. Whitney also testified as to the cash flow analysis of the Company as contained in the Debtors' Business Plan contained in the Debtors' Disclosure Statement, Exhibit "C". (TR1 at 79). Mr. Whitney testified that he was familiar with these projections and that he took part in the formulation of these figures. (TR1 at 79).

Mr. Whitney testified that it is the intention of Resorts if the Plan is confirmed to sell the Bahamas property within two years. (TR1 at 80). Mr. Whitney testified that with regard to the cash flow statement for the five years ending December 31, 1994, base case, (Sell Resorts Bahamas at

---

10. The Disclosure Statement provides:
 [T]he merger of TGC into a subsidiary of Resorts will contribute substantial value to New Resorts because it may avoid a deconsolidation of the consolidated tax group consisting of TGC, Resorts and its subsidiaries which

would result in the recognition of approximately $24,000,000 of income attributable to certain distributions and transfers of property among the companies which has been deferred for federal income tax purposes.
(D–9 at Section VIII(c), p. 59).

end of Year 2 for $250 million) in the business plan, Mr. Griffin would contribute $15 million in 1990 and that the ending cash balance for that year was $15.5 million. (TR1 at 80). Entered into evidence as exhibit D–10 was a letter from John J. Coleman, Vice President of Morgan Guaranty Trust Company of New York, dated July 23, 1990 addressed to Mr. Whitney indicating that as of the close of business on July 23, 1990, Merv Griffin had on deposit and in a demand deposit account maintained with Morgan Guaranty Trust Company of New York the sum of $17,500,000.00 which is presently available to be withdrawn without restrictions. (TR1 at 81–82). (D–10). Also entered into evidence was a letter dated July 23, 1990 from John J. Coleman, Vice President of Morgan Guaranty to Merv Griffin which states:

> **MORGAN GUARANTY TRUST COMPANY OF NEW YORK** is pleased to advise you of our commitment to issue for your account our irrevocable letter of credit in the amount of $11,000,000, in favor of **RESORTS INTERNATIONAL, INC.** ("Resorts") as contemplated by the Second Amended Joint Plan of Reorganization of Resorts and related Debtors dated as of May 31, 1990. This letter of credit facility will be governed by the terms that we have previously agreed upon, which will be set forth in the customary documentation for a facility of this type.

(Tr1 at 83). (D–11).

In regard to the aforementioned cash flow analysis of Resorts, Mr. Whitney testified as to the negative figures, specifically as to the capital expenditures in the Atlantic City operation in 1990 in the amount of $35 million, and in 1990 for the Bahamas operation which is in the amount of $11.7 million. (TR1 at 83–84). Mr. Whitney testified that these capital expenditures played a pivotal role in the Plan and in the company's health going forward. (TR1 at 84). Mr. Whitney testified that these expenditures were necessary in 1989 and 1990 in order to update and refurbish the Atlantic City plant as it was "extremely dated, tired, old and in need of refurbishing in order to compete in the market place."

The smaller number in the Bahamas indicated that capital expenditures had been made and invested in the Bahamas property over the years at a more significant rate. (TR1 at 84–85). Mr. Whitney testified that these capital expenditures would not be on any annual basis but would rather be one time expenditures under the Plan. (TR1 at 85).

Mr. Whitney also testified that he participated in the preparation of the cash flow projections that are shown for 1991, 1992, 1993, and 1994, which represent the maturity dates of bonds which would be issued under the Plan. (TR1 at 85).

Mr. Whitney also testified concerning the Showboat lease and as to the impact that the lease and the rents generated thereunder will have on the Plan. (TR1 at 87). Mr. Whitney testified that the debtor company owns the ground on which the Showboat Hotel Casino is located and that under the Plan, the Showboat Lease serves as security for the $105.3 million note to be issued to the GRI bondholders. Mr. Whitney testified that it is necessary for the implementation of the Plan for the Showboat lease to be assumed by Debtors. (TR1 at 89). Whitney also testified that the lease was current and that he was unaware of any defaults under the lease. (TR1 at 88).

Whitney testified that under the various scenarios set forth in the Debtors' business plan, the company will have adequate cash to operate for the entire four-year period (1990–1994). (TR1 at 91).

Mr. Whitney testified as to implementation of the marketing strategies which have occurred between April 16, 1990, the date of the business plan projections in the Disclosure Statement, and the date of the hearing on confirmation. (TR1 at 92). Mr. Whitney spoke specifically about the Debtors' EBDIT (earnings before depreciation, interest and taxes), and testified that the Debtors are ahead of the plan and the projections for the end of June 1990. (TR1 at 92–93). Mr. Whitney testified that the Atlantic City operation is about one million dollars ahead of the plan, and that the

Bahamas are about one million dollars behind, although on a consolidated basis, the same. (TR1 at 93). Whitney testified that the market growth assumption for Atlantic City in the original plan was 8.8% for 1990 and 5% for the years thereafter. He testified that during the first quarter of 1990 market growth in Atlantic City was flat, in April 1990 up 5%, in May 1990, up 11%, in June 1990 up 13.5% so that whether the 8.8% number for 1990 could hold was problematic or speculative, so that Resorts has ascribed a 10% per month market growth for the balance of the year. (TR1 at 94). Mr. Whitney testified that in terms of market share, the other large revenue assumption, the plan contemplates a market share in the 1990s of 7.4 percent. Whitney testified that during the first quarter of 1990, Resorts' market share was not up to 7.4%, but by the end of June 1990 it was at about 7%, and the indications are that in July 1990 "slot market share" was over 8% while on a consolidated basis for all games and tables it was 6 to 6.5%. Whitney attributed the softness of the market and the fact that several of Resorts' programs came on late as reasons why the first quarter 1990 market share was not up to 7.4%. (TR1 at 95).

On direct examination, Mr. Whitney identified several key programs that the Debtors sought to implement in the first quarter of 1990 as part of its market strategy. (TR1 at 96). Among those identified by Whitney were the new food strategy, the "Beverly Hills Buffet", and marketing and promotional plans such as the Jackpot game. (TR1 at 96). Mr. Whitney testified that Resorts ran into difficulties obtaining the permits for the new food program and the Jackpot game which resulted in delays in implementing these marketing strategies. (TR1 at 97). Specifically, the buffet and the Jackpot game which were scheduled to begin in April 1990 did not begin until May 1990, and the slot rating system which was intended to start in May 1990 did not start until June 1990. (TR1 at 97–98). According to Mr. Whitney, the Plan calls for the EBDIT in 1990 for Atlantic City to be $24 million, and that Resorts

Atlantic City is on schedule to generate the $24 million in EBDIT in 1990. (TR1 at 98).

As to the management of Resorts, Mr. Whitney testified that he was hired by Resorts in December 1988 when a new team of management was brought on board. (TR1 at 99). Mr. Whitney testified that he has no reason to believe that any member of the current management team has any plan not to be permanent. (TR1 at 100).

Whitney testified that the capital infusion contemplated by the Plan which was to be made by Merv Griffin was necessary to the Company going forward as to the projections in the plan. (TR1 at 241). Whitney also testified that since the filing of the Chapter 11 cases, no one other than Merv Griffin has offered to purchase equity in Resorts or New Resorts. (TR1 at 241). Whitney also testified that it would be costly to the debtor company to issue financial shares of stock and notes and accordingly the plan includes a class for small claimants. (TR1 at 241). With regard to the provisions of 12.2(5) of the Plan "Conditions to Effectiveness", Whitney testified that Resorts, RIFI, GRI, GRH and RIH, all the Resorts entities proponents, would be prepared to execute written waivers of the condition to effectiveness of the Plan that "the principal amount of GRI Notes held in the aggregate by Electing GRI Noteholders shall constitute not less than 90% of the principal amount of the outstanding GRI Notes." (TR1 at 247–258). Counsel for the Debtor, Robert A. Baime, Esquire, at the confirmation hearing on behalf of the debtor corporations represented to the Court that he was authorized to waive that condition of the Plan on behalf of Resorts, RIFI, GRI, GRH and RIH. Whitney also testified that he was of the belief that The Griffin Company and Merv Griffin would also waive the conditions set forth in Section 12.2(5) of the Plan, based upon the percentage of releases received as reflected in the Claudia King declaration. (TR1 at 249). (D–8).

Whitney testified that the debtor corporations presently hold valid licenses to operate in both the Bahamas and Atlantic City and that the Debtor was undertaking

efforts to obtain all the necessary approvals of the Plan from the New Jersey Casino Control Commission and the Bahamian Government. (TR1 at 25). In this regard, as of the confirmation hearing, a hearing before the New Jersey Casino Control Commission was scheduled for August 10, 1990 to consider the Plan. (TR1 at 258).

Antonio Alvarez, II, a partner of the firm of Alvarez & Marsal, a crisis management firm, also testified. (Transcript of July 25, 1990 at 10) (hereinafter "TR2 at ——"). Alvarez testified that his firm was retained by the Debtor to assist in reviewing its liquidating situation and to assist in the development of a business plan. (TR2 at 13). Alvarez testified that in fact a business plan was formulated with the assistance of senior management of the Debtors. (TR2 at 13). Alvarez reviewed the budget of the two operating companies in Atlantic City and the Bahamas, as well as corporate overhead budgets and the non-operating companies. (TR2 at 13–14). Alvarez testified that in arriving at a new budget as part of the business plan, certain business assumptions were made, including that the casino market in Atlantic City would grow by 8.8% in 1990 and grow by 5.0% annually thereafter, and that Resorts' market share in Atlantic City in 1990 would be 7.4%, and in years 1991 to 1995 would be 7.2%. (TR2 at 14–17).

Alvarez testified that marketing strategies were reviewed and formulated with Debtors' management. (TR2 at 15–16). That marketing strategy, articulated in the business plan, called for a redirection of effort to the low to mid or retail player which included completion of the upgrading of the Atlantic City facility by a capital spending program, the purchase of more modern slot machines, a slot rating program, a jackpot game, the opening of the "Beverly Hills Buffet", which would sell food at a cheaper price, an entertainment strategy that focused less on star attractions and more on revues. (TR2 at 16). The business plan also assumed that the Taj Mahal casino would open some time in the early second quarter of 1990, and that the Taj Mahal would have a beneficial effect on traffic at that end of the Boardwalk

that would be helpful to Resorts (located next door). (TR2 at 17). Alvarez testified that this led to the assumption that in 1990 the market share for 1990 would be 7.4%, and from 1991 to 1995 would be 7.2%. (TR2 at 17). The assumption was that Resorts would lose market share while the casino market was growing because of the opening of the Taj Mahal, but that Resorts would not lose as much as the other casinos because of its proximity to the Taj Mahal and the implementation of these marketing strategies along with the upgrading of the Resorts facility. (TR2 at 17–18). Alvarez testified that the capital spending plan was a central part of the business plan which called for spending $35 million in 1990, in addition to what had been spent in 1989. (TR2 at 19). Certain cost reduction activities were also included in the business plan, including the discontinuation of certain promotional activities directed toward "high rollers" which had not proven profitable. (TR2 at 19–20). The business plan also assumed that fixed costs, including payroll and other expenses would decline and a cost reduction program would be implemented. (TR2 at 20).

Alvarez testified that the development of the business plan began sometime around September 19, 1989 and was completed in late December 1989. (TR2 at 21). He also testified that he had continued to monitor the results of operations and more recently developed a latest thinking forecast which took the results of the first five months of operations in 1990 and compared them to the business plan. (TR2 at 21–22). Alvarez also testified that in his view the present management of Resorts and its subsidiaries "can deliver these numbers" in the business plan. (TR2 at 22). Alvarez testified that the business plan was contained in the Debtors' Disclosure Statement as Exhibit C. (TR2 at 23). (D–9).

Alvarez testified regarding the projected cash flow statements, projected Debt Paydown and Book Value Schedule, Projected Capitalization Tables, and Projected Income Statements, that appear in Exhibit C to the Debtors' Disclosure Statement. (TR2 at 25). This analysis developed four separate

cases: (1) the "base case" with the assumption that the Resorts Bahamas would be sold at the end of year two (1991) for $250 million (Case No. 1); (2) the base case with the assumption that the Resorts Bahamas would be sold at the end of year two (1991) for $300 million (Case No. 2); (3) the "improved operating assumptions" case with the further assumption that the Resorts Bahamas would be sold at the end of year two (1991) for $250 million (Case No. 3); and (4) the "improved operating assumptions" case with the further assumption that the Resorts Bahamas would be sold at the end of year two (1991) for $300 million (Case No. 4). (TR2 at 25–26). Alvarez testified that cases three and four contained improved operating assumptions as they pertain to the Atlantic City operations, including higher earnings before depreciation and interest and taxes ("EBDIT") in the years 1992 to 1994 for the Atlantic City operations based on the assumption of a slightly greater market share in 1992 to 1994 and slightly less payroll dollars. Alvarez testified that the "base cases" represented what he believes is the most likely numbers to occur in the next five years, while the projections in the "improved operating assumptions" case, while not improbable, are less likely to occur. (TR2 at 27–28). Alvarez explained that the base case reflects the base operating assumptions that were jointly developed with Debtors' management, along with the assumption on the sale of the Bahamas. Alvarez further testified that the Debtors' operations continue to be monitored and have resulted in a "latest thinking forecast" developed as of July 9, 1990. (TR2 at 28). Alvarez testified that in the first five months of 1990, Resorts Atlantic City had generated $3.8 million EBDIT, contrasted to a loss of $400,000.00 that was projected in the business plan. (TR2 at 29). Alvarez testified that the current thinking is that Resorts Atlantic City will still make 24 million dollars for the year, and that there is going to be less EBDIT for the remaining seven months of 1990 offsetting the gain experienced in the first five months. (TR2 at 30). Alvarez testified that in the first five months the revenues generated were lower than those projected in the business plan as compared to last year (although the business plan projected lower revenues in those months over last year), caused in part by a delay in the capital spending program, a delay in opening the Beverly Hills Buffet, and a delay in implementing the slot rating program, but that the "bottom line" was better due to expense reductions, primarily lower promotional expenses. (TR2 at 30). Alvarez also testified that the business plan included a $3.5 million contingency. (TR2 at 30). The budget for operating the property was $27.5 million. Alvarez also testified that based on the latest thinking forecast the base cases continue to be the most likely number that will occur, particularly with regard to the EBDITS. (TR2 at 33). Alvarez testified that Merv Griffin is to contribute $26 million to the Debtors, $15 million at confirmation and $11 million one year later. Alvarez also testified that the $26 million was a crucial part of achieving the business plan and allowing the company to continue with its capital spending program, necessary to achieve that business plan. (TR2 at 33–34). Alvarez testified that according to the base case, Case No. 1, the ending cash is $15.5 million and that if Merv Griffin were not to contribute the aforesaid $15 million one would have to develop a different plan, with a slower capital spending plan and delay in the turnaround of the EBDIT numbers. (TR2 at 34–35). Alvarez also testified that Merv Griffin is involved in the Debtors' marketing strategy at several levels, including the association of his name with the property, performing at the premises, entertaining customers, and spending time with the employees. (TR2 at 35). Alvarez testified that if Griffin were not a part of the marketing strategy, Alvarez & Marsal would have to reevaluate the entire business plan. TR2 at 35). Alvarez testified that in the last few months the strategies are "starting to pay off" with a growth in market share in the slot area and that a change in leadership would be in his opinion harmful to the company. (TR2 at 36).

Alvarez also testified regarding the capital structure that will result if the Plan of Reorganization is confirmed. (TR2 at 36).

Alvarez testified that under the Reorganization Plan the Debtor is issuing new debt: the $187.5 million Series A Note, the $137.5 million Series B Note, the $105.3 million Showboat Note. (TR2 at 37). Alvarez testified that the only mandatory cash paying note was the Showboat Note where effectively the proceeds that the Debtor receives from the Showboat lease are passed on to the new holders of the Showboat Notes. (TR2 at 37). The other two notes, Series A and Series B Notes, have a component known as "pay in kind" ("PIK") interest. (TR2 at 37). The terms of the Series A Notes and the Series B Notes provide that Resorts may pay all or any portion of the interest accruing on the Notes by issuing additional Series Notes in lieu of cash in satisfaction of interest payments due. *See* Disclosure Statement, Section X(B)(2) and (C)(2). (D–9). Alvarez testified that this element is central to the Reorganization Plan insofar as it allows the company to execute capital operating upgrades to allow it to compete and achieve its goals in the marketplace, and to sell the Bahamas without a "drop dead date", so to realize good value from that asset. (TR2 at 37).

Alvarez testified that while the projections show the Debtor paying more than the interest payments on the Showboat notes over the next four years, the only mandatory payments will be in conjunction with the Showboat Note. (TR2 at 38). Alvarez also testified that the Plan, which contemplates a sale of Resorts Bahamas during the next four years, will result in a capital structure where the debt remaining will be significantly lower. (TR2 at 39). For instance, if the Resorts Bahamas is sold for $250 million, there would remain under $100 million in debt on the Series A and Series B notes, which would need to be refinanced. (TR2 at 39–40). Alvarez testified that in the base case there would be $54 million of debt in the end of 1993, and $76 million of debt at the end of 1992. (TR2 at 40). Alvarez also testified that if the Resorts Bahamas operations were not sold during the next four years, the EBDITS would be greater than those contained in the projections because the company would have EBDIT for the Bahamas. (TR2 at 40–41).

Alvarez testified that for the first five months of 1990 market growth in Atlantic City was approximately 3% and the industry growth for the first six months of this year to date was 4.9%. (TR2 at 75). Alvarez also testified that Resorts' market share was 7.5% for the first three weeks of July 1990. (TR2 at 50). Alvarez testified that Resorts' market share for the first quarter 1990 was approximately 6.9%, in April 1990—6.8%, in May 1990—6.1%, June 1990—7.1%, July 1990—7.5%, as against projected market share in the business plan of 7.4% for 1990 and 7.2% for 1991 and thereafter. (TR2 at 49–50). Alvarez stated that the increase in Resorts' market share was primarily due to a growth in slot share and that revenue from table games has decreased fairly substantially, attributed primarily to the fact that the casino hotel rooms had not been completed in time. (TR2 at 50). Alvarez also stated that Resorts' marketing program and business plan is a mix of table and slots, with a focus on slots. Alvarez also projected that for the balance of 1990, Resorts' market share should be between 7.0 to 7.8%. (TR2 at 51). Alvarez also testified that if the market was flat and Resorts' market share was 7.0%, the $24 million base profit projected in the business plan would be at risk, however, if the market was flat and Resorts' market share was at 7.8%, Resorts would "overperform the 24." (TR2 at 53). Alvarez stated that if the market was flat and Resorts held its EBDIT through holding the expense line, there would be no impact on the base plan analysis for the subsequent four years. (TR2 at 54).

Alvarez also testified that for the first five months of 1990 revenues were down about 11% from last year, and the expectation for revenues for the next seven months would be down, as reflected by casino win, about 5%. (TR2 at 79, 81). He also stated that expenses for the rest of the year are projected to be reduced in excess of 10% from last year. (TR2 at 81).

Alvarez testified that for the first five months Resorts' budget before the contin-

gency was approximately $85 million casino win, while the actual revenues figure was $79.5 million. (TR2 at 79). The expenses had been budgeted before the contingency at $94.9 million, while actual expenses were $86.4 million. (TR2 at 80). Alvarez also testified that Resorts had anticipated that its buffet program would be on line by April, which was delayed along with the slot rating program which impacted to decrease expenses. (TR2 at 100).

In connection with the Bahamas operation, Alvarez testified upon the entry of the Crystal Palace, a major competitor in the market, the market grew but Resorts Bahamas lost market share. Alvarez also testified that the Resorts Bahamas revenue have been increasing and that the most recent figures indicated that the Bahamas operation is holding market share. (TR2 at 153).

Alvarez testified that if the sale of the Bahamas operation takes place in accordance with the base plan, Case No. 1, (sale of the Bahamas at end of year two for $250 million), the debt left on the outstanding Series A and Series B Notes, other than the Showboat note, at the end of 1994 would be $51.8 million, which would be refinanced under a revolving credit facility, while if under the base case the Bahamas operation were sold for $300 million net at the end of year two, no revolver or refinance would be required. (TR2 at 216–217).

Alvarez also testified that the assumptions in the base cases for the sale of the Bahamas operation assumed that the figures of $250 million and $300 million of proceeds would be net of expenses of sale and transfer taxes. (TR2 at 191).

Alvarez also testified that as between revenue growth and EBDIT projections, EBDIT projections are more critical to the correctness of the business plan, since that it what is used for capital spending and the service of debt. Alvarez also testified that for the first five months of 1990 and for the June year to date EBDIT for the Bahamas and Atlantic City was ahead of the business plan projections.

Alvarez also testified that in the first five months of 1990, Resorts' operation in Atlantic City and the Bahamas are ahead of plan, while capital spending is behind the plan, the timing of asset sales is ahead of plan, the ending cash number is significantly ahead of plan insofar as the company had $26.7 million in excess available house cash, while the business plan projected $9 million. Alvarez testified that EBDIT is projected to be behind plan for the last seven months of 1990, to end up at the same amount projected in the business plan. Based on these results, Alvarez stated that the numbers in the business plan were reasonable.

Charles M. Masson, an investment banker and a director and member of the financial restructuring group of Salomon Brothers also testified. (Transcript of July 26, 1990) (hereinafter "TR3 at ——"). Masson conducted an analysis of the reorganization value of the assets for the debtor companies on the basis of intrinsic value and going concern value. (TR3 at 24). Masson explained reorganization value to mean a capitalization of the earning stream of an entity. (TR3 at 25). He also testified that an additional way to value the assets of a company was to value them in whatever fashion will reflect the market's view of those assets. (TR3 at 25). Masson testified that these assets included in this case (1) the Atlantic City hotel and casino; (2) the Bahamas Paradise Island properties; (3) the Showboat lease; (4) various non-operating real estate properties in and around Atlantic City; and (5) miscellaneous assets, including Chalks Airlines, helicopters, and Intertel, a private investigation agency. (TR3 at 26). Masson testified that he valued Resorts' Atlantic City hotel and casino at 100 to 134 million dollars. (TR3 at 30). The Bahamas Paradise Island properties were valued at from 225 to 324 million dollars. (TR3 at 33). The Showboat lease was valued at 75 to 80 million dollars. (TR3 at 34). The non-operating real estate properties in Atlantic City were valued at 20 to 30 million dollars. (TR3 at 38). The Debtors' miscellaneous assets were valued at a range of 14 to 19 million dollars. (TR3 at 39). Masson aggregated the various values of these assets to arrive

at an enterprise value of $434 to 587 million, with a midpoint of 510 million dollars. (TR3 at 40). Masson also testified regarding the value of the company's debt. Masson testified that under the Plan of Reorganization, the principal face value of the debt was as follows: 191.8 million dollars for the Series A notes; 146.6 million dollars for the Series B notes; 105.3 million dollars for the Showboat note; and 2.4 million dollars of miscellaneous other debt, primarily capitalized leases. (TR3 at 43). Masson compared the face value of the debt with the trading values of the debt which he set forth as follows:

(1) Series A Notes—70 to 75% of face value;

(2) Series B Notes—80 to 86% of face value;

(3) Showboat Notes—74 to 78% of face value;

(4) 2.4 million miscellaneous debt at par.

(TR3 at 44). Masson testified that to calculate equity one could take the value of the assets and subtract the face amount of the debt and arrive at an equity value under the Plan of 89.9 million dollars or $4.39 per share. (TR3 at 45). Masson testified that in his opinion the trading range of the shares of stock would be between $3.00 and $3.50 per share, with a midpoint of $3.25, on a fully distributed basis. (TR3 at 45).

Masson testified that under the Plan Merv Griffin's contribution of 26 million dollars would be included in the value of all of the assets of the estate to produce an aggregate intrinsic value of $536 million. (TR3 at 48). Under this valuation the recoveries to the bondholders was as follows:

(1) GRI—55.4% of $536 million

(2) RIFI—16.7% of $536 million

(3) RII—23.5% of $536 million

(4) Merv Griffin and others—4.4% of $536 million

(TR3 at 48).

Masson also calculated on a cents per dollar basis how many cents per dollar of allowed claims each of the three bondholder classes would receive under the Plan on an "intrinsic value basis" under this valuation methodology:

(1) GRI—86.4 cents per dollar of allowed claim

(2) RIFI—40.7 cents per dollar of allowed claim

(3) RII—32.6 cents per dollar of allowed claim

(TR3 at 49–50).

Masson also testified that the fair market value trading of these assets was $409 million, reached by combining the fair market value trading of the debt securities which will be issued with the fair market or trading value of the common stock that will be issued by the company. (TR3 at 48–49). Masson explained that this figure represented the trading value of all of the securities that will be issued by Resorts under the Plan, plus $2.4 million of other securities which were valued at par. (TR3 at 177). That provides a lower value than the going concern or intrinsic value. Under this valuation the recoveries to the bondholders were as follows:

(1) GRI—53.5% of $409 million

(2) RIFI—17.5% of $409 million

(3) RII—24.6% of $409 million

(4) Merv Griffin and others—4.4% of $409 million

On cents per dollar of allowable claim, the bondholders recoveries on a "fair market value trading" basis are as follows:

(1) GRI—63.6 cents per dollar of allowed claim

(2) RIFI—32.6 cents per dollar of allowed claim

(3) RII—26.1 cents per dollar of allowed claim

Masson also testified that under the Plan no class would receive more than 100 cents per dollar. (TR3 at 50–51).

Masson also did a liquidation value of the enterprise. (TR3 at 51). As part of that analysis, Salomon Brothers assumed that a trustee would be appointed and a liquidation would need to be accomplished in a six-month time frame. (TR3 at 52). Masson testified that such a scenario would in his opinion place the Debtors' casino license in Atlantic City and the Bahamas in jeopardy and would be likely to create a diminu-

tion in cash flow and earnings that would taint the assets. (TR3 at 52–53). Masson testified that the gross liquidation value of the enterprise would be $310 million. (TR3 at 55). The Liquidation Valuation prepared by Salomon Brothers in the Disclosure Statement breaks down this valuation as follows:

| | |
|---|---|
| Atlantic City Casino/Hotel Operations | $ 80 million |
| Atlantic City Undeveloped Real Estate | $ 15 million |
| Bahamas Casino Hotel Operations and Undeveloped Real Estate | $140 million |
| Showboat Lease | $ 65 million |
| Airline Assets | $ 10 million |
| TOTAL | $310 million |

(*See* D–9 at Exhibit D).

Masson also testified that an adjusted liquidation value in present value terms would be 300 million dollars or slightly less. (TR3 at 57).

Masson testified that under a liquidation analysis he examined the recoveries to creditors under four (4) different scenarios. (TR3 at 57–59).

(1) First, assuming that the GRI collateral and claims remained intact and that the GRI Noteholders would recover on those assets, and that the RII and RIFI claims remained as they now exist. (TR3 at 59).

(2) Second, assuming that the GRI creditors had their collateral avoided except to the extent of $125 million (the $125 million based on money that remained in the estate for working capital spending) with the balance of the GRI claims unsecured. (TR3 at 59).

(3) Third, assuming that the GRI and RII and RIFI creditors would be treated *pari passu* and the GRI security interest avoided by a fraudulent conveyance action. (TR3 at 60).

(4) Fourth, assuming that the GRI noteholders could be subordinated to the position of the RII and RIFI holders. (TR3 at 60).

Masson testified that under Scenario No. 1 (GRI sustaining lien collateral position), the GRI recovery would be 64 cents per dollar of allowed claims. The RII and RIFI holders would receive 15 cents per dollar of allowed claims. (T3 at 61).

Under Scenario No. 2 (GRI holding a partially secured position), the GRI recovery would be approximately 51 cents per dollar of allowed claim; RII and RIFI would recover 22.5 cents per dollar of allowed claim. (TR3 at 61).

Under Scenario No. 3 (all claims treated pari passu), all claims would receive 33 cents per dollar of allowed claim. (TR3 at 62).

Under Scenario No. 4 (the subordination of the GRI class), the RII and RIFI classes would receive a little more than 51 cents per dollar of allowed claim and the GRI holders would receive nothing. (TR3 at 62).

Masson undertook an analysis of recovery to the creditors under a liquidation in accordance with the same percentages under the Plan which produced the following percentages of recovery:

(1) GRI—48.4 cents per dollar of allowed claims

(2) RIFI—24.8 cents per dollar of allowed claims

(3) RII—19.8 cents per dollar of allowed claims

(TR3 at 64).

Masson testified that an orderly sale process for the Bahamas properties would be approximately nine months, including two months to collect data and prepare to go to the market, three months taking the property to market, including face-to-face meetings with prospective purchasers, and four months bringing potential buyers to the Paradise Island site and allowing them to conduct due diligence, and conducting negotiations. (TR3 at 67–68, 75). Masson

also testified that it was reasonable to expect to sell the Bahamas property within two years. (TR3 at 67, 76).

Masson testified that under the plan, at the end of four years there would be maturity on various bonds issued under the Plan and a balance to pay off depending upon the sale proceeds from the Bahamas property. (TR3 at 76–77). Masson testified that in the event the Bahamas sold for a net figure of $250 million at the maturity of the Series A and Series B notes approximately 50 or 51 million dollars would need to be refinanced. (TR3 at 77). Masson testified that he considered it an imminently reasonable assumption that a company generating 40 million dollars of cash flow could refinance 50 million dollars of debt at a reasonable interest rate. (TR3 at 77). Masson also testified that if there was 75 million dollars of debt left on those bonds in 1994 his opinion as to the refinancability of the bonds would be the same. (TR3 at 78).

Masson also testified that if the Bahamas were sold for $300 million, there would be a zero balance on the bonds. (TR3 at 78). In the event that the Bahamas was not sold, in 1994 a balance of 330 to 340 million dollars would remain on the bonds. (TR3 at 78). Masson testified that in his opinion it was not unreasonable to assume under that scenario that the bonds could be refinanced. (TR3 at 79).

Masson further testified that the values set forth herein were calculated as of the time of the Debtors' Disclosure Statement, on or about April 16, 1990, but that there had not been any material impact on those values through the date of the confirmation hearings. (TR3 at 80).

Masson testified that he was not requested by the Debtors nor did he undertake to evaluate the value of fraudulent conveyance claims which the Debtor company might possess, or the Debtors' ability to collect on notes which it held issued by the Griffin Company or Merv Griffin, or the value of claims that are to be placed in the litigation trust under the Plan, or Donald Trump's ability to pay a judgment on any of the claims put in the litigation trust, or to value the agreement between Merv Griffin and the Debtor entities to use his likeness and name in marketing activities, or the value of that contract. (TR3 at 82). Masson also testified that in reaching his liquidation analysis he did not include a value for claims such as fraudulent conveyance claims or other claims Resorts may have against Merv Griffin or Donald Trump. (TR3 at 82–83).

Masson also testified that in valuing the Debtor, Salomon Brothers considered among other things, the market growth in the Atlantic City area which in Salomon Brothers' view will be approximately 9% in 1990 and 6.5% in 1991, with no views as to market growth in the subsequent years. (TR3 at 86).

Masson also testified that he made no determination at any time whether Resorts was insolvent (TR3 at 125), nor did he value Resorts' management (TR3 at 152) or Resorts' interest in the UURT tract (TR3 at 161).

Masson testified that he computed a corporate reorganization value for the Resorts entities based upon a capitalization of future earnings, and average future earnings for the Resorts entities for the next five years under the business plan in the Disclosure Statement. (TR3 at 192). The average future earnings generated as a result of that analysis was approximately $32 million. (TR3 at 193). The capitalization rate employed in that analysis was 9.1%, resulting in a multiplier of 11. (TR3 at 193). Utilizing a multiplier of 11 and average future earnings of $32 million, a reorganization value of $352 million was generated. (TR3 at 193). After making adjustments to that value, Masson testified that the reorganization value for Resorts was less than the intrinsic value developed of $536 million. (TR3 at 194). Masson testified that based on the reorganization value generated, the equity in New Resorts would still have a value greater than zero. (TR3 at 194). Masson also testified that in his opinion no reasonable investor other than Merv Griffin would purchase 21.5% of the equity in New Resorts for $26 million given the capital structure under the Plan. (TR3 at

196). Although Masson did not undertake an independent valuation of the control of New Resorts that Mr. Griffin would receive under the Plan, Masson testified that the value of the equity (4.4 million shares of stock in New Resorts), including any premium for control, subject to all of the limitations contained in the Plan, was less than $26 million. (TR3 at 220).

The Debtors also presented the testimony of Mr. Bruce Karsh, senior vice president of Trust Company of the West, Chairman of the Official Combined Bondholders Committee of Resorts International, Inc. and Resorts International Financing, Inc. Karsh testified that his firm, Trust Company of the West, owned the 16⅝% RIFI Bonds. (TR1 at 263). Karsh also testified that his firm owned GRI bonds, which fact had been disclosed to the other members of the RII/RIFI Committee. (TR1 at 263). Karsh testified that the Committee retained professional advisors, the firm of Jones, Day, Reavis & Pogue, attorneys to the Committee and Chemical Bank, as its financial advisor. (TR1 at 265–266). Karsh testified that the Committee was aware of the principal potential claims that the RII/RIFI Bondholders had against the GRI Bondholders, Donald Trump and Merv Griffin. (TR1 at 267). Karsh testified that these claims were discussed by the Committee, including the possible settlement of such potential litigation. (TR1 at 268). Karsh testified that the Committee was concerned with the complexity of such litigation, the protracted nature of such litigation, possibly 4 to 5 years, and the impact such litigation would have on the debtor companies, including a concern that if litigation proceeded the value of the debtor company's assets could deteriorate substantially, and that the Debtors' licenses in Atlantic City and the Bahamas could potentially be lost, and the cost of such protracted litigation. (TR1 at 269). Karsh noted that while the Committee believed that it had a "pretty good case" against some defendants, the result was not free from doubt, the remedy or damages the Committee would receive not certain, as well as what the value of the debtor company would be at the end of lengthy litigation.

(TR1 at 270). Karsh characterized the settlements proposed in the plan as necessary to an effective reorganization and that the proposal made in the Plan was acceptable to the Committee. (TR1 at 271–272). Karsh testified that the Committee considered Merv Griffin important to the debtor company, in terms of employee morale, and attracting gaming customers, and that the Committee wanted Griffin to continue as Chairman of Resorts and be involved in Resorts' business. (TR1 at 274). Karsh testified that the Committee believed that the debtor company could emerge from Chapter 11 yet preserve claims against Donald Trump, but that it would be impossible for the debtor company to emerge from Chapter 11 without settling claims against Merv Griffin and the GRI Bondholders. (TR1 at 280). Karsh testified that in his opinion if the RII/RIFI Bondholders pursue litigation against the GRI Bondholders, the debtor company would remain in Chapter 11, which would be detrimental by way of increased costs, loss of key people and the potential for loss of gaming customers and the potential loss of the debtors' gaming licenses. (TR1 at 348–349, 353). Karsh also testified that the RII/RIFI Committee had voted unanimously to support the Plan before the Court. (TR1 at 285).

In connection with the proposed settlement to release certain third parties, officers, directors, and professionals of the debtors, Karsh testified that the RII/RIFI Committee was concerned about the potential indemnity claims that may be asserted against Resorts and Merv Griffin. (TR1 at 369–410).

At the confirmation hearing a certain stipulation was entered into between counsel for the Trump Litigation Defendants and counsel for the Debtors and Alvarez & Marsal, Inc. as follows:

1. Neither Mr. Antonio Alvarez of Alvarez & Marsal, Inc. nor any employees or members of the firm of Alvarez & Marsal, Inc. prepared or otherwise conducted an analysis of any fraudulent conveyance claims that may be asserted by the Debtors against any persons or enti-

ties in connection with the acquisition in November 1988 of Resorts International, Inc. by The Griffin Company as well as all related transactions.

2. Neither Mr. Alvarez or any member of the firm of Alvarez & Marsal, Inc. prepared or otherwise conducted an analysis of the solvency of Resorts International, Inc. or any of its related or affiliated entities in connection with the acquisitions in November 1988 of Resorts International Inc. by The Griffin Company, as well as all related transactions.

3. Neither Mr. Alvarez nor any member of the firm of Alvarez & Marsal, Inc. prepared or made any determination of the value of any of the claims arising out of the transaction described in paragraphs 1 and 2.

(OT–1).

The following stipulation was entered into between counsel for the Trump Litigation Defendants, and the Combined Official Bondholders Committee and Mr. Arthur Newman:

1. That Mr. Arthur Newman of Chemical Bank, financial advisor to the Combined Official Bondholders Committee of RII and RIFI did not advise Christopher Whitney or any other employee or representative of the Debtors regarding: (1) fraudulent conveyance claims arising out of or relating to the acquisition of Resorts International, Inc. by The Griffin Company and all related transactions in November 1988; and (b) the solvency of the Debtors and affiliated companies at the time of and after the transactions described in subparagraph (a) above.

At the confirmation hearing, counsel for Trump raised an objection to the Court's approval of the appointment of Mr. Kenneth R. Feinberg, Esquire as Litigation Trustee under the Plan. (Transcript of July 27, 1990 at 32) (hereinafter "TR4 at ——").

The objection was based on the participation by Mr. Feinberg's firm, Kaye Scholer Fierman, Hays & Handler, in negotiations relating to Mr. Trump's own bank debt. (TR4 at 32). In this regard, counsel for Trump raised the issue of a potential conflict of interest. (TR4 at 37). Counsel for the Debtors and the GRI Noteholders Committee requested that the Court consider confirmation of the Plan, subject to the further approval of the litigation trustee and on the basis that the appointment of a litigation trustee was not essential until the initial distribution date or the effective date, when the causes of action will pass into the trust. (TR4 at 35–36). At the confirmation hearing this Court bifurcated the confirmation hearing and the approval of appointment of the litigation trustee, leaving the determination of the appointment of the litigation trustee to subsequent, separate proceedings. (TR4 at 39).

The Debtors seek confirmation of this Plan pursuant to § 1129(a) and (b) of the Bankruptcy Code. Because impaired Classes 4A, 4B, 4C, 5, 6 and 7 are deemed to have rejected the Plan, it does not satisfy the requirement of § 1129(a)(8) that each impaired class of claims or interests has voted to accept the Plan. Section 1129(b), however, provides for confirmation over the dissent of one or more impaired class if the Plan meets other additional requirements.

Section § 1129(a)(1) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

This court must here determine whether the plan complies with other applicable provisions of the Bankruptcy Code.

Section 1122 of the Bankruptcy Code requires:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Section 1122 of the Code requires that all claims which are classed together be substantially similar. Such a requirement insures that large claims of differing legal natures do not dictate the other claims within a class. *Matter of Rochem, Ltd.,* 58 B.R. 641, 642 (Bankr.D.N.J.1985).

In this respect, Section 1123(a)(4) also provides:

(a) Notwithstanding any other applicable nonbankruptcy law, a plan shall—

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

The Court of Appeals for the District of Columbia in *In re AOV Industries, Inc.,* 792 F.2d 1140 (D.C.Cir.1986) stated:

Even though neither the Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration— be it their claim against specific property of the debtor or some other cognizable chose in action exchange for the same percentage of recovery.

*In re AOV Industries, Inc., supra,* 792 F.2d at 1152. *See also In re Monroe Well Service, Inc.,* 80 B.R. 324, 335 (Bankr. E.D.Pa.1987).

This is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure since there is no statutory obligation upon plan proponents to quantify exactly what each class member is relinquishing by a release. *In re Monroe Well Service, Inc., supra,* 80 B.R. at 335. As the Court of Appeals stated in *AOV:*

We do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court's broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others.

*In re AOV Industries, Inc., supra,* 792 F.2d at 1154. *See also, In re Monroe Well Service, Inc., supra,* 80 B.R. at 335.

As set forth at length above the plan designates ten classes of claims and interests, with varying payment provisions (*See* Article II of Plan). Greenfield & Chemicles here asserts a claim for unpaid attorneys' fees in an unliquidated amount, arising out of litigation commenced in the Chancery Court for the State of Delaware, and the United States District Court for the District of New Jersey brought in connection with the offer by Donald Trump to purchase the outstanding Class A shares of Resorts. During the course of those actions, the parties entered into an Amended Stipulation and Agreement of Compromise and Settlement. With respect to classification, Greenfield & Chemicles argues that the Plan improperly includes its claim in Class 3C because other members of Class 3C are beneficiaries of the Litigation Trust, and as a result of Greenfield & Chemicles' release of claims against Trump, members of Class 3C have the potential to receive more than Greenfield & Chemicles. The Court rejects this argument for several reasons. First, it is clear that Section 1122 only requires that claims in a class be substantially similar. *See AOV, supra.* The releases contained in the subject stipulation, while affecting any claim by Greenfield & Chemicles arising out of the prior shareholder litigation, have no effect on Greenfield & Chemicles' unsecured unliquidated claim against Resorts.[11]

---

**11.** Paragraph 9 of the subject stipulation provides:

Plaintiffs' counsel of record in the Actions will jointly apply to this Court, through their co-lead counsel, Silverman & Harnes and

Greenfield & Chemicles, for an award of attorneys' fees, including reimbursement of actual expenses, in an amount not to exceed in the aggregate $3,250,000. Such application may be made, at the option of plaintiffs' coun-

Kenwood Dual Fund argues that it appears that the Committee consists disproportionately of entities that acquired their debentures *after* the alleged fraudulent conveyances who may not have fraudulent conveyance claims, *citing Kupetz v. Wolf,* 845 F.2d 842, 849–50 n. 16 (9th Cir.1988).

Kenwood also argues that since the Plan seeks to release litigation claims of RIFI Debenture holders (*citing* Exhibit 1.72 to Plan), and does not differentiate between holders who purchased their interests prior to the leveraged buy-out from those who purchased their interests after the leveraged buy-out, the Plan raises disparate treatment issues under the case of *In re AOV Industries, Inc.,* 792 F.2d 1140, 1152 (D.C.Cir.1986).

■ To the extent that this presents a classification issue, the Court notes that the holding of *AOV, supra* does not demand that all class members must be treated precisely the same in all respects but rather that there be an approximate measure of equality. It is also clear that even though some class members may have stronger claims, or stronger defenses than others, they may be classified together so long as their claims are substantially similar and their treatment is approximately equal.

■ The court finds that under this plan the claims of each class are substantially similar to meet the requirements of § 1122(a).

A plan must also comply with the requirements of § 1123 which provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(1), 507(a)(2), or 507(a)(7) of this title and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as—

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more

sel, at or subsequent to the hearing referred to in paragraph 7(c) hereof. Defendants will not object to such application. No signatory to this Amended Stipulation shall apply to any Court for any fees or disbursements except as provided for in this paragraph. Any attorneys' fees and expenses so awarded by the Court to plaintiffs' counsel shall not be payable unless and until the Order and Final Judgment, as provided for in paragraph 8 hereof, shall be finally affirmed on appeal or, by lapse of time or otherwise, not subject to appeal. Subject to consummation of the Griffin Merger and the conditions set forth in this paragraph, any expenses and any attorneys' fees awarded by the Court to plaintiffs' counsel after full hearing and consideration by the Court of such matters as the Court, in its discretion, shall require, shall be paid one-half by Resorts and one-half by Donald Trump. Such sums are to be wire-transferred by Resorts and Donald Trump respectively on behalf of defendants to a designated joint escrow account maintained jointly in the name of Silverman & Harnes and Greenfield & Che-

micles or as the Court may otherwise direct, within five (5) days after the date of the later of (a) the order approving the payment of attorneys' fees and expenses has become final or (b) the consummation of the Griffin Merger. Donald Trump and Resorts will share the costs of the Notice provided for by the Order referred to in paragraph 7(b) hereof; plaintiffs shall have no responsibility for any of such costs regardless of whether the Amended Settlement is consummated. Except as provided in this Amended Stipulation, the defendants in the Actions and their respective present and former officers, directors, employees, agents, attorneys, representatives, trustees, financial advisors and investment bankers, affiliates, associates, parents, subsidiaries, general or limited partners, heirs, executors, administrators, predecessors, successors in interest, and assigns shall bear no other expenses, costs, damages or fees incurred by any named plaintiffs, by the Company, by any member of the Class, or by any of their attorneys, experts, advisors, agents or representatives.

entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends; and

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee.

11 U.S.C. § 1123(a).

Claims and interests are classified in Article II of the plan. The Plan does not classify claims of the type described in Sections 507(a)(1), 507(a)(2) and 507(a)(7). (*See* Plan, Article III).

Article IV of the Plan sets forth the treatment of all classes of the Plan and Article V, Section 5.1 of the Plan indicates that Classes 1, 2C, 2D, 2E, 2F, 2G, 3A, 8, 9 and 10 are not impaired. Article VI, Section 6.1 of the Plan indicates that Classes 2A, 2B, 3B, 3C, 4A, 4B, 4C, 5, 6 and 7 are impaired under the Plan. Article IV of the Plan sets forth the treatment of those impaired classes. Article IV of the Plan provides the same treatment for each claims or interest of a particular class in compliance with Section 1123(a)(4).

Section 1123(a)(5) requires that the Plan "provide adequate means for the plan's implementation."

The means for implementation of the Plan are set forth in various provisions of the Plan: the retention by New Resorts of all of the property of the Debtors' estates (Article XIII, Section 13.1) except where the Plan specifically provides otherwise; the assignment of the Debtors' claims against the Trump Litigation Defendants to the Litigation Trustee (Article VII, Section 7.10(a)); the merger of GRH and RIFI into New Resorts (Article VII, Section 7.2(a)); the termination of the Indentures governing the GRI Notes, RII Debentures, and RIFI Debentures and cancellation of such Notes and Debentures (Article VII, Section 7.5(a) and (b)); the curing of any defaults under the secured claims in Classes 2C through 2G (Article IV, Sections 4.3(c)–(g) and under assumed Executory Contracts (Article X, Section 10.2); the issuance of the Series A Notes, and the capital stock of New Resorts (Article VII, Sections 7.12, 7.13 and 7.14) in exchange for the claims of the holders of the GRI Notes, RIFI Debentures and RII Debentures and approximately $23.3 million in new value contributions from Merv Griffin.

In accordance with section 1123(a)(6), Article VII, Section 7.3 of the Plan provides that New Resorts and New GRI shall adopt or amend their certificates of incorporation and bylaws to prohibit the issuance of non-voting equity securities. Finally, in compliance with section 1123(a)(7), the Plan contains only provisions consistent with the interests of creditors and equity security holders as well as public policy with respect to the manner of selection of any officer, director or trustee under the Plan. Article VIII, Section 8.2 of the Plan provides that as of the Effective Date, Griffin shall be a member and the Chairman of the Board of Directors of New Resorts, Griffin shall have designated three other directors who shall be reasonably satisfactory to the Selection Committee [12] and the Selection Committee shall have designated the remaining two directors who shall be reasonably satisfactory to Griffin. Set forth in Section XIV of the Disclosure Statement is the biographical information with respect to the directors selected in accordance with these provisions. The directors will be classified into three staggered classes of two each, with terms ending at the annual shareholders meeting in 1991, 1992 and 1993, at which successors will be elected in accordance with the Restated Certificate of Incorporation of New Resorts (Exhibit 7.3A to Plan). Any vacancies will be filled by replacements appointed by the remaining members of the Board of Directors. The management as set forth in the Plan, Restated Certificate of Incorporation (Exhibit 7.3A to Plan); Griffin License and Services Agreement (Exhibit 9.2 to Plan) and Hanlon Employment Agreement (Exhibit 9.3A to Plan) are included in the Plan.

Here the Court notes that objections have been raised to the employment agreement of David P. Hanlon, Chief Executive Officer, and the appointment and compensation of a member of the Bondholders Committee to serve as an Advisory Director of New Resorts. In regard to the Hanlon employment agreement, the Court, however, finds based on the testimony presented here that the continuation of present management is essential to the ongoing operations of the Debtors, particularly in respect to its meeting the projections set forth in the business plan including the sale of the Bahamas. Nor have there been any facts presented to the Court to determine that the expansion of the Board of Directors to include an Advisory Director should be disapproved by this Court.

Section 1123(b) specifies certain permissive provisions that may be included in the Plan. Subsection (1) provides that a plan may impair or leave unimpaired any class of secured or unsecured claims or interests. As noted above, Articles IV, V and VI of the Plan identifies 2A, 2B, 3B, 3C, 4A, 4B, 4C, 5, 6 and 7 as impaired classes; all other classes are unimpaired, Classes 1, 2C, 2D, 2E, 2F, 2G, 3A, 8, 9 and 10.

Article X of the Plan provides that except for executory contracts whose terms are the subject of litigation in this Court, effective on the Confirmation Date, all Executory Contracts listed in Exhibit 10.1 to the Plan will be rejected, all remaining Executory Contracts will be assumed, and all defaults under such assumed Executory Contracts will be cured in accordance with Section 365, as allowed by § 1123(b)(2).

Section 1123(b)(3) permits a Plan to provide for the retention, enforcement, settlement or adjustment by the debtor or by an appointed representative of the estate of any claim or interest belonging to the debtor or the estate. Article VII, Section 7.10(a) of the Plan provides that the Debtors shall take all necessary steps to establish the Litigation Trust, providing for the retention, preservation and enforcement by the Litigation Trustee, as a representative of the estate, of all of the Debtors' claims against the Trump Litigation Defendants.

Article VII, Section 7.10(h) of the plan provides for the settlement, compromise and extinguishment of all of the Debtors' claims against the GRI Noteholders, Griffin, Morgan Guaranty Trust Company of

---

**12.** The Selection Committee consists of voting representatives designated by the GRI Committee, and the RII/RIFI Debentureholders Committee and one non-voting representative designated by Resorts. (Article I, Section 1.78 of Plan).

New York, and other third parties, upon confirmation and consummation of the Plan in consideration for certain concessions and contributions provided for in the Plan.

Compromises are "a normal part of the process of reorganization." *See Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1, *reh'g denied* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968); *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 130, 60 S.Ct. 1, 14, 84 L.Ed. 110 (1939), *reh'g denied* 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939). The United States Supreme Court in the case of *Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson, supra* set forth the standard for court approval of a compromise or settlement:

> In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the "informed, independent judgment" of the bankruptcy court. *National Surety Co. v. Coriell,* 289 U.S. 426, 436, 53 S.Ct. 678, 682, 77 L.Ed. 1300 (1933). The requirements of §§ 174 and 221(2) of Chapter X, 52 Stat. 891, 897, 11 U.S.C. §§ 574, 621(2), that plans of reorganization be both "fair and equitable," apply to compromises just as to other aspects of reorganizations. *Ashbach v. Kirtley,* 289 F.2d 159 (C.A. 8th Cir.1961); *Conway v. Silesian–American Corp.,* 186 F.2d 201 (C.A.2d Cir.1950). The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. *In re Chicago Rapid Transit Co.,* 196 F.2d 484 (C.A. 7th Cir.1952). There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all

facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

390 U.S. at 424–425, 88 S.Ct. at 1163.

Whether to approve an application to compromise a matter is within the discretion of the court, which should approve a compromise after considering all the factors involved, and only if it is in the best interests of the estate. *In re Hallet,* 33 B.R. 564, 565 (Bkrtcy.D.Me.1983). Factors to be considered by the court include: (1) the probability of success of the litigation; (2) the difficulties of discovery; (3) the complexity, expense and delay incurred by the litigation, and; (4) the paramount interest of the creditors. *In re Continental Investment Corp.,* 637 F.2d 8, 11 (1st Cir.1980). *See also Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929). While creditors' objections are not controlling, emphasis is placed on the paramount interests of creditors and proper deference given to reasonable views set forth in their objections. *See In re Hallet,* 33 B.R. 564, 566 (Bkrtcy.D.Me.1983).

The Supreme Court in *Protective Committee, supra* rejected the notion that claims that the alternative was extensive litigation at heavy expense and unnecessary delay was sufficient to conclude that a settlement was "fair and equitable":

> If the quoted statement of the trial court had been the result of an adequate and intelligent consideration of the merits of the claims, the difficulties of pursuing them, the potential harm to the debtor's estate caused by delay, and the fairness of the terms of settlement, then it would without question have been justifi-

able to approve the proposed compromises. It is essential, however, that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law. Here there is no explanation of how the strengths and weaknesses of the debtor's causes of action were evaluated or upon what grounds it was concluded that a settlement which allowed the creditor's claims in major part was "fair and equitable." Although we are told that the alternative to settlement was "extensive litigation at heavy expense and unnecessary delay," there is no evidence that this conclusion was based upon an educated estimate of the complexity, expense, and likely duration of the litigation. Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.

390 U.S. at 434, 88 S.Ct. at 1168.

Bankruptcy Rule 9019(a) provides in relevant part:

(a) **Compromise.** On motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a) and to such other entities as the court may designate, the court may approve a compromise or settlement

Debtors' Plan proposes what its proponents have termed as a "global settlement" of claims against various parties in connection with the acquisition of Resorts International, Inc. by Griffco Resorts Holding, Inc., formerly The Griffin Company (TGC) which was accomplished through a series of transactions commonly referred to as a leveraged buyout. The proponents of the Plan have alleged that the filing of the bankruptcy petitions by and against the Debtors created the potential for various suits seeking to set aside or void some or all of the transaction which occurred in connection with the acquisition of Resorts. These potential causes of action include actions based upon the fraudulent conveyance and preference provisions of the Bankruptcy Code and state fraudulent transfer claims. The Plan provides for the "global settlement" of all potential litigation with Griffin and TGC ("the Griffin Settlement") and the GRI Noteholders ("the GRI Noteholders' Settlement") including fraudulent conveyance, preference and equitable subordination actions arising out of the acquisition of Resorts.[13]

Section 7.10(h) of the Plan provides:

(h) All claims and causes of action of any of the Reorganizing Entities, whether as debtors or debtors in possession, and all of their Affiliates (i) against holders of GRI Notes in their capacity as such, to the extent such claims and causes of action arise out of or relate to the Acquisition, or (ii) against Griffin (except with respect to the promissory note and letter of credit provided for in Section 9.1 hereof), the Morgan Bank, the Released Defendants[14] or their respective Affiliates, agents, accountants, at-

---

**13.** The GRI Noteholders note in their brief in support of the settlement that:

The global settlement referred to herein excludes the settlement of any claims the Debtors and their affiliates may have against Trump Taj Mahal Associates Limited Partnership, Donald Trump, Harvey Freeman, Robert Trump, The Trump Hotel Corporation and their respective affiliates (Collectively, the "Trump Litigation Defendants") as a result of the acquisition. Instead, the Plan provides for the establishment of a trust fund for the benefit of holders of RII and RIFI Debentures and other Class 3C Claims to pursue such claims against the Trump Litigation Defendants. (See GRI Noteholders' Committee's

memorandum in support of the settlement of claims, page 1, n. 2).

**14.** Section 1.62 of the Plan defines "Released Defendants" to mean:

Resorts, RIH, RIFI, GRI, GRH, TGC, Griffco Acquisition Corp., Griffin, and each of their officers, directors, employees, agents, attorneys, representatives, trustees, financial advisors, investment bankers, affiliates, associates, parents, subsidiaries, general and limited partners, heirs, executors, and administrators on the Confirmation Date, but in any event including William Druz, George A. Bariscillo, Jr., and Mitchell Sviridoff, and their successors and assigns.

torneys, advisers, employees or other representatives or, in the case of the Morgan Bank, its officers and directors, shall be deemed to have been settled, compromised and extinguished by the confirmation of this Plan effective as of the Effective Date. It is the intention of the Proponents that all claims settled, compromised and extinguished pursuant to the Plan shall be deemed to have been actually adjudicated.

Proponents of the Plan and counsel for the committees have asserted in their memoranda that under the terms of the Griffin Settlement, in exchange for the Debtors' release of all claims against Griffin, TGC, and certain other persons and entities, Griffin will, among other things, (1) enter into the License and Service Agreement, requiring Griffin to serve as Chairman of New Resorts' Board of Directors and granting New Resorts a non-exclusive license to use Griffin's name and likeness, (2) waive his $10 million claim for subrogation with respect to a letter of credit drawn to pay interest on the mortgage notes, (3) contribute all of TGC's shares in Resorts by means of a merger between TGC and a newly created subsidiary of Resorts, and (4) Griffin will concurrently contribute approximately $26 million in cash and a note in exchange for approximately 21.5% of the capital stock of New Resorts. In addition, as part of this global settlement, Griffin will also (1) create a $2.5 million fund in which RIFI Debentureholders can share by agreeing to exchange releases with Griffin and others, and (2) create a fund of 500,000 shares of the capital stock of New Resorts in which GRI Noteholders can share by agreeing to exchange releases with Griffin and others.

With respect to the GRI Noteholders Settlement, counsel for the GRI Noteholders Committee asserts that the Plan provides that in consideration for the releases of all of the Debtors' direct and derivative claims against them, the GRI Noteholders will exchange their GRI Notes for new secured debt, with a present value that is significantly less than the aggregate amount of their existing GRI Notes, secured by collateral, the bulk of which will be shares on a

*pari passu* basis with the new secured debt issued to the RII and RIFI Debentureholders under the Plan. (See GRI Noteholders Brief at page 4–5).

In a memorandum in support of the settlement of claims, the Combined Official Bondholders' Committee have summarized the claims which will be compromised under the plan as follows:

A. *The Claims Which Have Been Compromised*

The Claims for relief which have been compromised by the Plan arise out of several related transactions:

1. On or about November 15, 1988, GRI sold $325 million in noted (the "GRI Notes") to the GRI Noteholders. The GRI Notes are secured by certain collateral, including a first mortgage on the Resorts Casino Hotel in Atlantic City and, in the case of some of the GRI Notes, a $50 million first mortgage on certain of Resorts' Bahamian operating properties and a pledge of 66% of the capital stock of Resorts International (Bahamas) 1984 Limited ("RIB").

2. From November 15 to 17, 1988, Resorts and its subsidiary, Resorts International Hotel, Inc. ("RIH") paid $50 million to Donald Trump ("Trump"), who transferred his Class B Resorts shares to Griffin Co. The structure of this payment was a purported $15 million "loan" from Resorts to Griffin Co. and a purported $35 million "loan" from RIH to Griffin Co., both on November 17, 1988. The proceeds of those purported loans were then utilized to repay a two-day bridge loan from The Morgan Bank, which had financed the purchase of purportedly $50 million of Trump's Class B shares. (Griffin Co. paid another $46 million to Trump for those shares).

3. On November 16, 1988, Resorts and its subsidiaries paid approximately $63.7 million under a "Termination Agreement" to Trump Hotel Corporation, of which $60.7 million was purportedly to terminate a "Services Agreement" and a related license agreement

and $3 million represented accrued construction fees and reimbursable costs.

4. On November 16, 1988, a subsidiary of Resorts sold the hotel and related assets now known as "Trump Taj Mahal" to Trump Taj Mahal Associates Limited partnership purportedly for a payment of $273 million.

The Plan compromises all avoidance actions against the Griffin Noteholders, Griffin Co., Griffin and The Morgan Bank arising out of these transactions, yet at the same time reserves all claims against Trump and the Trump entities. These avoidance actions would include claims under Section 548 of the Bankruptcy Code and the UFCA seeking to avoid (a) the Debtors' obligations with respect to the GRI Note, (b) the liens securing the GRI Notes, and (c) the transfer of $50 million by Resorts and RIH on November 17, 1988. The remainder of this memorandum of law will refer collectively to the avoidance actions which have been compromised as the "Avoidance Actions."

In consideration for the compromise of the Avoidance Actions, the GRI Noteholders will exchange their GRI Notes for new secured debt, with a present value that is significantly less than the aggregate amount of the existing GRI Notes, secured by collateral, the bulk of which will be shared on a *pari passu* basis with new secured debt issued to the Resorts and RIB bondholders under the Plan.

In exchange for the Debtors' release of all claims they may have, directly or derivatively on behalf of the Resorts and RIF bondholders, against Griffin, Griffin Co. and certain other persons and entities, Griffin will, among other things: (1) enter into a License and Services Agreement, requiring Griffin to serve as Chairman of New Resorts' Board of Directors and granting New Resorts a license to use Griffin's name and likeness, (2) waive his $10 million claim for subrogation with respect to a letter of credit drawn to pay interest on the Mortgage Notes, (3) contribute all of the stock of Griffin Co. to New Resorts by means of a merger of Griffin Co. into a newly created subsidiary, and (4) concurrently contribute approximately $26 million in cash and a note in exchange for approximately 21.5% of the capital stock of New Resorts. In order to achieve a global settlement, Griffin will also (1) create a $2.5 million fund in which RIF bondholders can share by volunteering to exchange releases with Griffin and others.

In essence, then, the compromise and settlement of the Avoidance Actions achieves the global settlement necessary to enable the Debtors' herein to emerge from chapter 11 as a viable economic entity, yet, at the same time, reserves all claims against Trump and Trump's affiliates.

(Combined Official Bondholders' Committee Memorandum In Support of Confirmation of Debtors' Second Amended Joint Plan of Reorganization, pp. 5–8).

As noted earlier, the Plan provides for the Debtors's release of Griffin from potential claims relating to the leveraged buyout of Resorts. The Debtors have identified several potential claims in favor of Resorts and RIH against TGC and Griffin which may have arisen from the acquisition transactions.

The Debtors as well as the GRI Noteholders and the Combined Official Bondholders Committee have submitted memoranda in support of the Griffin and GRI Noteholders settlements. These parties represent to this Court that the chief reason in support of the settlements is because potential litigation against The Griffin Company, Merv Griffin, the Morgan Bank and the holders of $325 million in notes sold by GRI to the general public would be speculative, protracted, and extremely costly.

These parties have framed the potential claims against Griffin and the GRI Noteholders as actions which arise from the acquisition transactions which arose from the leveraged buyout (LBO) of Resorts. These parties have identified potential actions based on fraudulent conveyance provision of the Uniform Fraudulent Conveyance [Transfer] Act and the Bankruptcy

Code. The parties contend that the application of fraudulent transfers made in the case of an LBO has not been the subject of a large body of consistent reported judicial decision. The parties contend that the caselaw applicable to the lawsuits against Griffin and GRI Noteholders is "... in many respects unsettled and evolving, and since some of the factual and policy issues raised by such a lawsuit would in all likelihood be vigorously disputed, the outcome of such a litigation would be uncertain." (Combined Official Bondholders' Committee Memorandum at p. 5).

The Debtors have outlined several potential claims in favor of Resorts and RIH and against TGC and potentially Griffin from the acquisition transactions:

(1) Resorts and RIH possess claims against TGC for nonpayment of its debt;

(2) TGC may be liable on the basis of a claim under fraudulent conveyance law on the grounds that the loans from RIH and Resorts to TGC were for less than fair or reasonably equivalent value, made while the transferees were insolvent; and

(3) Griffin may be personally liable by "piercing the corporate veil," substantially consolidating Resorts and TGC, or holding Griffin personally liable as a beneficiary of transfers to TGC under § 550 of the Bankruptcy Code.

In order to determine whether the proposed settlements are fair, equitable and in the best interest of creditors, this Court must examine the probability of successful prosecution of these claims. *Protective Committee*, 390 U.S. at 425, 88 S.Ct. at 1163.

The Debtors have argued that potential claims seeking to hold Griffin liable present difficult questions of law and fact. Debtors claim that in order to hold Griffin personally liable for repayment of the loans it will be necessary to "pierce the corporate veil" and look beyond TCG's corporate identity or hold Griffin liable under § 550. Debtors have further argued that piercing the corporate veil is an extraordinary remedy, difficult to prove, with the burden of proof borne by the movant. This Court agrees that under applicable law, attempts to hold Griffin personally liable under a "corporate veil" theory would not be a clear cut case.

Corporate law in New Jersey is clear, "except in cases of fraud, injustice, or the like, courts will not pierce a corporate veil." *State Dept. of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 500, 468 A.2d 150 (1983) (*citing Lyon v. Barrett*, 89 N.J. 294, at 300, 445 A.2d 1153). Fundamental to corporate law is the notion that the corporation and its shareholders are separate entities and "[e]ven in the presence of corporate dominance, liability generally is imposed only when the parent [or in this case, the controlling stockholder] has abused the privilege of incorporation by using the subsidiary to perpetuate a fraud or injustice, or otherwise to circumvent the law." 94 N.J. at 501, 468 A.2d 150 (citations omitted). This Court is mindful of the fact that the task of bringing such an action and the potential success of such claims presents an arduous although perhaps not impossible task for the Debtors.

The Debtors also argue to the Court that any attempts to substantially consolidate Resorts and TGC would be met with resistance by the courts, as it is also an extraordinary remedy. Debtors argue that the substantive consolidation of Resorts and TGC would require a showing among other things that the assets and functions of these entities have been commingled, the practical inability to separate assets and liabilities of affiliates, and the extent of reliance by creditors of one affiliate upon the creditor of another.

It is a well-settled tenet of bankruptcy law that "The power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others." *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir.1966); *see generally Soviero v. The Franklin National Bank of Long Island*, 328 F.2d 446 (2d Cir.1964).

This Court next turns to the proposed settlement of potential fraudulent convey-

ance actions against Griffin and TGC. The Debtors argue that the loans from Resorts and RIH to TGC could be viewed as constructive fraudulent conveyances. In order to succeed under this theory requires a showing: (1) that at the time the relevant obligations were created or the transfer or pledge effected that GRI, RIH, RIB or Resorts received less than fair consideration or less than reasonable equivalent value for such obligation or transfer; and (2) was insolvent or rendered insolvent by the transfer; (3) was engaged or about to engage in a business or a transaction for which its remaining unencumbered property or assets constituted unreasonably small capital; or (4) intended to or believed that it would incur debts beyond its ability to pay as such debts matured or became due. *See* Uniform Fraudulent Conveyance Act (UFCA) adopted by New York as Debtor and Creditor Law § 270 *et seq.* and the Uniform Fraudulent Transfer Act (UFTA), adopted by New Jersey as N.J.Stat. 25:2–20 *et seq.*

The Debtors have identified some of the difficult tasks that it may encounter in bringing a fraudulent conveyance claim including proving the elements set forth above. The Debtors have also have identified some of the difficulties that they possibly face in choosing among the state fraudulent conveyance statutes under which to prosecute potential actions. While some fraudulent conveyance laws are similar in that they are based on the Model Uniform Fraudulent Transfer Act, different proofs as to insolvency may be required. (*See* Debtors' Memorandum In Support of Compromise and Settlement at p. 16). The

UFCA, the UFTA and Section 548 [15] of the Bankruptcy Code dealing with the avoidance of fraudulent conveyances in a bankruptcy case require different showings as to value or fair consideration.

In support of the settlement, Debtors also represent to the Court that Griffin is providing valuable consideration including: (1) the granting of a non-exclusive license by Griffin to use his name and image in advertising and promotion of Debtors' operations (Plan § 10.1); (2) Griffin's waiver of a $10 million subrogation claim relating to a December 1989 letter of credit (Plan § 9.4); (3) Griffin's contribution of all of TGC's shares in Resorts (Plan § 7.2); (4) Griffin will provide on a pro rata basis 500,000 shares of stock of New Resorts in exchange for voluntary releases by holders of GRI Notes and a fund of $2,500,000 in exchange for voluntary releases by holders of RIFI Debentures; (5) Griffin will purchase 4,400,000 shares of New Resorts common stock for approximately $23,346,-000 and a secured promissory note.

In regard to the proposed settlement of claims against GRI Noteholders contained in Section 7.10(h) of the Plan, the Debtors have argued that asserting fraudulent conveyance type claims are complex and difficult and that this is compounded by the fact that many of the transfers which occurred were in satisfaction of pre-existing intercompany claims or between entities which may not have been insolvent at the time and/or are not now in bankruptcy.

The Debtors here argue in favor of settling potential claims against the GRI

---

**15.** Section 548(a) of the Bankruptcy Code provides in part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily in involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Noteholders based upon their evaluation that the claims present novel questions of law which make the outcome of litigation uncertain. The Debtors take the position that the theory of applying fraudulent conveyance law to a leverage buyout is novel and that there is limited case law on this type of action.

In the case of *U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986) *cert. den. sub nom, McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1986) (*Tabor*), the Third Circuit considered whether the Pennsylvania Uniform Fraudulent Conveyance Act (UFCA) was properly applied to a leveraged buyout. The court determined that the UFCA did apply to leveraged buyout, and stated in this regard:

> The Act's broad language, however, extends to any "conveyance" which is defined as "every payment of money ... and also the creation of any lien or incumbrance." 39 Pa.Stat. § 35. This broad sweep does not justify exclusion of a particular transaction such as a leveraged buy-out simply because it is innovative or complicated. "If the UFCA is not to be applied to leveraged buy-outs, it should be for the state legislatures, not the court to decide."

*Tabor*, 803 F.2d at 1297. The Third Circuit stated further, that while "arguments against general applications of Act to leveraged buy-out are not without some force, the application of fraudulent conveyance law to certain leveraged buy-outs is not clearly bad public policy." (footnote omitted). 803 F.2d at 1297.

In *Tabor*, the Third Circuit discussed the policy reasons which are advanced against the application of fraudulent conveyance law to leveraged buy-outs. On this point, the court noted:

> A major premise of the policy arguments opposing application of fraudulent conveyance law to leveraged buy-outs is that such transactions often benefit creditors and that the application of fraudulent conveyance law to buy-outs will deter them in the future. *See* Baird and Jackson, *Fraudulent Conveyances Law and Its Proper Domain*, 38 Vand.L.Rev. 829, 855 (1985). An equally important premise is that creditors can protect themselves from undesirable leveraged buy-outs by altering the terms of their credit contracts. *Id.* at 835. This second premise ignores, however, cases such as this one in which the major creditors (in this instance the United States and certain Pennsylvania municipalities) are involuntary and do not become creditors by virtue of a contract. The second premise also ignores the possibility that the creditors attacking the leveraged buy-out (such as many of the creditors in this case) became creditors before leveraged buy-outs became a common financing technique and thus may not have anticipated such leveraged transactions so as to have been able to adequately protect themselves by contract. These possibilities suggest that Baird and Jackson's broad proscription against application of fraudulent conveyance law to leveraged buy-outs may not be unambiguously correct.

*Tabor*, 803 F.2d at 1297, f.n. 2.

The reasoning in *Tabor* offers significant guidance to this court on the issue of the application of fraudulent conveyance law to leveraged buy-outs. Contrary to Debtors' assertions that the issue is novel with limited case law, *Tabor* represents to this Court sound controlling precedent in this circuit on the application of state fraudulent conveyance law to complicated leveraged buy-outs. *See also Vadnais Lumber Supply, Inc. v. Byrne*, 100 B.R. 127, 134–35 (Bankr. D.Mass.1989); *Mellon Bank, N.A. v. Metro Communications*, 95 B.R. 921, 933 (Bankr. W.D.Pa.1989); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 500 (N.D.Ill. 1988).

The Debtors and counsel for the Combined Official Bondholders' Committee have also cited authority indicating that some courts disfavor or are reluctant to apply state fraudulent conveyance law to leveraged buy-outs including: *Credit Managers Ass'n. v. Federal Co.*, 629 F.Supp. 175, 179 (C.D.Cal.1985); *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988); Baird & Jack-

son, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand.L.Rev. 829 (1985) (contending that fraudulent conveyance laws should not be employed to unwind LBOs).[16]

In the case of *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir.1988), the chapter 7 trustee brought an adversary proceeding to set aside the purchase of the debtor and to recover payment following its sale which were part of a leveraged buy-out of debtor. The Ninth Circuit declined to apply California fraudulent conveyance law to the LBO based in part on findings that there was no evidence that the selling shareholder intended to defraud the corporation's creditors or that they knew that the financing of the sale of the debtor was through an LBO. *Id.* at 848.

Courts have not hesitated to apply state fraudulent conveyance law to leveraged buy-outs, particularly in cases where there is evidence of intent to defraud and knowledge of the LBO. *Tabor*, 803 F.2d at 1297; *Kupetz*, 845 F.2d 842. However, in cases where evidence of intent to defraud is lacking there is authority which legitimizes Debtors' position that the success on such a claim is uncertain. *Wieboldt Stores, Inc. v. Schottenstein*, 1989 WL 51068, 1989 U.S.Dist.Lexis 5216 (N.D.Ill.1989); *Kupetz v. Wolf, supra.* In fact, as one court observed:

> Courts which actually have applied the fraudulent conveyance laws to the facts of a particular situation have not settled upon a uniform analysis for determining the extent of the parties' ultimate liability for the conveyance. Because this issue is relatively novel and is certainly complex, see *[Board of Ed. of Tp. High School Dist. No. 214, Cook County, Ill. v.] Climatemp [Inc.]*, supra [91 F.R.D. 245] at 251, a substantial ground exists

for disagreement over the issues resolved by this court's December 1 and March 1 Orders.

*Wieboldt*, 1989 WL 51068, p. 1, 1989 U.S.Dist.Lexis 5216, p. 3; *Accord Kupetz v. Wolf, supra.*

In consideration of this settlement, the Debtors argue that the GRI Noteholders are giving up any claim for principal and accrued interest represented by the bonds. Under the Plan, each holder of a GRI Note will receive (1) a Series A Note in a principal amount equal to such holder's Pro Rata Share of $187,500,000; and (2) a Showboat Note in a principal amount equal to such Holder's Pro Rata Share of $105,333,000. The Debtors in their memoranda to the Court have characterized the value of the exchange as follows:

> The GRI Noteholders are relinquishing a claim entitled to the present value of $344,050,000 plus, with respect to at least the Reset Noteholders, a claim for post-petition interest for notes with a principal amount of $292,833,000 and a present value far lower than that. The GRI Notes pay cash interest at a rate of between 13-½ and 13-⅞ percent. The Series A Notes, which will be secured obligations of New Resorts, bear interest of 6% per year from April 11, 1990 until april 15, 1991, increasing to 9% in the second year, 12% in the third year and 15% in the fourth year. Resorts may, however, pay all or any portion of this interest by issuing additional Series A Notes. The Showboat Notes will be secured non-recourse notes. Interest on the Showboat Notes will consist of a pass-through of the lease payments actually received by New Resorts under the Showboat lease.

(Debtors' Memorandum In Support of Compromise and Settlement, p. 44).

---

**16.** In *Tabor*, the Third Circuit discussed the *Baird and Jackson* article and concluded that even under their analysis the complex LBO could be dismantled. In this regard the Third Circuit stated:

> It should also be noted that another basic premise of the Baird and Jackson analysis is that as a general matter fraudulent conveyance law should be applied only to those transactions to which a rational creditor would surely object. Baird and Jackson, at

834. Although a rational creditor might under certain circumstances consent to a risky but potentially beneficial leveraged buy-out of a nearly insolvent debtor, no reasonable creditor would consent to the intentionally fraudulent conveyance the district court correctly found this transaction to be. Thus, the application of fraudulent conveyance law to the instant transaction appears consistent even with Baird and Jackson's analysis.

*Tabor*, 803 F.2d at 1297 f.n.3.

To the extent that Greenfield & Chimicles asserts that the Plan abandons claims for relief Resorts may have against Griffin in violation of Section 554 of the Bankruptcy Code, such argument is misplaced. Instead, the Plan proposes a compromise of controversies between the Debtors and Griffin, consistent with Section 1123(b)(3) and Bankruptcy Rule 9019(a). *See also Teltronics Services, Inc.*, 762 F.2d 185, 190 (2d Cir.1985) (the court found no abandonment of claims by the trustee where he had executed a valid settlement of all outstanding claims).

In regard to Greenfield & Chimicles' claim that the Debtors failed to comply with the provisions of the Bankruptcy Code by not submitting the settlement with Griffin to the review of independent, disinterested directors or shareholders, Greenfield & Chimicles cites to no specific provisions of the Delaware General Corporate Law which the Debtors are alleged to have violated. The Debtors assert that under Delaware law, shareholder consent is required only in the situation of the amendment of charter (D.G.C.L. § 242) or by-laws (D.G.C.L. § 109), dissolution of the corporation (D.G.C.L. § 273) or of a joint venture corporation (D.G.C.L. § 153), merger (D.G.C.L. § 251) or the sale, lease or exchange of all or substantially all of the corporation's assets (D.G.C.L. § 271). The court further notes that the Bankruptcy Code provides specific procedures and standards to assess the fairness of the compromise with Griffin.

Greenfield & Chimicles, both at the prior Disclosure Statement Hearing and the Confirmation Hearing has asserted that the RII/RIFI Committees approved the releases to GRI Noteholders to avoid the effect of certain subordination provisions in the RII/RIFI Debentures should an avoidance action be brought against GRI. All that has been demonstrated in those proceedings is that legal questions exist pertaining to those subordination provisions.[17]

In considering the various settlements placed before the Court for approval, the Court finds that the settlements are fair and equitable to all creditors and are in the best interest of the Debtors' estate. The claims for relief which are proposed to be compromised arise from complicated transactions for which the legal remedy is anything but certain. But the costs and delays are a certainty. As reflected in the testimony of Mr. Karsh, it was in part the uncertainty regarding the remedy or damages to be obtained from litigation, weighed against the delays, costs and potential damage to the Debtors' assets during such time that was considered by the RII/RIFI Committee in deciding to support the settlements. In consideration for the compromise of claims the Debtors may have against Griffin and his affiliates, the estates are receiving what in this Court's view constitute valuable consideration from Merv Griffin as set forth above, including: (1) the granting of a non-exclusive license by Griffin to use his name and image in advertising and promotion of Debtors' operations; (2) Griffin's waiver of a $10 million subrogation claim relating to a December 1989 letter of credit; (3) Griffin's contribution of all of TGC's shares in Resorts (4) Griffin will provide on a pro rata basis 500,000 shares of stock of New Resorts in exchange for voluntary releases by holders of GRI Notes and a fund of $2,500,000 in exchange for voluntary releases by holders of RIFI Debentures; (5) Griffin will purchase 4,400,000 shares of New Resorts common stock for approximately $23,346,000 and a secured promissory note.

**17.** At the hearing on the Disclosure Statement, Greenfield & Chimicles argued that the RII Debentures were issued under indentures pursuant to which the claims of debentureholders are subordinated to "Senior Debt" (*citing* Indenture for 10% Subordinated Debentures due 1998 at 17) and that the GRI Notes are "Senior Debt." Greenfield & Chimicles asserted that in the event that avoidance actions were prosecuted to a successful judgment against holders of GRI Notes, the holders of GRI Notes would have claims against the estate, and the claims of RII debentureholders would be subordinated to those claims and that thus, the members of the RII Debentureholders' Committee have a direct, undisclosed interest in the release which GRI Noteholders will receive. At that time, counsel for the GRI Noteholders' Committee opposed such an interpretation of the indentures.

In consideration for the compromise of claims the Debtors may have against the GRI Noteholders, the GRI Noteholders are foregoing claims for interest on their debt, exchanging their GRI Notes for new secured debt, with a value less than the aggregate amount of the existing GRI Notes, and secured by collateral much of which will be shared on a *pari passau* basis with new secured debt issued to the RII and RIFI Bondholders under the Plan.

These settlements, in this Court's view, provide the Debtors with the ability to emerge from Chapter 11 as a viable economic entity, while at the same time preserving the Litigation Trust claims, for the benefit of the RII and RIFI Bondholders and other creditors.

Accordingly, the compromises set forth in the Debtors' Plan will be approved. In so ruling, this Court notes that questions have been raised as to conflicts of interest on behalf of members of the RII/RIFI Committee, particularly Mr. Karsh. The actions of the RII/RIFI advisors, including Jones, Day, Reavis & Pogue and Chemical Bank, have also been subjected to scrutiny by certain of the objectors.

In this regard, the Court is satisfied that Mr. Karsh disclosed both to the RII/RIFI Committee and the United States Trustee his company's holdings of GRI Notes. No particular facts have been presented to the Court to find that Mr. Karsh's interests should taint or render ineffective the Committee's negotiations, which have been lengthy and in this Court's view undertaken in conformance with the Committee's duties under the Bankruptcy Code. Nor have any facts been presented to indicate that the RII/RIFI advisors, including its legal counsel, Jones, Day, Reavis & Pogue, and its financial advisor, Chemical Bank, have performed except in conformance with their fiduciary duties under the Bankruptcy Code.

Objections have also been made to the actions of Debtors' co-counsel, Gibson, Dunn & Crutcher, in regard to the settlements and the Plan before the Court. This Court in separate proceedings authorized the retention of Gibson, Dunn & Crutcher, as co-counsel for the Debtors. That retention was authorized by the Court, in part, in view of the fact that Gibson, Dunn & Crutcher had relinquished its representation of Merv Griffin in these proceedings. No facts have been brought to the attention of this Court to establish that the firm of Gibson, Dunn & Crutcher has acted other than in compliance with this Court's orders.

Section 1123(b)(5) authorizes in a plan the inclusion of "any other appropriate provision not inconsistent with the applicable provisions of this title. Contained in this Plan are provisions enabling Electing GRI Noteholders and Electing RIFI Debentureholders voluntarily to tender releases to Griffin *et al.* in exchange for receiving either reciprocal releases and stock (Electing GRI Noteholders) or cash (Electing RIFI Debentureholders). *See* Plan, Article IV, Section 4.3(a)(ii) and (b)(ii), Section 4.4(b)(ii), Article VII, Section 7.16.

■ Here the Court must consider the various objections to confirmation of the Plan based upon the proposed release provisions of the Plan.

Section 7.16 of the Plan provides:

**Procedures Relating to Electing GRI Noteholders and Electing RIFI Debentureholders.**

(a)(i) In order to qualify as an Electing GRI Noteholder, a Holder of an Allowed Class 2A or 2B Claim on the record date for voting on the Plan set forth in the Order of the Bankruptcy Court approving the Disclosure Statement shall, prior to the Effective Date, deliver to the applicable Existing Indenture Trustee for the GRI Notes a duly executed GRI Plaintiff's Release.

(ii) On or prior to the Initial Distribution Date, Griffin shall deliver to the Existing Indenture Trustees for the GRI Notes, in appropriate amounts, (x) $2,654,082 and (y) sufficient duly executed GRI Defendants' Releases to provide a release for each Electing GRI Noteholder as consideration for the GRI Plaintiff's Releases.

(iii) on the Initial Distribution Date, the Existing Indenture Trustees for the GRI Notes shall:

(x) purchase 500,000 shares of newly issued New Common Stock from New Resorts on behalf of the Electing GRI Noteholders for an aggregate issue price of $2,654,082;

(y) deliver to each Electing GRI Noteholder (1) a certificate representing the number of shares of New Common Stock to be delivered to such Holder pursuant to Section 4.3(a) or (b) hereof and (2) a fully executed GRI Defendants' Release; and

(z) deliver to New Resorts and to Griffin the GRI Plaintiff's Releases received pursuant to clause (i) above.

(b)(i) In order to qualify as an Electing RIFI Debentureholder, a Holder of an Allowed Class 3B Claim on the record date for voting on the Plan set forth in the Order of the Bankruptcy Court approving the Disclosure Statement shall, prior to the Effective Date, deliver to the Existing Indenture Trustee for the RIFI Debentures a duly executed RIFI Plaintiff's Release.

(ii) On or prior to the Initial Distribution Date, Griffin shall make available $2,500,000 in cash to the Existing Indenture Trustee for the RIFI Debentures.

(iii) On the Initial Distribution Date, the Existing Indenture Trustee for the RIFI Debentures shall:

(x) deliver to New Resorts and to Griffin the RIFI Plaintiff's Releases received pursuant to clause (i) above; and

(y) deliver to each Electing RIFI Debentureholder his Pro Rata share of the $2,500,000 received from Griffin as provided in Section 4.4(b) hereof.

Any of the $2,500,000 not required to be distributed to Electing RIFI Debentureholders shall be promptly returned to Griffin.

The form of GRI Plaintiff's Release proposed in the Plan, Exhibit 1.38 to Plan (D–9A) provides in pertinent part:

3. In consideration for the additional consideration provided for Electing GRI Noteholders in the Plan, the undersigned ("RELEASOR"), effective as of the Initial Distribution Date, for itself and on behalf of its officers, directors, agents, attorneys, employees, representatives, trustees, affiliates, parents, subsidiaries, general and limited partners, heirs, executors, administrators, successors and assigns, hereby releases and discharges RELEASEES from all claims, rights, or causes of action, known or unknown, by reason of, arising from, in connection with or relating to the Acquisition or the GRI Notes, including, without limitation, all claims that have been or could have been asserted in the GRI Actions; provided, however, that if any of the RELEASEES shall commence any action against RELEASOR for any claim, right or cause of action arising out of the Acquisition or the GRI Notes, this release shall become null and void as to the RELEASOR and each such RELEASEE and shall cease to be of any effect as to actions by RELEASOR against each such RELEASEE; and provided further that if the RELEASOR is sued in its capacity as a holder of GRI Notes for claims arising from, in connection with or relating to the Acquisition on the GRI Notes by any RIH Creditor or creditor of RIB, nothing in this release shall be construed to release any action by the RELEASOR against the RELEASEES for an amount not to exceed any damages incurred by RELEASOR in connection with such action.

4. Nothing in this Release shall be interpreted to release, or shall affect the enforceability of, the Litigation Claims assigned to the Litigation Trust pursuant to the Plan and any claims against the UNRELEASED DEFENDANTS.

5. Nothing in this Release is intended to affect, nor shall be interpreted to release or affect, RELEASOR'S claim as a GRI Noteholder under the Plan.

The form of RIFI Plaintiff's Release proposed in the Plan, Exhibit 1.72 to Plan (D–9A) provides in pertinent part:

3. In consideration for the additional consideration provided for Electing RIFI Debentureholders in the Plan, the undersigned ("RELEASOR"), effective as of the Initial Distribution Date for itself and on behalf of its officers, directors, agents, attorneys, employees, representatives, trustees, affiliates, parents, subsidiaries, general and limited partners, heirs, executors, administrators, successors and assigns, hereby releases and discharges RELEASEES from all claims, rights, or causes of action, known or unknown, by reason of, arising from, in connection with or relating to the Acquisition or the RIFI Debentures, including, without limitation, all claims that have been or could have been asserted in the RIFI Actions; provided, however, that if any of the RELEASEES shall commence any action against RELEASOR for any claim, right or cause of action arising out of the Acquisition or the RIFI Debentures, this release shall become null and void as to the RELEASOR and each such RELEASEE and shall cease to be of any effect as to actions by RELEASOR against each such RELEASEE.

4. Nothing in this Release shall be interpreted to release, or shall affect the enforceability of, the Litigation Claims assigned to the Litigation Trust pursuant to the Plan and any claims against the UNRELEASED DEFENDANTS.

5. Nothing in this Release is intended to affect, nor shall be interpreted to release or affect RELEASOR'S claim as a RIFI Debentureholder under the Plan.

The GRI Plaintiff's Release and the RIFI Plaintiff's Release both identify "Releasees" as follows:

"RELEASEES" shall mean and refer collectively to Resorts, RIH, RIFI, GRI, TGC, Griffco Acquisition Corp., Griffin, and Drexel Burnham Labert, Inc. and their present and former officers, directors, agents, attorneys, employees, representatives, trustees, affiliates, parents, subsidiaries, general and limited partners, heirs, executors, administrators, successors and assigns, except that RELEASEES shall not include those individuals and entities identified in paragraph 2(c) of this Release.

Both Releases define "Unreleased Defendants" as follows:

"UNRELEASED DEFENDANTS" shall mean and refer collectively to the Acquisition Defendants, American Appraisal Associates, Inc., American Appraisal Capital Services, Inc., and Houlihan Likey Howard & Zukin.

Section 524(e) of the Bankruptcy Code provides:

(e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

When a bankruptcy court discharges a debtor, it does so by operation of the bankruptcy laws, not by contractual consent of the creditors. *Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985); *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982). *See also In re Elsinore Shore Associates,* 91 B.R. 238, 247 (Bankr. D.N.J.1988).

In *Union Carbide,* the plan of reorganization provided for the "settlement, satisfaction and discharge" against third party guarantors in exchange solely for distribution of proceeds from property of the debtor. Subsequently, a creditor sued the guarantors on the guaranty. The guarantors contended that creditors' approval of the plan of reorganization worked an accord and satisfaction under Indiana law and thereby erased their liability on the guaranty.

Relying on Section 16 of the Bankruptcy Act of 1898, which provided that "[T]he liability of a person who is co-debtor with, or guarantor or in any matter a surety for, a bankrupt shall not be altered by the discharge of such bankruptcy," the court held that the statute specifically prohibited the purported discharge of the guarantors, regardless of the provision in the plan to the contrary. The court reasoned that the purpose of Section 16 was to prevent a creditor from being forced to lose his claim against a third party involuntarily and without consideration:

A bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of the creditors.... A creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings, simply because the gamesmanship imported by state contract law into the bankruptcy proceedings would be intolerable. Since a majority of the creditors must approve the debtor's plan for the debtor to be discharged, in many instances one creditor's approval or disapproval will have no effect even in the bankruptcy proceeding.... Similarly, the payment which effects a discharge is not consideration for any promise by the creditors, must less for one to release non-party obligors.

*Id.* at 595. *Accord at R.I.D.C. Industrial Development Fund v. Snyder*, 539 F.2d 487, 490, n. 3 (5th Cir.1976), *cert. denied* 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977).

In the case of *Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985), after National Mortgage Exchange of Southern California ("NMESC") filed for reorganization under Chapter 11 of the Bankruptcy Code, investor Underhill (an unsecured creditor who held an investment interest in promissory notes executed by NMESC) filed a class action alleging securities fraud on the part of Carlos Royal, the principal shareholder of NMESC.

The proposed plan of reorganization provided that NMESC would exchange the promissory notes in which Underhill and the prospective class members held an interest for property held by a third-party financial institution. NMESC was to use the property obtained in the exchange to secure a loan intended to satisfy creditors' claims. Attached to the proposed exchange transaction was a release by investors in the promissory notes of all claims against NMESC, its affiliates and insiders. *Underhill v. Royal, supra,* 769 F.2d at 1429–30.

Eighty-nine percent of the creditors approved the plan; Underhill, however, raised objections to the release provision. The bankruptcy court confirmed the plan, explicitly leaving to the district court hearing the class action a ruling on the scope and enforceability of the release provision. 769 F.2d at 1430. The Ninth Circuit rendered its opinion on appeal of, among other matters, the district court's ruling that the claims release was unenforceable.

Generally, discharge of the principal debtor in bankruptcy will not discharge the liabilities of co-debtors or guarantors. 11 U.S.C. § 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." This section of the 1978 Bankruptcy Reform Act was a reenactment of Section 16 of the 1898 Act which provided that "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." Act of July 1, 1898, ch. 541 § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976)).

In addition, the Bankruptcy Act of 1898, as amended, provided that a corporation's discharge in bankruptcy "shall not release its officers, the members of its board of directors or trustees or of other similar controlling bodies, or its stockholders or members, as such, from any liability under the laws of a State or of the United States." Act of June 22, 1938, ch. 575, § 4(b), 52 Stat. 845 (formerly codified at 11 U.S.C. § 22(b) (1976)). Thus, under the old Act, stockholders or directors could remain liable for substantive violations despite discharge of the corporate entity. 1A J. Moore *Collier on Bankruptcy* Para. 16.-14, at 1551 (14th ed. 1978).

The above statutory provisions underscore the limitations on the bankruptcy court. When a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. *Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir.1982) (per curiam). *See also In re Kornbluth*, 65 F.2d 400, 401 (2d Cir.

1933). "The import of Section 16 [of the 1898 Act] is that the mechanics of administering the federal bankruptcy laws, no matter how suggestive, do not operate as a private contract to relieve co-debtors of the bankrupt of their liabilities." *Union Carbide*, 686 F.2d at 595 (citing *R.I.D.C. Industrial Development Fund v. Snyder*, 539 F.2d 487, 490 n. 3 (5th Cir.1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977)); *Beconta, Inc. v. Schneider*, 41 B.R. 878, 879 (D.C.E.D.Mich.1984). Consequently, "the payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligors." *Union Carbide*, 686 F.2d at 595.

*Underhill v. Royal, supra*, 769 F.2d at 1432.

In the case of *In re Future Energy Corporation*, 83 B.R. 470 (Bankr.S.D.Ohio 1988) Future Energy Corporation ("Future") was engaged in the business of oil and gas exploration and development. Future operated the wells under arrangements with limited partnerships or other entities involved in drilling and completion programs. By early 1986, Future had incurred large losses and owed substantial sums to its trade creditors. In late 1986 and early 1987, Krutex Energy Corporation ("Krutex") commenced negotiations with the principals of Future regarding the acquisition of 100% of the outstanding shares of Future. The deal between Future and Krutex was consummated, thereby making Future a wholly-owned subsidiary of Krutex prior to the filing for Chapter 11 relief.

In January 1987, Canyon Development Corporation ("Canyon"), a corporation which had been formed for the purpose of acquiring control of Future, purchased several claims of Future's creditors in an attempt to obtain Future's assets. At this time, Canyon was acting independently of Krutex in attempting to gain control of Future's assets.

Prior to the filing of Future's Chapter 11 petition on February 10, 1987, Krutex engaged in several transactions which were intended to facilitate the formulation of a plan of reorganization and the ultimate rehabilitation of Future. These transactions consisted of receiving assignments of claims held against Future by creditors, and cash infusion into Future to satisfy several claims held by BancOhio. Subsequent to the filing of Future's Chapter 11 petition, Krutex continued to negotiate with various creditors of Future in an attempt to obtain assignments of their claims. It was during this time that Krutex first became aware that Canyon was also purchasing the claims of Future's creditors. Canyon planned to acquire Future's assets by obtaining the secured positions of Future's creditors and then proceeding with state court foreclosure actions. Thus, a bidding war had developed between Krutex and Canyon over the control of Future's assets.

Krutex determined that the time and expense involved in attempting to successfully reorganize Future would be increased unnecessarily if the competition between Krutex and Canyon continued. Accordingly, Krutex and Canyon commenced a series of negotiations which culminated in an August 19, 1987 sale by Krutex to Canyon of 80% of the outstanding common shares of Future. The three entities; Future, Krutex, and Canyon, jointly proposed a Chapter 11 plan of reorganization.

Two creditors of Future objected to the proposed plan on the basis that it improperly provided for the release of potential claims against third parties, i.e., Krutex and Canyon in violation of § 524(e). The release provision objected to purported to release Krutex and Canyon from all claims and causes of actions held by third parties receiving distributions under the plan. The release provision provided in relevant part as follows:

> Any creditor receiving distributions pursuant to this plan shall be conclusively presumed to have fully released Future, Krutex, Canyon and their affiliates for any debt for which such distributions are received. Such release shall be given in consideration of the funding of this plan by Krutex and Canyon and shall be enforceable against any claimant receiving

distributions as a matter of contract. Acceptance of distributions pursuant to this plan of reorganization by any holder of an allowed claim or allowed interest shall constitute, except as set forth herein, a full, complete, final and binding release of any and all claims, actions or causes of actions, now or heretofore existing, whether asserted or unasserted, as to Future, Krutex, Canyon and their affiliates.

*In re Future Energy Corporation,* 83 B.R. at 485–6. The bankruptcy court held that since the release provision purported to release Krutex and Canyon from liability on Future's debts, and from all other potential claims and causes of action, that aspect of the plan violated § 524(e) and, thereby, caused the plan to run afoul of § 1129(a)(1). *In re Future Energy Corporation, supra, citing, Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982); *Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985); *In re Eller Brothers, Inc.,* 53 B.R. 10, 12 (Bankr. M.D.Tenn.1985); *In re L.B.G. Properties, Inc.,* 72 B.R. 65, 66 (Bankr.S.D.Fla.1987). *See also In re Sanders,* 81 B.R. 496, 499 (Bankr.W.D.Ark.1987); *In re Scranes,* 67 B.R. 985, 989 (Bankr.N.D.Ohio 1986); *In re Sago Palms Joint Venture,* 39 B.R. 9 (Bankr.S.D.Fla.1984).

In *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104, *reh'g denied,* 305 U.S. 675, 59 S.Ct. 250, 83 L.Ed. 437 (1938), the United States Supreme Court was faced with an issue regarding the conclusiveness of a reorganization plan which released the guarantor from his obligation, assuming the bankruptcy court did not have jurisdiction of the subject matter of the order, the release in reorganization of a guarantor from his guarantee of the debtor's obligations. The Supreme Court stated:

A court does not have the power, by judicial fiat, to extend its jurisdiction over matters beyond the scope of the authority granted to it by its creators. There must be admitted, however, a power to interpret the language of the jurisdictional instrument and its application to an issue before the court. Where adversary parties appear, a court must have the power to determine whether or not it has jurisdiction of the person of a litigant, or whether its geographical jurisdiction governs the place of the occurrence under consideration. Every court in rendering a judgment, passively, if not expressly, determines its jurisdiction over the parties and the subject matter. An erroneous affirmative conclusion as to the jurisdiction does not in any proper sense enlarge the jurisdiction of the court until passed upon by the court of last resort, and even then the jurisdiction becomes enlarged only from the necessity of having a judicial determination of the jurisdiction over the subject matter. When an erroneous judgment, whether from the court of first instance or from the court of final resort, is pleaded in another court or another jurisdiction the question is whether the former judgment is *res judicata.*

*Stoll v. Gottlieb, supra,* 305 U.S. at 170, 59 S.Ct. at 137.

The Supreme Court went on to hold that the order of the bankruptcy court confirming the plan of reorganization which provided for the releases of guarantees was *res judicata* in a subsequent action to recover on the guarantees. *Stoll v. Gottlieb, supra,* 305 U.S. at 174, 59 S.Ct. at 139–40. *Accord, Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987).

In the case of *Monroe Well Service, Inc.,* 80 B.R. 324 (Bankr.E.D.Pa.1987), there were five inter-related debtors that were in the business of putting together limited partnerships for oil drilling ventures. Once the investors were obtained and the limited partnership formed, one of the debtors would undertake oil exploration, drill oil wells, and operate them. Other debtors would provide equipment, own some of the wells and act as general partners. When oil prices declined during the 1980's, the debtors were forced to seek protection under Chapter 11 of the United States Bankruptcy Code.

The debtors' financial problems had significant consequences for those financially connected to the debtor entities. Continen-

tal Bank, who was involved in financing the debtors' operations, found itself the target of a multi-million dollar lawsuit brought by a class of limited partners in the debtors' ventures. Sheldon S. Somerman, the principal of the debtor entities, had personally guaranteed corporate obligations and some creditors anxious to collect on those guarantees initiated an involuntary petition against him. Oil wells, of which the limited partnerships owned the mineral rights or their working interests, were subject to the liens of mechanics and materialmen. The mechanics and materialmen were unsecured creditors of the debtors but secured creditors of the nondebtor limited partnerships.

Continental Bank, the official committee of limited partnerships, and Somerman had joined forces in an attempt to resolve most, if not all, of their respective disputes surrounding the affairs of the debtors within the context of the Chapter 11 proceedings. They proposed a plan which, upon confirmation, was designed to put an end to various claims and litigation involving nondebtors. Each of these nondebtor entities provided funds to implement the plan. The plan itself placed all unsecured creditors into one class for voting purposes. Creditors could opt into one or more voluntary nonvoting classes in exchange for granting releases to the nondebtors. Funds provided by the nondebtors would be distributed only to members of the optional classes. Electing unsecured creditors would receive about 7% of their claims, while non-electing creditors would only receive .4%.

Objections to the plan were raised in the context of objections to the disclosure statement submitted by the debtors and the plan proponents. Since virtually all of the structural objections were dependent upon the distributions to be made to creditors, the court deferred ruling upon these objections until the confirmation hearing. All parties to the proceedings, however, believed that the question whether a plan of reorganization can provide for voluntary releases of nondebtors could be determined by the court. The dispute surrounding this issue was deemed purely a legal issue by the parties to the proceeding, which was both capable of being addressed at hearing on disclosure and that, in the interest of economy, should be addressed. The court stated that this issue was somewhat connected with the question of claim classification which can be addressed prior to a confirmation hearing. *In re Monroe Well Service, Inc.*, 80 B.R. 324, 333 (Bkrtcy. E.D.Pa.1987); Bankruptcy Rule 3013. Thus, the bankruptcy court deemed this issue ripe for determination. *Id.*

The court in *Monroe Well* relied upon *In re AOV Industries, Inc.*, 792 F.2d 1140 (D.C.Cir.1986), which upheld, in part, an order confirming a plan of reorganization which provided for voluntary releases by creditors in favor of nondebtor plan funders. The *Monroe Well* court agreed with the objectors to the proposed plan, in that, under § 524(e) the debtors could not obtain confirmation of a plan which would attempt, over their objection, to discharge the obligations of nondebtors, such as guarantors. *In re Monroe Well Service, Inc., supra*, 80 B.R. at 334. The court further stated:

As with the plan here, the plan in *AOV Industries* made no attempt to release any claim held by a creditor against a nondebtor over the wishes of that individual creditor. Each creditor was permitted to render an individual decision whether to provide a release to a nondebtor in return for payment provided by a nondebtor plan funder. In *AOV Industries*, the District Court concluded that, so long as the release is purely voluntary and the will of the majority of creditors cannot force dissenting creditors to provide releases, *compare Union Carbide v. Newboles*, the nondebtor plan funders will not receive a discharge and the debtor's discharge did not, by itself, affect the rights of creditors vis-a-vis those plan funders. *In re AOV Industries, Inc.*, 31 B.R. 1005, 1010–1011 (D.D.C.1983) *aff'd in part* 792 F.2d 1140 (D.C.Cir.1986). I agree; a plan provision permitting individual creditors the option of providing a voluntary release to nondebtor plan funders does not violate 11 U.S.C. § 524(e).

*In re Monroe Well Service, Inc., supra,* 80 B.R. at 334–35.

Even though both the District of Columbia Circuit in *AOV* and the bankruptcy court in *Monroe Well* would permit voluntary releases of nondebtor funders of the plan, such release provisions must also meet the requirements of § 1123(a)(4). *In re Monroe Well Service, Inc., supra,* 80 B.R. at 335. Section 1123(a)(4) provides:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
>
> . . . .
>
> (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

The *Monroe Well* court noted that the Court of Appeals for the District of Columbia Circuit in *AOV* concluded that equality of treatment of members of a class as contemplated by § 1123(a)(4) is not provided by permitting each creditor of that class to opt to provide a release and receive the same pro rata distribution on its claim. *In re Monroe Well Service, Inc., supra,* 80 B.R. at 335. Rather, the Court of Appeals stated:

> Even though neither the Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements . to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration— be it their claim against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.

*In re AOV Industries, Inc., supra,* 792 F.2d at 1152. *See also, In re Monroe Well Service, Inc., supra,* 80 B.R. at 335.

This is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure since there is no statutory obligation upon plan proponents to quantify exactly what each class member is relinquishing by a release. *In re Monroe Well Service, Inc., supra,* 80 B.R. at 335. As the Court of Appeals stated in *AOV:*

> We do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court's broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others.

*In re AOV Industries, Inc., supra,* 792 F.2d at 1154. *See also, In re Monroe Well Service, Inc., supra,* 80 B.R. at 335.

Although *Monroe Well* and *AOV* purport to allow releases of non-debtors, both decisions involve releases which were voluntarily given by creditors. The district court's decision in *AOV Industries, Inc.,* 31 B.R. 1005 (D.C.1983), *aff'd in part* 792 F.2d 1140 (D.C.Cir.1986) noted the following:

> ... the debtor argues that there has been no "discharge" of Steag or Sleigh [non-debtor plan funders] as that term is defined under the Bankruptcy Code, 11 U.S.C. § 524, and, that therefore, the principle set forth in *[First Nat. Bank of Herkimer v.] Poland Union[,* 109 F.2d 54] is inapposite to the present case. Rather than granting a discharge, the plan provides that any creditor may individually and *voluntarily* release Steag and Sleigh of any alleged liability in return for the extremely valuable consideration tendered by Steag and Sleigh. Hawley and Bruce [objecting creditors] are completely free to pursue any rights they may have against these entities. Release of these rights was not even tied to acceptance or rejection of the plan, although the debtors argue that it might legally have been.

31 B.R. at 1010.

The Court is satisfied that the Plan provisions in this case permitting individual creditors the option of providing a volun-

tary release to non-debtor plan funders and other third parties does not violate Section 524(e). The voluntary releases of non-debtors contained in the Plan are to be exchanged for separate consideration provided for by a non-debtor third party plan proponent, Merv Griffin, and accordingly are purely contractual between the parties to the release. Under the Plan, Electing GRI Noteholders and Electing RIFI Debentureholders may voluntarily tender releases to Griffin and certain other parties in exchange for receiving from Griffin either reciprocal releases and stock (Electing GRI Noteholders) or cash (Electing RIFI Debentureholders). The Court here notes the other consideration Griffin is providing under this Plan: (1) the License and Service Agreement; (2) waiver of a $10 million subrogation claim; (3) contribution of the stock of TGC to New Resorts; (4) a total cash infusion of approximately $26 million. A review of the relevant case law does not require that each party released supply independent consideration or any consideration so long as the releases are voluntary. Nor have the Objectors sustained the assertion that the releases were coerced from creditors. The condition precedent to the effectiveness of the Plan that 90% of the GRI Noteholders tender releases (Plan, Section 12.2), standing alone, does not demonstrate that the releases tendered were not voluntary. Nor is such requirement prohibited by any applicable case law. *See e.g. In re Orlando Investors, L.P.*, 103 B.R. 593, 595 (Bankr.E.D.Pa.1989) (plan which was contingent upon 90% of certain limited partnership interests voluntarily releasing claims they may have had against certain named defendants in a federal lawsuit found not to violate § 524(e)).

Accordingly, the requirements of § 1129(a)(1) are met.

Section 1129(a)(2) requires that "the proponent of the plan complies with the applicable provisions of this title. In the case at bar this Court on June 14, 1990 entered an order approving the adequacy of the Disclosure Statement relating to the Plan before this Court, pursuant to 11 U.S.C. § 1125(b). Declarations of mailing have been filed with this court indicating that a copy of the Plan and Disclosure Statement were mailed to all creditors and interest holders, and ballots were also mailed to all creditors entitled to vote (those holding claims in Classes 2A, 2B, 3B or 3C).

11 U.S.C. § 1125(b) provides:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

By order dated June 14, 1990, this Court had previously found that the Disclosure Statement filed in connection with the Plan contained adequate information under § 1126 of the Bankruptcy Code. The Court reaffirms that finding in this opinion.

Section 1125 of the Bankruptcy Code does not require that there be transmitted with the Plan and Disclosure Statement objections to the Disclosure Statement or Plan unless otherwise ordered by the Court. This Court did not here require that such objections be included with the Disclosure Statement materials. Moreover, the Court is satisfied that the form of ballot was properly submitted to creditors in accordance with the Court's order of June 14, 1990, approving the Disclosure Statement, approving the form of ballot and scheduling the Confirmation Hearing. In connection with an objection raised at the Confirmation Hearing, this Court has reviewed certain language contained in the cover letter from Resorts to its creditors, dated June 21, 1990, which accompanied the Disclosure Statement and Plan. Included in that letter was the following language:

In addition, it is a condition precedent to the effectiveness of the Plan that holders of Reset Notes and Mortgage Notes

holding at least 90% in principal amount of such Notes as of June 14, 1990 voluntarily elect to tender a release, releasing the Debtors, Merv Griffin and certain other parties.

(D–9). While that cover letter did not contain the language in Section 12.2 of the Plan that this condition may be waived by the Proponents, the Court is satisfied that the language of the Plan itself was sufficiently clear to apprise creditors of such facts. Accordingly, the requirements of Section 1129(a)(2) are met.

■ Section 1129(a)(3) requires that "the plan has been proposed in good faith and not by any means forbidden by law."

"Bad faith" is not defined by the bankruptcy code, however, bad faith has been broadly defined as:

> The opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.

Black's Law Dictionary 127 (5th ed. 1979). The existence of bad faith is determined by an examination of the totality of the factors at issue. *See, Camelot, Inc. v. Hayden,* 30 B.R. 409, 411 (E.D.Tenn.1983).

■ In the context of reorganization under Chapter 11, a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code. *In re Toy & Sport Warehouse, Inc.,* 37 B.R. 141 (Bankr.S.D.N.Y. 1984); *In re Nite Lite Inns,* 17 B.R. 367 (Bankr.S.D.Cal.1982). Thus, the court may consider a debtor's pre-filing conduct as well as the feasibility of the plan itself. *In*

*re Toy & Sport Warehouse, Inc., supra,* 37 B.R. at 149.

■ The Plan before the Court embodies a comprehensive capital restructuring and a settlement of all litigation related to the acquisition, except the causes of action against the Trump Litigation Defendants, which are assigned to the Litigation Trust. The Plan allows for the cure and reinstatement of all secured debts (other than the GRI Notes) and the assumption and cure of defaults under assumed Executory Contracts.

The history of the negotiations conducted among all major constituencies and the actions of the Debtors before this Court lead this Court to find that the Debtors have acted diligently throughout the course of these proceedings to negotiate with the various creditor classes, to present a plan of reorganization supported by both creditors committees herein.

On July 27, 1990, the last date of the hearing on the Debtors' Plan, this court directed several parties to file legal memoranda on the issues of the validity of the Litigation Trust (the "Trust") and on the application of the doctrine of champerty and maintenance to the same. On August 2, 1990, legal memoranda were filed by the Trump Defendants ("Trump"), the Combined Official Bondholders Committee of RII and RIFI, and jointly by the Debtors and the GRI Noteholders.

Resorts' Plan proposes to establish a Litigation Trust whereby $5 million would be allocated to prosecute all potential fraudulent conveyance, breach of fiduciary duty and other claims of the Debtors arising out of or related to the Acquisition, against Donald J. Trump and certain of his affiliates (hereinafter "Trump Claims").

Section 7.10 of the Plan provides, *inter alia,* that on the Effective Date, the Reorganizing Entities shall execute the Litigation Trust Agreement and take all steps necessary to ensure the establishment of the Litigation Trump. The Plan further provides that on the Initial Distribution Date, the Reorganizing Entities shall cause the "Litigation Claims" to be transferred to the Litigation Trust, for the retention and

enforcement of such claims by the Litigation Trustee as representative of the successor in interest to the Reorganization Entities.

Specifically, Section 7.10 of the Plan provides:

(a) On the Effective Date (but prior to the mergers of GRH and RIFI into Resorts pursuant to this Plan), the Reorganizing Entities shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust. On the Initial Distribution Date, New Resorts shall (i) deliver to the Litigation Trustee an irrevocable letter of credit in the amount of $5,000,000 against which drawings may be made for reasonable expenses of the Litigation Trust as and when incurred with the balance, if any, to be drawn upon final settlement of all Litigation Claims; and (ii) cause the Litigation Claims to be assigned to the Litigation Trustee as the successor in interest to the Reorganizing Entities for the purpose of prosecuting such Litigation Claims for the benefit of the holders of Litigation Trust Units, as expeditiously as possible, consistent with the best interests of such holders. In such capacity, the Litigation Trustee shall retain and preserve the Litigation Claims for enforcement, as representative of and successor to the Reorganizing Entities in accordance with Bankruptcy Code §§ 1123(b)(3)(B) and 1145(a)(1).

"Litigation Claims" is defined under the Plan as follows:

**"Litigation Claims"** shall mean all rights, claims, torts, liens, liabilities, obligations, actions, causes of action, avoiding powers, suits, proceedings, debts, contracts, judgments, damages and demands whatsoever in law or in equity, whether known or unknown, contingent or otherwise, that one or more of the Reorganizing Entities, RIH or RIB and their respective Subsidiaries had, now has, or hereafter can, shall or may have against the Acquisition Defendants as a result of the Acquisition, including, without limitation, all such claims arising out of or based upon (i) the acquisition in

November, 1988 by TGC of the outstanding common stock of Resorts, (ii) the sale by Resorts and its Subsidiaries of the Taj Mahal, (iii) payments made by Resorts and its Subsidiaries to the Trump Hotel Corporation, or (iv) Bankruptcy Code § 544, 545, 547, 548, 549, 550 or 553(b). Plan, Article I, Section 1.44.

The "Acquisition Defendants" is defined under the Plan to mean Trump Taj Mahal Associates Limited Partnership, Donald J. Trump, Harvey Freeman, Robert Trump, The Trump Hotel Corporation, and their respective affiliates. Plan, Article I, Section 1.2. The Plan is governed by New York law. Plan, Section 14.1. The Litigation Trust Agreement, however, is governed by New Jersey law. *See* Litigation Trust Agreement, Exhibit 1.46 to Plan at Article 10.4.

The transfer of the Litigation Claims are accomplished under Article I of the Litigation Trust Agreement, which provides under "Declaration of Trust":

**Declaration of Trust.** In order to declare the terms and conditions hereof and in consideration of the confirmation of the Plan pursuant to the Bankruptcy Code, the Reorganizing Entities have executed this Agreement and hereby absolutely assign to the Trustee and to its successor and assigns, all right, title and interest of the Reorganizing Entities in and to the Litigation Claims, except that any Litigation Claim shall be retained by the Reorganizing Entities or their successors in interest insofar as necessary, but only to such extent, to preserve causes of action or avoidance powers relating thereto; to have and to hold unto the Trustee and its successors and assigns forever; **in trust nevertheless,** under and subject to the terms and conditions set forth herein and in the Plan for the benefit of the Holders of Units, their successors and assigns as provided for herein and in the Plan. Notwithstanding any retention by the Reorganizing Entities or their successors in interest of any Litigation Claim pursuant to this Section 1.1, the conduct of litigation provided for herein and decisions with respect to any

settlements thereof shall be made, and the proceeds thereof shall be distributed, in accordance with this Trust Agreement and the Plan.

Litigation Trust Agreement, Exhibit 1.46 to Plan at Article 1.1.

Article III, Section 3.1 of the Litigation Trust Agreement further provides:

**Prosecution of Litigation Claims, Defense of Counterclaims and Settlement Thereof.**

(a) The Trustee shall be empowered to and, in its sole discretion, may prosecute all Litigation Claims, including those based upon Sections 544, 547, 548, 549, 550 or 553(b) of the Bankruptcy Code and shall defend and/or settle all Counterclaims.

(b) The Trustee may settle any Litigation Claim or Counterclaim, but shall not settle Litigation Claim or Counterclaim unless the Trustee shall have obtained written approval of Majority Holders if (i) the amount originally sought by the Trustee on account of such Litigation Claim is greater than $3,000,000 and the settlement amount with respect to such Litigation Claim is less than 40% of the amount originally sought or (ii) the settlement amount with respect to any Counterclaim is greater than $250,000. If the Trustee receives an offer to settle any Litigation Claim and the settlement amount is at least 75% of the amount originally sought by the Trustee with respect to such Litigation Claim, the Trustee may accept such offer but shall not reject such offer unless and until such offer shall have been submitted to the Holders and rejected by Majority Holders.

Under the Plan, the Debtors' unsecured creditors (Classes 3B and 3C) shall receive 100% of the beneficial interest in any recovery achieved by the Litigation Trustee. The Plan contemplates the issuance of tradeable Trust Units in the Trust to unsecured creditors. Section 7.10(e) of the Plan requires the following of the Litigation Trustee prior to issuing the Trust Units, to the extent permitted by applicable law.

Section 7.10(e) of the Plan states:

Unless New Resorts and the Litigation Trustee are advised in writing by counsel that no such registration or qualification is necessary, the Litigation Trustee shall make no distribution of any Litigation Trust Certificates unless and until all registrations and qualifications of the Litigation Trust, such Litigation Trust Certificates (or any other security or instrument evidencing any interest in any Litigation Trust Unit) and the Litigation Trust Agreement under the Securities Act of 1933, the Trust Indenture Act of 1939 and the Investment Company Act of 1949, each as amended, to the extent any of the same may be applicable and any applicable state securities or "Blue Sky" laws shall have been made and declared effective. Upon receipt of such written advice of counsel, or upon the effective date of such registrations and qualifications, if applicable, but in any case not prior to the Initial Distribution Date, the Litigation Trustee may to the extent permitted by law issue, authenticate and deliver Litigation Trust Certificates in the appropriate amounts to the Persons in whose name the Litigation Trust Units are registered on the Unit Register required to be kept by the Litigation Trustee pursuant to the Litigation Trust Agreement.

The Trump Defendants have challenged the validity of the proposed Litigation Trust on grounds that the transfer of the Debtors' claims against Trump pursuant to the Trust Agreement would violate the New York Judiciary Law, Section 489 (McKinney 1983) which prohibits the champertous transfer of claims. Champerty has been defined as the transfer of a claim by the owner to a third party who has no prior interest in the claim for the exclusive purpose of prosecuting the claim for a share of the recovery. *See Coopers & Lybrand v. Levitt*, 52 A.D.2d 493, 384 N.Y.S.2d 804 (1st Dep't 1976). Maintenance has been defined as the intermeddling in a suit by a stranger, one having no privity or concern in the subject matter and standing in no relation of duty to the suitor. 14 Am.

Jur.2d Champerty and Maintenance, § 2 (2d Ed.1964).

New York's champerty statute section 489 of the New York Judiciary Law provides in relevant part:

489. Purchase of claims by corporations or collection agencies

No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill or exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon; provided however, that bills receivable, notes receivable, bills of exchange, judgments or other things in action may be solicitated, bought, or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors, trustee or receiver in bankruptcy, or any other person or persons in change of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise.

\* \* \* \* \* \*

The Debtors and the committees have argued that the New York champerty law is inapplicable and that even if it did in fact apply, that the proposed Litigation Trust does not violate the law of any relevant jurisdiction; including New York, New Jersey and Delaware.

 Under New Jersey law the doctrines of champerty and· maintenance do not exist to prevent the assignment of claims or causes of action. *See Schomp v. Schenck*, 40 N.J.L. 195 (1878); *Sweeney v. Veneziano*, 70 N.J.Super. 185, 175 A.2d 241 (App.Div.1961); *Hughes v. Eisner*, 8 N.J.Super. 351, 72 A.2d 901 (Ch.Div.1950), *rev'd on other grounds*, 14 N.J.Super. 58, 81 A.2d 394 (App.Div.1951). Under Delaware law, to the extent applicable, any applicable Delaware law prohibiting champerty and maintenance was repealed. 11

Del.C. § 371, repealed by Del.Laws C. 497, eff. April 1, 1973.

In the case of *Koro Company, Inc. v. Bristol–Myers Co.*, 568 F.Supp. 280, 281 (D.C.Cir.1983), the United States District Court for the District of Columbia applied the New York champerty statute to the assignment of an antitrust claim. In *Koro*, an antitrust claim was assigned to plaintiff, a New Jersey corporation, pursuant to a stock purchase agreement between the assignor and another New Jersey corporation. The assignment was made for the exclusive purpose of enabling the plaintiff to bring an action on the claim. The District Court found that such an assignment of a claim for that purpose was in violation of the New York champerty statute and so was null and void. *Koro*, 568 F.Supp. at 288–89.

The *Koro* case discussed both the issues of choice of law and the application of the New York champerty statute. Trump contends here that under New Jersey choice of law principles, the New York champerty statute is applicable to the proposed creation of the Litigation Trust.

In *Koro*, both the plaintiff and assignor were New Jersey corporations. The *Koro* court considered several factors in determining that the New York champerty statute applied to the assignment of the antitrust claim. First, the court noted that the stock purchase agreement contained a choice of law clause selecting New York as the controlling body of law for resolving disputes arising under the agreement. 568 F.Supp. at 286. Second, the court applied the choice of law test of its jurisdiction and examined:

(1) the place of contracting;

(2) the place of negotiation of the contract;

(3) the place of performance of the contract;

(4) the location of the subject matter of the contract and;

(5) the place of incorporation and the place of business of the parties.

*Id.* at 286 (citing Restatement (2d) of Conflicts of Law § 188 (1971)); *In re Park-*

wood, Inc., 461 F.2d 158 (D.C.Cir.1971). Finally, the Koro court considered the governmental policies underlying the conflicting laws and the interests of each state in having its own law applied. Id. at 286. (citing Mazza v. Mazza, 475 F.2d 385, 387–388 (D.C.Cir.1973)); Williams v. Williams, 390 A.2d 4, 5–6 (D.C.1978). The Koro court observed that New Jersey does not have a stated policy against champerty nor does it recognize the doctrine, while on the other hand, New York has a statute prohibiting champerty. Id. at 287. Accordingly, the Koro court determined that application of the New York law would frustrate no New Jersey policy, whereas application of New Jersey law would impair the principal underlying the New York statute. The Koro court also noted the interest of the forum state, there the District of Columbia, in applying the law that most conformed to its own, noting that champerty was prohibited in the District of Columbia, as it was in New York and that the same was true under federal common law. Id. at 287.

In the instant case, the Debtors and the committees have argued that New York law does not apply since the Trust Agreement contains a choice of law clause selecting New Jersey as controlling law. In addition, they argue that the principal offices of the Debtors and a substantial portion of their assets are located in New Jersey and that the main target of the Litigation Trust, the Taj Mahal is located in New Jersey. Trump argues that New York rather than New Jersey is the state with the most significant relationship to the Trust. Trump asserts that the Trust instrument and the Plan were negotiated and executed in New York and that New York is the location where the underlying transactions that are the subject of the dispute occurred, and where the Trump Defendants and many of the assets which may be the subject of the claims are located.

In applying the New York champerty statute, the Koro court observed that "... the critical inquiry is whether the assignment was made for the exclusive purpose of bringing an action on the claim." Koro, 568 F.Supp. at 288. The New York cham-

perty statute is designed to prevent the trafficking and speculation in law suits. Id.

■ Under New York law, the assignee of a claim must be a real party in interest in order to prosecute a law suit. Refac Int'l, Ltd., v. LOTUS Dev. Corp., 131 F.R.D. 56 (S.D.N.Y.1990). In Refac, the court held that under the New York Judiciary Law § 489, an agreement was champertous where the assignee was granted a 5% interest in a computer software patent exclusively for the purpose of litigating a claim on behalf of the assignor, the 95% owner of the computer computer software patent, since the assignee was not a real party in interest. Id. at 2.

■ The Debtors and the committees argue that even were New York law to apply, section 489 of the New York Judiciary Law contains a provision which excludes the Litigation Trust set forth in Debtors' Plan of Reorganization. The New York Judiciary Law section 489 provides in part:

... [P]rovided however, that bills receivable, notes receivable, bills of exchange, judgment or other things in action may be solicited, bought or assignment thereof taken, from any executor, administrator, assignee for the benefit of creditors trustee or receiver in bankruptcy, or any other person or persons in charge of the administration, settlement or compromise of any estate, through court actions, proceedings or otherwise.

Trump has argued that the claims that Debtors propose to transfer to the Trust are inchoate claims and do not fall within the exception set forth in Section 489; specifically, Trump has argued that the claims are not "other things in action." (See Trump Brief at p. 11).

In the case of People v. Berlin, 65 Misc.2d 245, 317 N.Y.S.2d 191 (Nassau Cty.Ct.Special Term 1971), a New York State County Court examined whether judgments which were purchased fit within the meaning of "other thing in action" for purpose of Section 489. The Berlin court stated in this regard that the intent and the purpose for obtaining the judgments had to be ascertained before it could be deter-

mined whether the purchase of a judgment was the purchase of a "thing in action" forbidden by Section 489. *Berlin,* 317 N.Y.S.2d at 196. In so ruling, the *Berlin* court noted that the exception contained in the permissive language of Section 489 was in furtherance of the state's public policy of facilitating the expeditious liquidation and final settlement of the various listed estates, and allowing in those cases for the solicitation, purchase and assignment of certain listed assets. *Id.* at 194.

In considering the issue of whether a "claim" is a "thing in action" under the language in the exception portion of Section 489, the Court notes that Black's Law Dictionary provides the following definition for "thing in action": "a right to recover money or other personal property by a judicial proceeding." *Black's Law Dictionary,* 1326 (5th ed. 1979). *See also Sprung v. Jaffee,* 3 N.Y.2d 539, 169 N.Y.S.2d 456, 147 N.E.2d 6 (1957) (action on a claim for money considered a "chose" in action).

Debtors and the Bondholders' Committee have argued that the New York champerty law is inapplicable to the Litigation Trust since federal bankruptcy law is controlling under the supremacy clause of the United States Constitution, Article VI, Clause 2, where a conflict between state law and federal law is found. *See e.g. Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). However, this Court finds that there is ample support for the determination that a "thing in action" which is contained in the statutory exception of Section 489 is broad enough to include the actions which will be transferred to the Litigation Trust, and that New York's champerty statute would not render the Litigation Trust impermissible. Thus, this Court declines to venture into constitutional analysis where the matter before the Court does not require it.

■ This Court now turns to the issue of the validity of the Litigation Trust pursuant to 11 U.S.C. § 1123(b)(3)(B). The parties have presented opposing arguments as to the validity of the Litigation Trust

under § 1123(b)(3)(B). Section 1123(b)(3)(B) provides in relevant part:

(b) Subject to subsection (a) of this section, a plan may—

(3) provide for—

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest.

■ In order for the Litigation Trust to be valid pursuant to 1123(b)(3)(B) two elements must be met: (1) the appointment of a representative of the estate under § 1123(b)(3)(B) must be approved by the Court and; (2) the trustee or entity must be a proper representative of the estate. *In re Sweetwater,* 884 F.2d 1323, 1326–1327 (10th Cir.1989). Trump argues that under the provisions of the Litigation Trust Agreement the Debtors have relinquished any interest in any potential recovery on the claims in favor of the holders of the Litigation Trust Certificates; and consequently, this relinquishment of interest and assignment of claims violates section 1123(b)(3)(B).

Trump asserts that the Debtors have relinquished claims in favor of the holders of Litigation Trust Certificates who have no necessary relationship to the Debtors thus violating the requirements of Section 1123(b)(3)(B). Conversely, the Debtors and the Committees argue that the Litigation Trust as proposed under the Plan meets all of the requirements of Section 1123(b)(3)(B).

In Chapter 11 cases, the appointment of a representative of the estate under § 1123(b)(3)(B) *to pursue claims under* §§ 544, 547 and 548 for the benefit of creditors is a frequently utilized device to administer a plan of reorganization. *See In re Sweetwater,* 884 F.2d 1323, 1326 (10th Cir.1989); *In re Kroh Bros. Development Co.,* 100 B.R. 487, 495 (Bankr.W.D.Mo. 1989); *In re Amarex Inc.,* 96 B.R. 330, 334 (Bankr.W.D.Okla.1989); *In re Southern Commodity Corp.,* 78 B.R. 626, 627

(Bankr.S.D.Fla.1987); *In re Southern Industrial Banking Corp.*, 59 B.R. 638, 642 (Bankr.E.D.Tenn.1986); *In re Xonics, Inc.*, 63 B.R. 785, 788 (Bankr.N.D.Ill.1986).

■ The appointment of a representative of the estate under § 1123(b)(3)(B) must be approved by the court, and may not be done by a unilateral declaration of the debtor in possession. *In re Sweetwater*, 884 F.2d 1323, 1326 (10th Cir.1989). An agreement by the debtor and creditors which is included in a plan of reorganization "... which was voted on and approved by the creditors and confirmed by the bankruptcy court" is sufficient procedurally to comply with the requirement of section 1123(b)(3)(B). *In re Sweetwater*, 884 F.2d at 1326; *citing Nordberg v. Sanchez (In re Chase & Sanborn)*, 813 F.2d 1177, 1180 n. 1 (11th Cir.1987) (other citations omitted).

The second element under Section 1123(b)(3)(B) which must be demonstrated is that the trustee or appointed party qualifies as a representative of the estate. Courts have adopted a case by case approach to determine whether an appointed party's responsibilities and authority under a reorganization plan qualifies them as a "representative of the estate." *In re Sweetwater*, 884 F.2d at 1326–27. (citations omitted).

The *Sweetwater* court observed the ruling in *Temex*, "the primary concern is whether a successful recovery by the appointed representative would benefit the debtor's estate and particularly, the debtor's unsecured creditors." *Id.* at 1327, *citing Temex Energy v. Hastie and Kirschner (In re Amarex)*, 96 B.R. 330, 334 (Bankr.W.D.Okla.1989).

In the case of *In re Kroh Bros. Development Co.*, 100 B.R. 487, 488 (Bankr. N.D.Mo.1989), the defendant, a bank, filed a motion to dismiss for lack of standing to bring certain adversary proceedings filed by the partner of a reorganized debtor seeking recovery on the grounds of preference and avoidance. The *Kroh* court held that both avoidance actions and the avoiding actions necessary to enforce those actions were within the purview of claims and interests that may be retained under § 1123(b)(3)(B). *Id.* at 495.

In this regard, the *Kroh* court observed that:

> To construe § 1123(b)(3)(B) as prohibiting the retention of avoidance actions would force the trustee or debtor in possession to bring all avoidance actions pre-confirmation. Such an interpretation does not make good business sense and is not necessary, *see e.g. TSM Associates [In re Kroh Bros. Development Co.]*, 100 B.R. [480] at 486 n. 7, because it would lengthen the time required for confirmation of a plan of reorganization, possibly to the extent that no plan could be confirmed. The section therefore must be read to include the retention of avoidance actions as claims or interests of the debtor or the estate.

*In re Kroh Bros.*, 100 B.R. at 495.

It is also clear that provisions in a plan are sufficient to appoint a party as a representative of the estate for purposes of § 1123(b)(3)(B). *See Kroh*, 100 B.R. at 497; *See also In re Amarex, supra* 96 B.R. at 334.

In the case at bar, the provisions of the Plan before the Court provide for the appointment of the Litigation Trustee. (Plan § 7.10). Additionally, the Debtors have sought this Court's approval of the Litigation Trustee in the Debtors' proposed order of confirmation. The beneficiaries of any recovery by the Litigation Trustee will be the Debtors' unsecured creditors. Pursuant to Section 7.10 of the Plan, the Units will be distributed *pro rata* to Classes 3B and 3C, the Debtors' unsecured creditors. These units are freely tradable only to the extent not violative of applicable law. Plan, § 7.10.

Accordingly, for all of the reasons stated above, this Court finds that the requirements of Section 1129(a)(3) are met.

■ Section 1129(a)(4) requires that "Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services, or for costs and expenses in or in connection with the case, or in connection with the plan and incident

to the case, has been approved by or is subject to the approval of the court as reasonable."

No payment for services or costs and expenses in connection with these cases, other than payments already approved by this court, have been made. Pursuant to this Court's Administrative Order Establishing Interim Fee and Expense Reimbursement Procedure, dated May 15, 1990, monthly invoices and applications for allowance of interim compensation and reimbursement of expenses have been filed on a periodic basis by various professionals retained by authorization of this Court since the inception of these Chapter 11 cases. Any compensation paid by the Debtors pursuant to such monthly invoices or interim applications, together with all fees and expenses incurred by professionals in these Chapter 11 cases will be subject to the final approval of this Court in accordance with Section 330 of the Bankruptcy Code.

These procedures for the Court's review and ultimate determination of the fees and expenses paid by the Debtors satisfies Section 1129(a)(4). *See In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr.S.D.Ohio 1988). ("Court approval of payments for services and expenses is governed by various Code provisions—*e.g.* §§ 328, 329, 330, 331 and 503(b)—and would not be explicitly provided for in a Chapter 11 plan;") *In re Texaco, Inc.*, 84 B.R. 893, 907–08 (Bankr. S.D.N.Y.) *appeal dismissed*, 92 B.R. 38 (S.D.N.Y.1988). Accordingly, the requirements of § 1129(a)(4) are met.

Section 1129(a)(5) requires that "(i) The proponent of the plan has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliation of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and, (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."

Section 101(30)(B) defines insider, in the case of a corporation, to include directors, officers, persons in control of the debtor, partnerships in which the debtor is a general partner, general partners of the debtor, or relatives of any of the foregoing.

The Declaration of Christopher Whitney, D–7, sets forth in detail the identity, affiliations of persons who are proposed to serve after Confirmation of the Plan, as directors and officers of RII, GRI, Resorts International Hotel, Inc. and the subsidiary of RII into which Griffco Resorts Holding Inc. will be merged ("New Griffco"). (D–7).

Accordingly, the requirements of § 1129(a)(5) are met.

Section 1129(a)(6) requires that "Any governmental regulatory commission with jurisdiction after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in such plan, or such rate change is expressly conditioned on such approval."

The Plan does not provide for any rate changes and accordingly Section 1129(a)(6) does not apply.

The Court here notes that the Plan contains as a "Conditions to Effectiveness", among other things, that (1) "The CCC (New Jersey Casino Control Commission) shall have issued all necessary approval of this Plan and of the Exhibits hereto" and that (2) "The Bahamian Government shall have issued all necessary approvals of this Plan and of the Exhibits hereto." (Article XII, Section 12.2(iii) and (iv)).

Section 1129(a)(7) requires that "With respect to of each impaired class of claims or interests [sic]—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder

would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims."

Subsection (7) focuses upon each holder of a claim, as distinguished from the class in which the claim is placed. Pursuant to clause (A)(i), the standard is satisfied with respect to each holder of a claim or interest which has accepted the plan pursuant to § 1126(f). *See In re Toy & Sports Warehouse Inc.*, 37 B.R. 141, 150 (Bankr. S.D.N.Y.1984). As to the dissenting creditors or claim holders, the so-called best interests test, incorporated in § 1129(a)(7) must be met to achieve confirmation. *In re Toy & Sport Warehouse, Inc., supra*, 37 B.R. at 150. Accordingly, Section 1129(a)(7) requires that the Plan proponents demonstrate that with respect to each impaired class of claims or interests, the holder of each claim or interest in such claim has either accepted the Plan or will receive and retain under the Plan property of a value as of the effective date of the Plan that is not less than the amount the holder would receive or retain if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.

According to the testimony of Mr. Masson, under the Plan, on an "intrinsic value basis" with the intrinsic value of the assets of the Debtors' estate placed at $536 million, the bondholder classes, under the Plan would receive the following amounts per dollar of allowed claims: GRI—86.4%; RIFI—40.7%; RII—32.6%. (D–12). Masson further testified that on a "fair market value trading basis" the bondholders recoveries were as follows: GRI—63.6%; RIFI—32.6%; RII—26.1%. (D–12). Against this scenario, Masson formulated the liquidation value of the Debtors' enterprise. Masson testified that the adjusted liquidated value in present value terms was 300 million dollars or less. (D–12). Masson testified that in developing his liquidation analysis, it did not include a value for claims, such as potential fraudulent conveyance claims or other claims Resorts might have against Merv Griffin or Donald Trump. Masson examined the recoveries to creditors under five different liquidation scenarios as set forth above.

The potential recoveries for the GRI creditors ranged from zero to 64%; the recoveries for the RIFI creditors and the RII creditors both ranged from 15% to 51%. While these scenarios vary greatly depending upon the relative positions of the bondholders, the court is satisfied that creditors will receive under several of the scenarios at least what they could expect to receive in liquidation under Chapter 7.[18] Moreover, the Liquidation Analysis contained in

18. Masson's analysis produces the following percentages of recovery:

| | Intrinsic Value $536 million (Under Plan) | Fair Market Value Trading $409 million (Under Plan) | Liquidation $300 million (same assumptions as under Plan |
| --- | --- | --- | --- |
| GRI | 86.4% | 63.6% | 48.4% |
| RIFI | 40.7% | 32.6% | 24.8% |
| RII | 32.6% | 26.1% | 19.8% |

| | Liquidation GRI Sustaining Lien Position | Liquidation GRI Partially Secured Up to 125 Million | Liquidation GRI/RII/RIF Pari Passu |
| --- | --- | --- | --- |
| GRI | 64% | 51% | 33% |
| RIFI | 15% | 22.5% | 33% |
| RII | 15% | 22.5% | 33% |

the Disclosure Statement also provided in relevant part:

The Debtors have determined that confirmation of the Plan will provide each Creditor with a greater recovery than it would receive if the Debtors were liquidated under Chapter 7. This determination is based upon the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors, including: (1) the likelihood of revocation of the Debtors' casino licenses in Atlantic City and The Bahamas upon the occurrence of any such liquidation; (ii) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to one or more trustees in bankruptcy and professional advisors to such trustees; (iii) the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail and, in particular, the effect of HCB's [The Hotel Corporation of the Bahamas, a corporation wholly owned by the Bahamian government pursuant to which the Paradise Island Casino is leased] right of first refusal upon any such forced sale; (iv) the adverse effects on the salability of business segments as a result of the departure of key employees and the loss of major customers; and (v) the substantial increases in claims that would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 case. According to the liquidation analysis attached hereto as Exhibit D, the Debtors estimate that the liquidation value of their assets is $310,-000,000 before deduction of expenses of the liquidation, which could be substantial.

Disclosure Statement, at VII, (F). (D–9).

Accordingly, this Court is satisfied that the proponents have demonstrated that the holders of Class 2A, 2B, 3B and 3C Claims will receive under the Plan on account of their claims, as of the effective date of the Plan, not less than the amount that such holder would receive or retain under Chapter 7, and so complies with the requirements of Section 1129(a)(7).

Section 1129(a)(8) requires that "with respect to each class of claims or interests—

(A) such class has accepted the plan, or

(B) such class is not impaired under the plan."

As set forth above, the Plan designates ten classes of claims and interest. Classes 1, 2C, 2D, 2E, 2F, 2G, 3A, 8, 9 and 10 are not impaired under the Plan. Classes 2A and 2B (GRI Noteholders); Class 3B (RIFI Debentureholders) and Class 3C (RII Debentureholders and other Unsecured Classes) have voted to accept the Plan. The Plan provides that the holders of Claims and Interests in Classes 4A, 4B, 4C, 5, 6 and 7 will not retain or receive any property or account thereof, accordingly such classes are impaired and deemed to have rejected the Plan. 11 U.S.C. § 1126(g). Accordingly, the requirements of § 1129(a)(8) are not met. The Debtors, however, seek to confirm the Plan under § 1129(b), the so-called "cram down" provisions of the Bankruptcy Code. The requirements of § 1129(b) will be discussed below.

Title 11 U.S.C. § 1129(a)(9) requires that:

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the

| | Liquidation Subordination of GRI |
| --- | --- |
| GRI | 0% |
| RIFI | 51% |
| RII | 51% |

plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(7) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

Under Article III, Sections 3.1 and 3.3 holders of allowed claims entitled to priority under Section 507(a)(1) (administrative claims) or Section 507(a)(2) (involuntary gap claims under § 502(f)) will be paid in full in cash on the latter of the Initial Distribution Date, ten days after the date on which claims are allowed, in accordance with the ordinary business terms of payment of such claims, or such other dates agreed to by the holders of such claims.

Under Article III, Section 3.2 of the Plan holders of Allowed Tax Claims entitled to priority under Section 507(a)(7) will receive deferred cash payments over a period of six years after the date of assessment of such claim in accordance with the provisions of section 1129(a)(9)(C).

Accordingly, the requirements of Section 1129(a)(9) are met.

Section 1129(a)(10) requires that "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

As set forth above, Classes 2A, 2B, 3B and 3C are impaired and have all accepted the Plan by the requisite majorities, excluding the acceptances of insiders. Accordingly, the requirements of § 1129(a)(10) are met.

Section 1129(a)(11) requires that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

Title 11 U.S.C. § 1129(a)(11) requires a feasibility test. It must appear that confirmation of the plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor. In the case of *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653 (Bankr.D.N.J. 1980) the court observed that the following facts should be considered: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management, and; (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. 7 B.R. at 659. *See also In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984).

Availability of prospective credit, both capital and trade, adequacy of funds for equipment replacement and provisions for adequate working capital are other factors examined. *See e.g. In re Jartran, Inc.*, 44 B.R. 331, 393 (Bankr.N.D.Ill.1984).

Insofar as it is possible to forecast feasibility, the elimination of debt together with the infusion of funds in light of the market that exists must be considered. *See In re Landau Boat Co.*, 13 B.R. 788, 791 (Bankr.W.D.Mo.1981).

Under the Plan, Resorts' current indebtedness of approximately $931,000,000 will be replaced by two new issues of New Resorts debt and approximately 75% of the common stock of New Resorts. The first

new debt issue will consist of two series of secured notes (the "Series Notes") in an aggregate principal amount of approximately $329,294,000.00. The semi-annual interest on the Series Notes, which mature on April 15, 1994, may be paid in cash or additional Series Notes. The second new debt will consist of non-recourse notes in an aggregate principal amount of approximately $105,333,000. Thus, the face amount of the Debtors' consolidated indebtedness will be reduced from over $931,000,-000.00 to approximately $434,626,000.00 of which approximately $105,333,000.00 will be non-recourse, the remainder will require no cash distribution for over three and one-half years. In addition, New Resorts will receive a capital infusion of approximately $26 million from Griffin. The five year business plan contained in the Debtors' Disclosure Statement includes four sets of financial projections which indicate that New Resorts will be able to satisfy its debt obligations and fund its costs of operations after the Plan's Effective Date, under various sets of assumptions.

Regarding the issue of feasibility, Mr. Whitney testified that under the various scenarios set forth in the Debtors' business plan, the debtor company will have adequate cash to operate for the four-year period from 1990 to 1994.

While Whitney testified that it was problematic that the market growth assumption for the Atlantic City casino industry for 1990 (8.8%) would be met based on the actual figures to date, and that the business plan assumption of Resorts' market share for that period (7.4%) was not met in the first quarter of 1990 (although by the end of June the market share was about 7%, and according to Alvarez's testimony, Resorts' market share for the first three weeks of July 1990 was 7.5%), Whitney also testified that the Debtors' EBDIT (earnings before depreciation, interest and taxes) was in fact ahead of the plan and the projections for the end of June 1990.

Alvarez testified that the "base cases" represented what Alvarez believed were the most likely numbers to occur in the next five years, and that the Debtors' "lat-est thinking forecast" developed as of July 9, 1990, based in part on the first five months of 1990, while showing lower revenues, the "bottom line" was better due to expense reductions. Resorts Atlantic City had generated 3.8 million EBDIT contrasted with a loss of $400,000 proposed in the business plan. Overall, Alvarez testified that the numbers in the business plan were reasonable ones. Mr. Alvarez testified that in his view present management of Resorts can deliver the numbers in the business plan.

Masson also testified that the company's debt remaining in 1994, under the several scenarios developed, could reasonably be refinanced.

The Court is also satisfied based upon the correspondence submitted from Morgan Guaranty Trust Company of New York, that Merv Griffin has the financial wherewithal to make the initial payment of 15 million dollars due under the Plan and the second payment of $11 million. (D–10 and D–11).

In consideration of the foregoing, this Court finds that the requirements of § 1129(a)(11) have been met.

Section 1129(a)(12) requires that "all fees payable under section 1930, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan."

Article I, Section 1.3 of the Plan includes fees or charges assessed under 28 U.S.C. § 1930 in the defined term "Administrative Claims." Article III, Section 3.1 of the Plan provides that Administrative Claims will be paid in cash and in full on the Initial Distribution Date if such claims are allowed as of that date.

The Plan accordingly complies with Section 1129(a)(12).

Section 1129(a)(13) requires that a plan provide for the continued payment of certain retiree benefits for the duration of the period that the debtor has obligated itself to provide such benefits.

Article XIV, Section 14.18 of the Plan provides for the continuation of any such

retiree benefits as that term is defined in Section 1114, maintained or established by any of the Debtors prior to the Confirmation Date in compliance with Section 1129(a)(13).

Thus, with the exception of Section 1129(a)(8), the Plan satisfies all of the requirements contained in Section 1129(a).

The Court will now determine whether the Plan satisfies the Confirmation Requirements set forth in Section 1129(b) of the Bankruptcy Code.

In the instant case, the proponents seek confirmation over the deemed rejection of the impaired classes. Under the Plan, the impaired classes are 4A, 4B, 4C, 5, 6 and 7 which are deemed to have rejected the Plan since the holders of these claims will not receive or retain any property on account of their status as a member of these classes. Section 1129(b), the so-called "cram down" provision sets forth the standards for confirmation of a plan of reorganization where the plan creates impaired classes.

Section 1129(b)(1) provides in relevant part:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

■ The operative language in this section is that the proposed plan: (1) not discriminate unfairly and; (2) treats fair and equitable each rejecting class whose status as creditors is impaired under the plan. 11 U.S.C. § 1129(b). In the instant case, the proponents allege that the Plan does not unfairly discriminate and that it treats fairly and equitably all rejecting class members.

While Congress has provided little guidance in defining the standard of "unfair discrimination", the courts have determined that a plan does not unfairly discriminate where "... a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986), *aff'd* 78 B.R. 407 (S.D.N.Y.1987). In accordance with this rule, "... a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *Id.*

Under the Plan, Classes 4A, 4B, and 4C, consist of disputed and unliquidated Debentureholders' Litigation Claims for damages arising from the purchase or sale of securities of the Debtors, and all other claims required to be subordinated under Section 510(b). These claims are dissimilar to any of the other Classes of claims under the Plan (e.g. priority claims (Class 1), claims based directly on the debt securities (Classes 2A, 2B, 3B, 3C), administrative convenience claims (Class 3A), miscellaneous secured claims (Classes 2C–2G), Intercompany Claims (Class 5), and shareholders' merger claims (Class 6)). Because the Plan provides the same treatment for all subordinated claims in Classes 4A, 4B, and 4C—the retention or receipt of no property on account of such claims—the Plan does not unfairly discriminate with respect to such Classes.

In regard to the treatment of the claims and interests in Class 5 (Intercompany Claims), Class 6 (shareholders' merger claims), and Class 7 (equity interests in Resorts), these claims are unlike any other claims or interests in the Plan. The Plan places each of the Intercompany Claims, shareholders' merger claims, and Resorts equity interests in single, separate Classes and provides equal treatment with respect to all claims and interests in each such Classes. Accordingly, the Plan does not discriminate unfairly with respect to these Classes.

■ The second standard under 11 U.S.C. § 1129(b) is that of "fair and equitable". The standard of "fair and equitable"

has been defined in section 1129(b)(2)(B) and (C) which provide:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

\* \* \* \* \* \*

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

(C) With respect to a class of interests—

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2).

Courts have ruled that section 1129(b)(2)(C) is not exclusive and that other factors should be considered in determining whether a plan is "fair and equitable" with respect to dissenting classes. *Johns–Manville*, 68 B.R. at 636 (citing *In re Jones*, 32 B.R. 951, 960 n. 14 (Bankr.D.Utah 1983) ("Fair and equitable" is a term of art which carries with it decades of judicial interpretation. Congress clearly intended to transfer some of the judicial gloss placed on the fair and equitable test under former law into the fair and equitable test under § 1129(b). 124 Cong.Rec.H. 11, 103 (Sep-

tember 28, 1978, S. 17, 420 October 6, 1978).")).

The Plan provides that the Classes of claims that will receive or retain property under the Plan are: Class 1 (priority claims); Classes 2A and 2B (claims under the GRI Notes); Classes 2C–2G (other secured claims); Class 3A (administrative convenience claims); Class 3B (claims under the RIFI Debentures) and Class 3C (claims under the RII Debentures and other general unsecured claims) are all senior to the Rejecting Classes which consist of claims subordinated under Section 510(b) (Classes 4A, 4B, 4C and 6), disallowed intercompany claims (Class 5), and equity interests (Class 7). Because the Plan provides that the holders of claims and interests junior to each of the Rejecting Classes will not receive or retain any property under the Plan, the Plan satisfies Section 1129(b)(2)(B)(ii) and (C)(ii) with respect to such Classes. Mr. Masson testified that under the Plan no Class was receiving more than 100 cents on a dollar. Accordingly, the Plan also satisfies the general requirements of § 1129(b)(1) because no holder of claims senior to the Rejecting class will be compensated more than in full.

As noted by counsel for the GRI Noteholders at the Confirmation Hearing, the testimony of Mr. Masson sets forth a reorganization value of the company ranging from $352 million, plus the Litigation Trust, to $536 million plus the Litigation Trust. Given the presence of over $900 million in debt, there is no evidence in the record to show that the reorganization value in this case would exceed the principal and interest to reach subordinated creditors or shareholders. (TR4 at 197–98).

Under the Plan, Griffin will receive approximately 21.5% of the capital stock of New Resorts in exchange for his payment of approximately $26 million in cash and a note. It is the position of both the Debtors and the supporters of the Plan that this aspect of the Plan does not make the Plan unfair nor equitable with respect to the impaired dissenting classes. Objections have been raised to Mr. Griffin's receipt of stock on the basis that such exchange vio-

483

lates the absolute priority rule embodied in § 1123(b)(2)(B)(ii). In addition, the Objectors have argued that under this provision of the Plan, Griffin will exchange an inadequate contribution for his interest in the New Resorts.

As one court has observed:

Inherent in the "fair" and "equitable" standards is the doctrine of absolute priority. This doctrine provides that creditors and shareholders may participate in the debtor's assets only in accordance with their respective priorities, and that senior classes must receive full compensation for their claims before other classes can participate. *Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). Implicit in this rule is that stockholders cannot participate in a reorganization plan unless it is established that the debtor is solvent.

*In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 152 (Bankr.S.D.N.Y.1984) (*quoting In re Duplan Corp.*, 9 B.R. 921, 924–925 (Bankr.S.D.N.Y.1980)).

■■■ There is an exception to the absolute priority rule, and "there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor." *Case v. Los Angeles Lumber Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10 (9th Cir.1939), *reh'g denied*, 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939) (*"Los Angeles Lumber"*). This exception is known as the "new capital exception" where typically there is an infusion of new capital in "money or money's worth" into the reorganized debtor by a former stockholder of the debtor. *Id.; Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203, 108 S.Ct. 963, 967, 99 L.Ed.2d 169 (1988). Under this exception, former shareholders may retain or receive new equity in the reorganized debtor if they have contributed new capital in "money or money's worth equal to the value retained or received." *Ahlers*, 485 U.S. at 203, 108 S.Ct. at 967; *Los Angeles Lumber*, 308 U.S. at 122–123, 60 S.Ct. at 11. The contributions of future

labor, management or expertise do not constitute a contribution of new capital in "money or money's worth." *Ahlers*, 485 U.S. at 201, 203–05, 108 S.Ct. at 966, 967–8.

Since *Los Angeles Lumber*, numerous courts have followed the rule that the concept of "new capital" does not include promises of future contributions of labor or pledges of monetary compensation; in the same vein, many courts have concluded that the notion of "sweat equity" does not qualify as a new capital contribution. *See In re Pullman Construction Industries, Inc.*, 107 B.R. 909 (Bankr.N.D.Ill.1989) (*citing In re Stegall*, 865 F.2d 140, 142 (7th Cir.1989)); *In re Witt*, 60 B.R. 556 (Bankr. N.D.Iowa 1986); *See also Ahlers*, 485 U.S. at 203, 108 S.Ct. at 967.

■■■ A bankruptcy court must review all available factors in determining whether a former equity holder's contribution is equal to the proposed participation. *In re Pullman*, 107 B.R. at 949. A retained interest of a shareholder has a value measured in terms other than net worth. *Id.*

■■■ In determining whether or not a new capital contribution constitutes a "substantial contribution" to the reorganized debtor, one court has observed that a court must not only examine the amount of the contribution, but that "... it must look at the amount in light of prepetition claims." *In re Pullman*, 107 B.R. at 950 (*citing In re Kendavis Industries International, Inc.*, 91 B.R. 742, 18 B.C.D. 105 (Bankr. N.D.Tex.1988); *In re Olson*, 80 B.R. 935 (Bankr.C.D.Ill.1987); *In re Synder*, 99 B.R. 885 (Bankr.C.D.Ill.1989)). In order to determine if a proposed contribution is "substantial" and equal to the value to be obtained, "... a court must compare the contribution to the total prepetition claims and the amount of the debt to be discharged under the Plan." *In re Pullman*, 107 B.R. at 950. Courts have also taken into consideration whether creditors will share in the potential growth of the newly capitalized debtor, or whether the shareholder's new equity position will have the potentiality of only benefiting the shareholders under the plan. *Id.* Consequently, there are many factors that a court must consider in its

determination of whether a new capital contribution is in fact a "substantial contribution" which is fair and equitable to creditors. *In re Pullman,* 107 B.R. at 950.

The *Pullman* court stated the new capital exception as follows:

> An equity-interest owner may retain an interest in the debtor corporation so long as the owner invests new capital into the corporation.... The new capital investment must (1) represent a substantial contribution and (2) equal or exceed the value of the retained interest in the corporation.

107 B.R. at 948–949.[19]

In this case, Mr. Whitney testified that the capital infusion contemplated by the Plan to be made by Merv Griffin was necessary to the company going forward to meet the projections in the business plan. Whitney also testified that since the filing of the Chapter 11 cases, no one other than Merv Griffin has offered to purchase equity in Resorts or New Resorts. Whitney also testified that Merv Griffin is an integral part of Resorts' marketing strategy and the use of his name and person would serve to distinguish Resorts in the Atlantic City market, and that Griffin's contribution to New Resorts of the shares of The Griffin Company will preserve an NOL going forward.

Alvarez testified that the infusion of 26 million dollars by Merv Griffin was a critical part of the Debtors' achieving the business plan and allowing the Debtors to continue its capital spending program. Alvarez also testified that Merv Griffin's involvement in the Debtors' marketing strategy was an important part of that strategy and the business plan itself.

Although Masson did not undertake an independent valuation of the control of New Resorts that Merv Griffin was receiving under the Plan, Masson testified that the value of the equity (4.4 million dollars of New Resorts) including any premium for control, was less than 26 million dollars.

Accordingly, the Court is satisfied that Griffin's contribution in "money or in money's worth" is essential to New Resorts' operations, cannot be obtained from other sources and exceeds the value of the equity interest in New Resorts that Griffin will receive under the Plan.

Accordingly, the requirements of Section 1129(b) have been met.

As the Plan proponents have demonstrated that the requisite elements of § 1129(a) and (b) have been met, the Court will enter an order confirming the Plan over the deemed dissent of the rejecting parties and over the objections set forth herein.

An order in conformance with this Opinion shall be submitted.

---

19. Counsel for the GRI Noteholders' Committee argued at the Confirmation Hearing that the new capital exception should not strictly apply here because the shares of the Debtor are not owned by Merv Griffin but by The Griffin Company. (TR4 at 195–196).